h:/ljg/231001107/resp.mot.remand
09/09/03/LJG/CJS/lou

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 1 2003

Michael N. Milby
Clerk of Court

FRANK CARRALES and SANDRA       §
CARRALES                        §
                                §
VS.                             §        CASE NUMBER B-03-144
                                §        JURY
ALLSTATE TEXAS LLOYD'S INSURANCE,§
TONY SILVA and GARY SELIGMAN    §

**DEFENDANTS', ALLSTATE TEXAS LLOYD'S INSURANCE, TONY SILVA,
and GARY SELIGMAN, RESPONSE TO PLAINTIFFS' MOTION TO
REMAND REQUEST OF REIMBURSEMENT OF ATTORNEY FEES,
COSTS, EXPENSES, SANCTIONS, AND SUPPORTING BRIEF**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

DEFENDANTS, ALLSTATE TEXAS LLOYD'S INSURANCE("Allstate"), TONY

SILVA ("Silva"), and GARY SELIGMAN ("Seligman"), file their Response to Plaintiffs' Motion

to Remand, Request of Reimbursement of Attorney Fees, Costs, Expenses, Sanctions, and

Supporting Brief, and in support thereof, will respectfully show this Court as follows:

## BACKGROUND

1.      Frank Carrales and Sandra Carrales ("Plaintiffs") filed suit against Allstate, Seligman (a

claims adjuster), and Silva (their insurance agent) on January 28, 2003, in the 197th Judicial District

Court of Cameron County, Texas ("the underlying suit"). Plaintiffs are Texas residents. Defendant

Allstate is an Illinois resident and Defendant Seligman is a Florida resident. However, Plaintiffs'

Original Petition also named Silva, a Texas resident.

2.      However, on July 31, 2003, Defendants deposed the Plaintiffs and became aware that Silva

had been fraudulently joined, for the sole purpose of defeating diversity of citizenship. After

becoming aware that the case was removable to Federal Court, Defendants properly removed the underlying suit to this Court on August 13, 2003 (within thirty (30) days of making the discovery).

3.     On August 20, 2003, Plaintiffs filed their Motion to Remand on the grounds that this Court lacks subject matter jurisdiction.  Specifically, Plaintiffs argue that Allstate, Seligman, and Silva are all Texas residents and that as a result this Court lacks subject matter jurisdiction because complete diversity of citizenship does not exist.  Furthermore, Plaintiffs claim that since all of the current parties were named at the inception of the lawsuit, Defendants are barred from removing this case to Federal Court because Defendants did not file their Notice of Removal within thirty (30) days after the underlying suit was filed.

4.     It is undisputed that Defendants did not file their Notice of Removal within the thirty-day period following the filing of Plaintiffs' Original Petition in the underlying suit.  However, as stated above, within thirty (30) days of discovering that Plaintiffs had fraudulently joined Silva, Defendants properly removed the underlying suit to this Court pursuant to the provisions of 28 U.S.C. § 1441(a), as this Court has original jurisdiction based upon the provisions of 28 U.S.C. § 1332(a).

5.     Allstate will show this Court that Plaintiffs' Motion to Remand must be denied because this Court has proper subject matter jurisdiction based on the following reasons:

   A.     Diversity Exists Because a Lloyd's Insurer Whose Members and Underwriters Reside in Illinois Cannot be Deemed a Texas Citizen For Diversity Purposes;

   B.     Diversity Exists Because Defendant Gary Seligman is a Florida Citizen; and

   C.     Plaintiffs Fraudulently Joined Defendant Tony Silva and Upon Discovery of This Fraudulent Joinder, Defendants Timely Filed a Notice of Removal.

## A. DIVERSITY EXISTS BECAUSE A LLOYD'S INSURER WHOSE MEMBERS AND UNDERWRITERS RESIDE IN ILLINOIS CANNOT BE DEEMED A TEXAS CITIZEN FOR DIVERSITY PURPOSES

### 1. THE LAW

6.    Pursuant to the provisions of 28 U.S.C. § 1332(a), federal courts have jurisdiction over civil actions wherein:

> 1.    the amount in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000.00) exclusive of interest and costs; and
>
> 2.    such actions are between parties of different states.

Furthermore, it is well established in this Circuit that federal court diversity jurisdiction for purposes of removal is determined by the citizenship of the parties at the commencement of the suit in state court and by the live pleadings in place at the time of removal. *See Kidd v. Southwest Airlines Co.,* 891 F.2d 540, 545 (5th Cir. 1990); *Mobil Oil Corp. v. Kelley,* 493 F.2d 784, 786 (5th Cir.), *cert. denied,* 419 U.S. 1022 (1974); *Scott v. Communications Services, Inc.,* 762 F.Supp. 147, 151 (S.D. Texas 1991).

### 2. AMOUNT IN CONTROVERSY REQUIREMENT SATISFIED

7.    Here, it is undisputed that the amount in controversy at the time of the filing of Plaintiffs' Original Petition, and at the time of removal, exceeded Seventy Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys fees.[1]  Therefore, the amount in controversy requirement has been satisfied pursuant to 28 U.S.C. § 1332(a).

### 3. DIVERSITY OF CITIZENSHIP REQUIREMENT SATISFIED

8.    With respect to diversity of citizenship, Plaintiffs' Original Petition was the live pleading in place at the time Allstate filed its Notice of Removal on August 13, 2003. *See* Plaintiffs' Original

---

[1] Plaintiffs, in their Motion to Remand, do not dispute that the amount in controversy exceeds the jurisdictional requirements for federal court jurisdiction.

Petition filed on January 28, 2003. It is undisputed that Plaintiffs are Texas citizens, and were Texas citizens at the time Plaintiffs filed their Original Petition. However, Plaintiffs contend that complete diversity does not exist arguing that Allstate currently is, and was, a Texas citizen for the purpose of diversity jurisdiction at the time they filed their lawsuit. This is both legally and factually untrue.

9.      Allstate is a "Lloyd's" insurer. *See* Affidavit of Ingrid Bohlender, attached as Exhibit "A." (In an effort to meet this Court's deadline to file this Response and to avoid this case being remanded, Defendants will supplement their Response to provide this Affidavit as soon as it is received from Ms. Bohlender). It is well established in the Fifth Circuit that only the citizenship of the members and/or underwriters of a "Lloyd's" insurer is considered when determining whether diversity jurisdiction exists. *See Royal Ins. Co. v. Quinn-L Capital Corp.*, 3 F.3d 877, 883 (5th Cir. 1993), attached as Exhibit "B." Here, the members and/or underwriters of Allstate were citizens of the State of Illinois on January 28, 2003 (the date Plaintiffs filed their Original Petition in the underlying suit). *See* Exhibit "A." Additionally, Allstate's members and/or underwriters remain citizens of the State of Illinois. *Id.* Therefore, since the Plaintiffs are from Texas and Defendant Allstate is from Illinois, complete diversity of citizenship exists between these parties, and this Court has proper subject matter jurisdiction. *See* 28 U.S.C. §1441(a); 28 U.S.C. § 1332(a); *Royal Ins. Co.*, 3 F.3d at 883; *Kidd*, 891 F.2d at 545; *Kelley*, 493 F.2d at 786; *Scott*, 762 F.Supp. at 151. As such, this Court should deny Plaintiffs' Motion to Remand. *See id.*

## B. DIVERSITY EXISTS BECAUSE DEFENDANT GARY SELIGMAN IS A FLORIDA CITIZEN

10.     Seligman currently is and was a Florida citizen at the time Plaintiffs filed the underlying suit. *See* Affidavit of Gary Seligman, attached as Exhibit "C." (In an effort to meet this Court's deadline to file this Response and to avoid this case being remanded, Defendants will supplement

their Response to provide this Affidavit as soon as it is received from Mr. Seligman.)  Pursuant to

the above-cited requirements for federal court diversity jurisdiction, such diversity exists between

the Plaintiffs and Seligman.  *See* 28 U.S.C. §1441(a); 28 U.S.C. § 1332(a); *Kidd*, 891 F.2d at 545;

*Kelley*, 493 F.2d at 786; *Scott*, 762 F.Supp. at 151.  Therefore, this Court has proper subject matter

jurisdiction because complete diversity of citizenship exists.  As such, Plaintiffs' Motion to Remand

should be denied.  *See id.*

### C. PLAINTIFFS FRAUDULENTLY JOINED DEFENDANT TONY SILVA

#### 1. FRAUDULENT JOINDER

11.     In an attempt to defeat diversity, Plaintiffs have joined insurance agent Tony Silva as an

individual Defendant.  Where one of the Defendants is a resident of the Plaintiffs' resident state,

whether the case has been properly removed is determined by reference to the Plaintiffs' State Court

pleadings.  *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir.1999); *Tedder v. FMC Corp.*,

590 F.2d 115, 116-117 (5th Cir. 1979).  If there is no reasonable basis for predicting that state law

might impose liability on the resident defendant under the facts alleged, then the claim is deemed

fraudulent, and the defendant's presence will not prevent removal.  *Tedder*, 590 F.2d at 117.  The

Court can consider affidavits and other evidentiary material in making such a prediction.  *See B.,*

*Inc.*, 663 F.2d at 549.  Additionally, the presence of a non-diverse defendant is to be disregarded for

removal purposes if the joinder was fraudulent.  *See B., Inc. v. Miller Brewing Co.*, 663 F.2d 545,

549 (5th Cir.1981).

12.     Plaintiffs correctly state that in fraudulent joinder cases, defendants carry the burden of

proving that plaintiffs have absolutely no recovery against non-diverse defendants.  *Coker v. Amoco*

*Oil Co.*, 709 F.2d 1433, 1440 (11th Cir. 1983); *see Chicago, R.I. & Pacific v. Whiteaker*, 239 U.S.

421, 424-425 (1915).  Here, to meet this burden, Defendants direct this Court's attention to

Plaintiffs' deposition testimony to determine whether Plaintiffs can recover from non-diverse Defendant Silva. Plaintiffs' deposition testimony makes it abundantly clear that there is absolutely no chance of recovery from non-diverse Defendant Silva. Both Sandra and Frank Carrales stated that they have **no** criticisms against Tony Silva as their insurance agent. *See* Oral Deposition of Sandra Carrales, p. 27, lns. 10-12, attached as Exhibit "D;" and Oral Deposition of Frank Carrales, p. 64, lns. 19-21, attached as Exhibit "E."

13.     Specifically, during Mrs. Carrales' deposition, Defendants asked her: "**Do you have any criticisms against the agent, Mr. Silva?,**" and she responded "**No.**" *See* Exhibit "D," p. 27, lns. 10-12. During Mr. Carrales' deposition, Defendants asked him: "**Do you have any complaints against your insurance agent, Tony Silva?,**" and Mr. Carrales also responded "**No.**" *See* Exhibit "E," p. 64, lns. 19-21. In furtherance of this argument, the Plaintiffs also stated that they had no criticisms of the policy that Silva issued, and that Silva is still their insurance agent and they have no plans to change agents. *See* Exhibit "D," p. 8 lns. 16-18; p. 29, lns. 21-25; p. 30, lns. 1-2; and Exhibit "E," p. 64, lns. 22-23.

14.     These statements clearly meet the burden that Defendants carry to establish that Plaintiffs have no grounds to bring a cause of action against non-diverse Defendant Silva. Here, both Plaintiffs have stated in their very own words that Silva did nothing wrong in his capacity as their insurance agent. *See id*. As such, Defendants have met their burden of demonstrating that Defendants have no grounds to bring suit against Silva and have absolutely no chance of recovery from non-diverse Defendant Silva. *See Coker*, 709 F.2d at 1440; *Whiteaker*, 239 U.S. at 424-425. Therefore, since Plaintiffs have no cause of action against Silva, Defendants have met their burden of demonstrating that Plaintiffs fraudulently joined Silva for the sole purpose of defeating diversity

of citizenship. *See Tedder*, 590 F.2d at 117. Therefore, removal is proper and Plaintiffs' Motion to Remand should be denied. *See id.*

### 2.    DEADLINE TO FILE NOTICE OF REMOVAL

15.    Plaintiffs incorrectly state in their Motion to Remand that Defendants failed to timely file their Notice of Removal as required by the United States Code Section 1446(b). *See* Plaintiffs' Motion to Remand, Request for Reimbursement of Attorney Fees, Cost, Expenses, Sanctions, and Supporting Brief. Specifically, Plaintiffs claim that 28 U.S.C. § 1146(b) required Defendants to file their Notice on or before February 28, 2003 (thirty (30) days from the filing of the underlying suit). In support, Plaintiffs argue that because all of the parties were named in the Original Petition, diversity could be determined at that time and Defendants' Notice of Removal should have been filed during the thirty-day period following the filing of the underlying suit. *See id.*

16.    However, as discussed below, Defendants could neither determine whether this case was removable, nor were they required to file their Notice of Removal within the first thirty (30) days following the filing of the underlying suit. The United States Code provides a provision for cases where it cannot be ascertained whether removal is appropriate at the time of the initial pleadings. Specifically, the Code states that:

> If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order *or other paper* from which it *may first be ascertained* that the case is one *which is* or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

28 U.S.C. § 1146(b) (emphasis added).

17.    Here, it could not be ascertained whether the underlying suit was removable during the thirty-day period following the filing of the underlying suit because:

        1)    complete diversity did not exist at the time the underlying suit was filed, and

7

2)    Defendants could not immediately ascertain whether Plaintiff had a viable cause of action against non-diverse Defendant Silva.

18.    Complete diversity could not be determined at the time the underlying suit was filed because Plaintiffs (Texas residents) named Silva (a Texas resident) as a defendant. While it was suspected that Plaintiffs did not have a viable cause of action against Silva, Defendants did not want to base their Notice of Removal on unfounded and unsubstantiated accusations. Instead, Defendants conducted discovery in order to make the determination that Plaintiffs did not have a cause of action or chance of recovery against Defendant Silva.

19.    The first opportunity to take Plaintiffs' depositions was on July 31, 2003. As previously mentioned, during the depositions it became abundantly clear that Plaintiffs had absolutely no chance of recovery against non-diverse Defendant Silva. *See* Exhibit "D," p. 27, lns. 10-12; p. 8 lns. 16-18; p. 29, lns. 21-25; p. 30, lns. 1-2; and Exhibit "E," p. 64, lns. 19-21; p. 64, lns. 22-23.

20.    Pursuant to the United States Code, Defendants have thirty (30) days from the time they become aware that the case is or has become removable to file their Notice of Removal. *See* 28 U.S.C. § 1146(b). Applied to the facts at hand, Plaintiffs' depositions were taken on July 31, 2003. These depositions were the first time that Defendants could ascertain that the case was removable. Accordingly, Defendants' deadline to file Notice of Removal did not pass until August 31, 2003. *See* 28 U.S.C. § 1146(b). Defendants filed their Notice of Removal well within the thirty-day time limit on August 13, 2003, as set forth by the United States Code. *See* 28 U.S.C. § 1146(b). *See* Defendants' Notice of Removal filed on August 13, 2003. Therefore, Defendants' Notice of Removal was timely filed and proper. As such, Plaintiffs' Motion to Remand should be denied.

### D. PLAINTIFFS' MOTION FOR ATTORNEY FEES, EXPENSES, COSTS, AND SANCTIONS SHOULD ALL BE DENIED

21. Additionally, because Defendants properly removed the underlying suit to this Court, Plaintiffs' Request for Attorney Fees, Expenses, Costs, and Motion for Sanctions should all be denied.

WHEREFORE, PREMISES CONSIDERED, Defendant, ALLSTATE TEXAS LLOYD'S INSURANCE, respectfully prays that this Court deny PLAINTIFFS', FRANK CARRALES and SANDRA CARRALES, Motion to Remand, Request of Reimbursement of Attorney Fees, Costs, Expenses, Sanction, and Supporting Brief based on the above-mentioned reasons, and grant Defendant, ALLSTATE TEXAS LLOYD'S INSURANCE, such other and further relief to which it may be justly entitled.

Respectfully submitted,

ADAMI, GOLDMAN & SHUFFIELD
Nowlin Building
9311 San Pedro, Suite 900
San Antonio, Texas 78216
Telephone: (210) 344-0500
Telecopier: (210) 344-7228

By:_____
LARRY J. GOLDMAN
"Attorney in Charge"
Federal Bar No. 341
State Bar No. 08093450
DOUGLAS E. PENNEBAKER
State Bar No. 00788178
Federal Bar No. 23238

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been forwarded to the following counsel of record in compliance with the Federal Rules of Civil Procedure on this 10th day of September, 2003:

Mr. Benigno (Trey) Martinez
MARTINEZ, BARRERA Y MARTINEZ, L.L.P.
1201 E. Van Buren
Brownsville, Texas 78520

Mr. Gilbert M. Piette
PEREZ & ASSOCIATES
436 Paredes Line Road
Brownsville, Texas 78523-3490

 

 

LARRY J. GOLDMAN
DOUGLAS E. PENNEBAKER

# EXHIBIT "A"
## (to be supplemented)

# EXHIBIT "B"

3 F.3d 877
(Cite as: 3 F.3d 877)

Page 1

⊳

United States Court of Appeals,
Fifth Circuit.

ROYAL INSURANCE COMPANY OF
AMERICA and Royal Lloyds of Texas, Plaintiffs-
Appellees,
v.
QUINN-L CAPITAL CORPORATION, et al.,
Defendants-Appellants.

No. 92-1808.

Sept. 27, 1993.
Rehearing and Suggestion for Rehearing En Banc
Denied Nov. 5, 1993.

Insurer, which had obtained a federal court declaratory judgment of no coverage with respect to securities claims by investors against insureds, sought to enjoin state court actions in which investors sought to enforce against insurers state court judgment and sought damages for insurer's postdeclaratory judgment conduct. The United States District Court for the Northern District of Texas, Barefoot Sanders, Chief Judge, 759 F.Supp. 1216, entered preliminary injunction, and investors appealed. The Court of Appeals, 960 F.2d 1286, affirmed in part, reversed in part and remanded. Rehearing was denied, 966 F.2d 674. Thereafter the District Court granted summary judgment for insurer. Appeal was taken. The Court of Appeals, Jerry E. Smith, Circuit Judge, held that: (1) district court did not have ancillary jurisdiction to address claims; (2) district court did have diversity jurisdiction; and (3) trial court did not err in holding that insurer did not have duty to represent insured in state securities litigation, and that insurer had not lost right to assert noncoverage of policy by waiver, estopped or negligence in its representation of insured in state case.

Affirmed.

West Headnotes

[1] Federal Courts ☞917
170Bk917 Most Cited Cases

Under law of case doctrine, Court of Appeals will follow its prior decision without reexamination in subsequent appeal unless evidence in subsequent trial was substantially different, controlling authority has since made contrary decision of law applicable to such issues, or decision was clearly erroneous and would work manifest injustice.

[2] Courts ☞99(1)
106k99(1) Most Cited Cases

Doctrine of law of case extends to those issues previously decided by necessary implication as well as those decided explicitly.

[3] Federal Courts ☞917
170Bk917 Most Cited Cases

Law of case principles apply to an interlocutory appeal of granting of preliminary injunction, as to decisions of law.

[4] Federal Courts ☞917
170Bk917 Most Cited Cases

As to factual determinations, Court of Appeals decision on interlocutory appeal of preliminary injunction will ordinarily not establish law of case; standard of review for factual determinations on direct appeal is higher than standard applied during interlocutory appeal of preliminary injunction.

[5] Federal Courts ☞917
170Bk917 Most Cited Cases

Holding by Court of Appeals, that district court issuing declaratory judgment of noncoverage in insurance case had "ancillary jurisdiction over the present controversy" did not preclude, under law of case doctrine, consideration of whether district court had ancillary jurisdiction to decide, in second case, whether conduct of insurer in connection with defense of state suit on policy precluded assertion of noncoverage on grounds of waiver, estoppel and negligence; Court of Appeals' initial holding had been limited to determination that district court had ancillary jurisdiction to issue an antisuit injunction under "protect or effectuate its judgments" exception to Anti-Injunction Act, and conduct alleged as basis of waiver, estoppel and negligence claim had taken place after trial court's first declaratory judgment. 28 U.S.C.A. §§ 1367, 2283.

[6] Federal Courts ☞20.1
170Bk20.1 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877

**(Cite as: 3 F.3d 877)**

(Formerly 170Bk20)

Ancillary jurisdiction to issue antisuit injunctions normally will not allow federal court to exercise jurisdiction over new claims not addressed in judgment court is seeking to protect. 28 U.S.C.A. § § 1367, 2283.

**[7] Courts ☜508(2.1)**
106k508(2.1) Most Cited Cases

**[7] Federal Courts ☜20.1**
170Bk20.1 Most Cited Cases
(Formerly 170Bk20)

District court, which had issued declaratory judgment of noncoverage under an insurance policy, did not have ancillary jurisdiction, under Anti-Injunction Act, to enjoin insureds from pursuing state court action seeking determination that insurer's failure to defend insureds in securities lawsuit brought in state court after federal declaratory judgment was entered precluded assertion of noncoverage, on grounds of waiver, estoppel and negligence; exception to Anti-Injunction Act bar to interference with state proceedings extended to injunctions in support of judgments, and acts underlying waiver, estoppel, and negligence claims had occurred after declaratory judgment was entered. 28 U.S.C.A. §§ 1367, 2283.

**[8] Federal Courts ☜302**
170Bk302 Most Cited Cases

For purposes of determining whether federal courts have diversity jurisdiction, unincorporated association is considered to have citizenship of its members.

**[9] Insurance ☜1227(4)**
217k1227(4) Most Cited Cases
(Formerly 217k31.3)

Under "Lloyd's plan," as provided for in Texas law, individual member of insuring group accepts responsibility only for portion of risk, and liability among members is several but not joint. V.A.T.S. Insurance Code, art. 18.02.

**[10] Insurance ☜1224(1)**
217k1224(1) Most Cited Cases
(Formerly 217k31.3)

Attorney-in-fact for Lloyd's group underwriters is in effect chief executive and managing agent of insurance enterprise, under Texas law. V.A.T.S. Insurance Code, art. 18.01-1.

**[11] Insurance ☜1224(1)**
217k1224(1) Most Cited Cases
(Formerly 217k31.3)

**[11] Insurance ☜1227(1)**
217k1227(1) Most Cited Cases
(Formerly 217k31.3)

Attorney-in-fact is not "member" of Lloyd's group insurance association, under Texas law, and is rather an agent. V.A.T.S. Insurance Code, art. 18.01-1.

**[12] Federal Courts ☜290.1**
170Bk290.1 Most Cited Cases
(Formerly 170Bk290)

**[12] Federal Courts ☜302**
170Bk302 Most Cited Cases

For purposes of determining whether diversity exists, in suit against Lloyd's group insurance underwriters, citizenship of members actually underwriting obligations would be taken into consideration, but not citizenship of attorney-in-fact.

**[13] Federal Courts ☜681.1**
170Bk681.1 Most Cited Cases
(Formerly 170Bk681)

District court loses jurisdiction over all matters validly before Court of Appeals.

**[14] Courts ☜508(1)**
106k508(1) Most Cited Cases

Anti-Injunction Act applies whenever state suit is pending, regardless of whether federal suit seeking injunction was filed before or after commencement of state action. 28 U.S.C.A. § 2283.

**[15] Federal Courts ☜51**
170Bk51 Most Cited Cases

Federal courts need not abstain from declaratory judgment actions when federal suit has been filed substantially prior to any state suits, significant

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877                                                                    Page 3
**(Cite as: 3 F.3d 877)**

proceedings have taken place in federal suit, and federal suit has neither purpose nor effect of overturning previous state court ruling.

**[16] Federal Courts** ☞**47.1**
170Bk47.1 Most Cited Cases
(Formerly 170Bk47)

Federal court considering whether insurer had duty to represent insureds in state court suit regarding coverage, was not required to abstain from considering case by virtue of default judgment in that suit, followed by second state court suit claiming that insurer's failure to properly defend precluded assertion of noncoverage defense, on grounds of waiver, estoppel and negligence; there had been substantial federal court action, including assertion of waiver, estoppel and negligence defenses, prior to filing of second state case.

**[17] Judgment** ☞**564(1)**
228k564(1) Most Cited Cases

Order of district court, denying motion to reopen first declaratory judgment action regarding applicability of insurance coverage, stating that case had been closed and issues could be litigated in current state court litigation, was not "final judgment" having res judicata effect and collaterally estopping insurer from bringing second declaratory judgment proceeding.

**[18] Federal Courts** ☞**917**
170Bk917 Most Cited Cases

Earlier determination by Court of Appeals, that offeror of real estate investments suing insurer claiming that investment losses were covered by liability policy was in privity with investors, was not "law of case"; Court of Appeals made determination on appeal of interlocutory order, at which point applicable standard was clear error, and in reviewing district court's finding of privity on appeal from final decision, de novo standard of review applied.

**[19] Judgment** ☞**677**
228k677 Most Cited Cases

Investors in real estate ventures were parties to, and bound by, declaratory judgment action brought by insurer of party offering investments, in which district court found there was no coverage; offeror

had been "virtual" representative for entire group.

**[20] Federal Courts** ☞**917**
170Bk917 Most Cited Cases

Court of Appeals decision, as to scope of declaratory judgment issued by district court, was law of case with respect to later challenge to scope.
***880** Arthur R. Miller, Cambridge, MA, Wayne Swift, Samuel L. Boyd, Priscilla E. Perry, Mark W. Romney, Boyd & Assoc., Dallas, TX, for defendants-appellants.

Chester J. Hinshaw, Patricia J. Villareal, Jones, Day Reavis & Pogue, Dallas, TX, for plaintiffs-appellees.

Appeal from the United States District Court for the Northern District of Texas.

Before WISDOM, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The facts of this case are set forth in *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286 (5th Cir.1992) ("*Royal I* "). Following remand in *Royal I,* the district court entered final judgment against defendant *Quinn-L Capital Corp.* ("Quinn-L"), granting summary judgment in favor of plaintiffs Royal Insurance Company of America and Royal Lloyds of Texas (collectively, "Royal") and entering a permanent injunction that barred Quinn-L and the defendant investors from relitigating any of the claims or issues decided in either this declaratory judgment action or the first declaratory judgment action.

I.

Quinn-L argues that the federal courts do not have jurisdiction for three reasons. First, Quinn-L contends that the district court did not have ancillary jurisdiction over the affirmative defenses of waiver, estoppel, and negligence. Second, Quinn-L contends that no diversity jurisdiction exists. Third, Quinn-L asserts that the district court had no jurisdiction to grant summary judgment while an appeal was pending before this court.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## A.

In *Royal I,* we recognized that the district court had ancillary jurisdiction to issue an anti-suit injunction to protect or effectuate its prior judgments. 960 F.2d at 1292. Quinn-L argues that the district court lacked jurisdiction to grant summary judgment on the waiver, estoppel, and negligence claims because those claims are outside the scope of the first declaratory judgment action. Royal contends that we held in the first action that the district court had ancillary jurisdiction over the entire controversy and that this holding is law of the case.

Before addressing the merits of the jurisdictional argument, we must decide whether law of the case principles apply to appeals of preliminary injunctions. We decide that issue here because Royal relies upon the law of the case doctrine in addressing numerous points of error raised by Quinn-L. Quinn-L argues that the doctrine has no application in preliminary injunction proceedings.

[1][2] The law of the case doctrine was developed to "maintain consistency and avoid [needless] reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Charles A. Wright et al., Federal Practice and Procedure § 4478, at 788 (1981). "These rules do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment." *Id.* Under this doctrine, we will follow a prior decision of this court without reexamination in a subsequent appeal unless "(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work manifest injustice." *North Miss. Communications v. Jones,* 951 F.2d 652, 656 (5th Cir.), *cert. denied,* 506 U.S. 863, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992). The doctrine extends to those issues "decided by necessary implication as well as those decided explicitly." *\*881Dickinson v. Auto Ctr. Mfg. Co.,* 733 F.2d 1092, 1098 (5th Cir.1983) (citation, quotation marks, and emphasis omitted).

[3] We disagree with Quinn-L's suggestion that law of the case principles have no application to an interlocutory appeal of the granting of a preliminary injunction. As in any other interlocutory appeal, our decision constitutes law of the case. 1B JAMES W. MOORE ET AL., MOORE'S

FEDERAL PRACTICE ¶ 0.404[4.--7], at II-37 (2d ed. 1993). Obviously, the doctrine extends only to matters actually decided. *Id.* at II-37 to II-38. As to decisions of law, the interlocutory appeal will establish law of the case.

[4] As to factual determinations, however, an interlocutory appeal of a preliminary injunction often will not establish law of the case. To obtain a preliminary injunction, the movant need only show a substantial likelihood of success on the merits. We review a district court's findings of fact supporting the grant of a preliminary injunction for clear error. *Royal I,* 960 F.2d at 1297. Because the standard of review for factual determinations on direct appeal is higher than the standard applied during an interlocutory appeal of a preliminary injunction, the interlocutory appeal normally will not establish law of the case on factual matters.

Contrary to Quinn-L's suggestion, however, the reason this result does not obtain is not because law of the case principles are inapplicable. Rather, the lesser standard of review applied during an appeal of a preliminary injunction necessarily means that the factual issues differ from those on direct appeal. Such a difference often will result only from the higher standard of review applied during the direct appeal.

[5] With this background in mind, we now address Royal's contentions that we previously held that the district court had ancillary jurisdiction over the entire controversy and that this alleged holding is law of the case. In *Royal I,* we held that the district court has "ancillary jurisdiction over the present controversy." 960 F.2d at 1292. Read in context, this means that we held only that the district court had ancillary jurisdiction to issue an anti-suit injunction under the "protect or effectuate its judgments" exception to the Anti-Injunction Act (the "Act"), 28 U.S.C. § 2283 (1988). 960 F.2d at 1299. We also held that the district court should have limited the scope of that injunction to exclude the claims that arose after the first declaratory judgment action. *Id.*

In other words, we held that the district court had ancillary jurisdiction to issue an injunction but that the Act bars a portion of the injunction. We did not have to decide, and did not decide, the jurisdictional issue as to the claims of waiver, estoppel, and negligence, as Quinn-L obtained a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877                                                                                              Page 5
(Cite as: 3 F.3d 877)

reversal on the merits as to those claims. [FN1] Here, the jurisdictional issue is squarely presented, and we must decide it.

> FN1. It is uncertain whether it was proper for us to pretermit the jurisdictional issue in *Royal I* while reversing the preliminary injunction as to the waiver estoppel and negligence claims. Because of our holding today on diversity jurisdiction, we need not address this.

[6][7] We conclude that the district court did not have ancillary jurisdiction to address the waiver, estoppel, and negligence claims. As noted above, the district court has ancillary jurisdiction [FN2] to protect or effectuate its judgments. This jurisdiction extends no further than necessary to achieve that purpose. But "[w]hile ... the ... Act is not a grant of jurisdiction, no independent basis of jurisdiction is required for a federal court to entertain an application to enjoin relitigation in state court. The jurisdiction that the federal court had when it entered its original judgment is enough to support its issuance of an injunction." *Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft)*, 730 F.2d 367, 374 (5th Cir.1984) (citing 17 Wright et al., *supra*, § 4276, at 345 (1978)).

> FN2. What was referred to formerly as "ancillary jurisdiction" is now included within the category of "supplemental jurisdiction." *See* Pub.L. No. 101-650, 104 Stat. 5113 (codified at 28 U.S.C.A. § 1367 (West Supp.1993)). The amendment applies only to actions filed on or after December 1, 1990, so it is inapplicable to the instant case.

In *Mooney*, we noted that where a bankruptcy court seeks to enjoin claims that were not encompassed in a prior judgment, no ancillary jurisdiction exists. 730 F.2d at 374. *882 Under *Mooney*, the district court must have an independent basis for jurisdiction over Quinn-L's waiver, estoppel, and negligence claims, as those claims were not raised in the prior declaratory judgment proceeding and are not barred by that proceeding under res judicata principles.

Thus, we agree with Quinn-L that ancillary jurisdiction extends no further than the scope of the first judgment. The basis for allowing the federal courts to exercise ancillary jurisdiction in issuing anti-suit injunctions is to allow them to protect their prior judgments; where new claims are involved, the policy basis for ancillary jurisdiction disappears. We therefore conclude that ancillary jurisdiction to issue anti-suit injunctions normally will not allow a federal court to exercise jurisdiction over new claims not addressed in the judgment the court is seeking to protect. [FN3]

> FN3. Of course, if the first action bars the new claims because of res judicata principles, ancillary jurisdiction exists as to those claims.

B.

[8] Next, we must decide whether diversity jurisdiction exists in this case. Royal is an unincorporated association that sells insurance under a so- called "Lloyd's plan." For purposes of ascertaining whether the federal courts have diversity jurisdiction, an unincorporated association is considered to have the citizenship of its members. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96, 110 S.Ct. 1015, 1021, 108 L.Ed.2d 157 (1990). This case turns on the question of who constitutes a "member" of a Lloyd's plan insurance association. None of the underwriters is a citizen of Texas, while at least one attorney in fact is a resident.

[9] A Lloyd's plan insurer consists of a group of underwriters who join together to issue insurance through an attorney in fact or other representative. Tex.Ins.Code Ann. arts. 18.01-.02 (West 1981). Ordinarily, such insurers provide insurance for risks for which American insurance companies otherwise would not issue policies. Robert E. Keeton & Alan I. Widiss, Insurance Law § 2.1(a)(1) (West 1988) (practitioner's ed.). Under the Lloyd's plan, the insured typically obtains insurance from one or more members of the Lloyd's group; each member accepts responsibility for a portion of the risk, and liability among the members is several but not joint. *Jones v. Hollywood Style Shop*, 62 S.W.2d 167, 167 (Tex.Civ.App.--San Antonio 1933, no writ); Keeton & Widiss, *supra*, § 2.1(a)(1). In other words, the individual member is responsible only

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877
**(Cite as: 3 F.3d 877)**

Page 6

for the portion of the risk that it chooses to insure.

[10] The Lloyd's group underwriters appoint an attorney in fact to act for them under a power of attorney. Tex.Ins.Code Ann. art. 18.01-1 (West 1981). The attorney in fact has the power to issue policies of insurance, "authorized by and acting for such underwriters...." *Id.* The attorney in fact is "in effect the chief executive and managing agent of the enterprise...." *Grace v. Rahlfs,* 508 S.W.2d 158, 161 (Tex.Civ.App.--El Paso 1974, writ ref. n.r.e.).

[11][12] Quinn-L contends that the attorney in fact is akin to a general partner of a general partnership and that the underwriters are akin to limited partners. We do not find the analogy relevant to our inquiry, as the degree of control exercised by an individual over an entity is irrelevant to the question of whether he is a member of the entity. *Carden,* 494 U.S. at 192, 110 S.Ct. at 1019.

Analogies to other types of state-created entities likewise are not especially helpful. The only relevant inquiry is the identification of the members of *this* particular entity. Normally, we should examine an entity's definition of "member." Here, such an inquiry is unnecessary, as the relationship of the attorney in fact to a Lloyd's group is described by statute.

We agree with Royal that the attorney in fact is not a member of a Lloyd's group insurance association; only underwriters are members of the organization. As noted above, the attorney in fact acts as an *agent* for the Lloyd's group. *Grace,* 508 S.W.2d at 161. Under Texas law, the attorney in fact must be authorized by the underwriters to **\*883** execute insurance polices and *acts for* those underwriters by so doing. Tex.Ins.Code Ann. art. 18.01-1 (West 1981). Moreover, the attorney acts under powers of attorney from the underwriters, *id.,* who also dictate, in the articles of agreement, where the principal office of all attorneys will be, *id.* art. 18.02 . Thus, for purposes of determining whether diversity jurisdiction exists, we conclude that the members of a Lloyd's group are the underwriters alone. [FN4]

> FN4. Our conclusion is not altered by the fact that Texas law requires that the Lloyd's group appoint a resident of Texas as an attorney in fact if it wishes to issue

insurance policies in Texas. *See* Tex.Ins.Code Ann. art. 18.02 (West 1981). Texas could have required one or more underwriters to be a resident of the state but chose only to require the attorney in fact to be a resident. Texas's election to require an association to employ an agent within the state to conduct the association's business does not make the agent any more or less an agent.

Because attorneys in fact are not members of Lloyd's plan insurance associations, we look only to the citizenship of the underwriters to determine whether diversity jurisdiction exists. Here, because none of the underwriters is a Texas citizen, complete diversity exists.

C.

[13] Finally, we must consider Quinn-L's contention that the district court lacked jurisdiction to grant summary judgment while the interlocutory appeal in *Royal I* was pending. A district court loses jurisdiction over all matters validly before a court of appeals. *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.,* 906 F.2d 1059, 1063 (5th Cir.1990). The district court does not have the power to "alter the status of the case as it rests before the Court of Appeals." *Id.* Quinn-L argues that the summary judgment determined a matter within our jurisdiction.

This case does not fall within the scope of *Dayton,* a case in which the district court made a ruling that mooted an interlocutory appeal. In other words, the district court's action interfered with our jurisdiction to decide the issues before us. Here, the district court's continuing jurisdiction during the pending interlocutory appeal did not interfere with our ability to decide the issues presented in *Royal I.* Accordingly, the district court had jurisdiction to enter summary judgment.

II.

[14] Quinn-L argues that the declaratory judgment and permanent injunction must be vacated because they violate the Act, which provides as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877
**(Cite as: 3 F.3d 877)**

Page 7

or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (1988). The Act is "an absolute prohibition against enjoining state court proceedings unless the injunction falls within one of [the] three specifically defined exceptions." *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs,* 398 U.S. 281, 286, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). The Court also has warned that "the exceptions should not be enlarged by loose statutory construction." *Id.* at 287, 90 S.Ct. at 1743.

Here, the district court rendered a declaratory judgment on the waiver, negligence, and estoppel claims and enjoined defendants from proceeding therewith in state court. On its face, then, this judgment falls squarely within the "protect or effectuate its judgments" exception to the Act. We have stated, however, that "[i]f an injunction would be barred by § 2283, this should also bar the issuance of a declaratory judgment that would have the same effect as an injunction." *Texas Employers' Ins. Ass'n v. Jackson,* 862 F.2d 491, 506 (5th Cir.1988) (en banc) (citation and quotation marks omitted), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 404 (1989). Quinn- L argues that because we held in *Royal I* that the Act barred the preliminary injunction as to the waiver, estoppel, and negligence claims, *Jackson* necessarily bars the declaratory judgment and permanent injunction on those claims.

In *Jackson,* the plaintiff sought relief under the Longshore and Harbor Workers' Compensation Act (LHWCA) using the normal administrative process. Before that process \*884 was complete, he sued his employer's LHWCA insurer in state court, alleging, *inter alia,* deceptive trade practices, fraud, bad faith, and intentional infliction of emotional distress. The insurer filed a plea in bar asserting LHWCA preemption. The state court denied the petition, and extensive discovery was conducted. Later, the insurer filed a declaratory judgment action in federal court seeking an injunction against prosecution of the state court suit.

The district court granted the injunction on the basis of the "protect or effectuate its judgments" exception to the Act. The panel reversed and barred the grant of injunctive relief but allowed the declaratory judgment to stand. *Texas Employers' Ins. Ass'n v. Jackson,* 820 F.2d 1406 (5th Cir.1987). The en banc court held that the declaratory

judgment was invalid as well, because it was "plain that the *only* purpose and effect of TEIA's federal suit was to defeat Jackson's state suit against it and to, in effect, overrule the state trial court's denial of TEIA's plea in bar." 862 F.2d at 491. Expressing our concern over the apparent attempt to interfere with a state proceeding, we observed that "[t]o allow declaratory relief in these circumstances would be to transform section 2283 from a pillar of federalism reflecting the fundamental constitutional independence of the states and their courts, to an anachronistic, minor technicality, easily avoided by mere nomenclature or procedural sleight of hand." *Id.*

As we noted above, we stated in *Jackson* that if "an injunction would be barred by § 2283, this should also bar the issuance of a declaratory judgment that would have the same effect as an injunction." 862 F.2d at 506. Our inquiry here then depends upon the resolution of two issues. First, we must decide whether the Act would prevent the federal courts from issuing an injunction under the facts of this case. If it would not, then *Jackson* does not apply. Second, if an injunction must be barred, we must decide whether *Jackson* is distinguishable.

To decide whether the Act would bar an injunction on the waiver, estoppel, and negligence claims, we must address a question that is *res nova* in this circuit. Quinn-L injected these claims into the federal proceedings *before* it had filed any state court actions on these claims. In other words, Royal filed a declaratory judgment action seeking an anti-suit injunction prior to the commencement of any state proceedings. Before a state court suit is filed, the Act has no application, and a federal court may enjoin parties from ever filing suit in state court. *Jackson,* 862 F.2d at 507 (citing 17 Wright et al., *supra,* § 4222, at 506-07 (1988)).

A circuit split exists on the question of whether the Act has any application where the injunction is sought before a state suit has been filed but is not issued until after a state suit was filed. Three circuits have adopted the rule that the Act does not apply where the federal suit is filed first. *See Barancik v. Investors Funding Corp.,* 489 F.2d 933, 937 (7th Cir.1973); *National City Lines v. LLC Corp.,* 687 F.2d 1122, 1127 (8th Cir.1982); *Hyde Park Partners, L.P. v. Connolly,* 839 F.2d 837, 842 n. 6 (1st Cir.1988). Two circuits, on the other hand, have held that the Act should be applied to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877
(Cite as: 3 F.3d 877)

Page 8

the case as it stands, regardless of the order in which the actions were filed. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 533 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *see also Standard Microsystems Corp. v. Texas Instruments,* 916 F.2d 58, 61-62 (2d Cir.1990) (disapproving of the reasoning in *Barancik* )).

The leading case holding that the Act does not apply when the federal suit is filed first is *Barancik,* in which the court reasoned that the Act does not apply because the applicability of the Act should be determined at the time the federal court's injunctive powers are invoked. 489 F.2d at 937. The court was concerned that otherwise a litigant could defeat a well-founded motion for an anti-suit injunction by filing a suit in state court. *Id.* The thrust of this reasoning is weakened, however, by the fact that a federal district court often issues a temporary restraining order (TRO) against filing a state court suit while it is considering a motion for a preliminary injunction seeking such relief. Such an action goes a long way to avoid the danger raised by the *Barancik* court.

**\*885** The *Barancik* court felt that using TRO's would encourage the liberal granting of the kind of protective orders that the statute was designed to prevent. We also disagree with this analysis, which assumes the district court will decide the issue wrongly and that granting a TRO will prejudice the decision on the merits. Such logic proves too much, as no TRO would be justified under this reasoning. Although the issuance of a TRO should not be automatic and is subject to, *inter alia,* the requirements of Fed.R.Civ.P. 65(b), [FN5] the TRO is a useful tool where appropriate.

> FN5. Rule 65(b) reads in relevant part as follows:
> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any,

which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice....

The *Barancik* court, moreover, held that the Act *does not apply* where the federal suit is filed first. In this class of cases, then, *Barancik* eviscerates the statutory bar against anti-suit injunctions. The *Barancik* court also expressed concern that the court might have to take action without notice to the opposing party. We find this reasoning to be questionable as well, as it assumes that district courts will ignore the requirements of rule 65(b).

We subscribe to what we think is the better view--that the Act applies regardless of when the federal and state suits were filed. The plain language of the statute contains no exception for a situation in which the federal suit was filed first. As the *Roth* court notes, 583 F.2d at 533, the Supreme Court has held that the statute provides an absolute prohibition on injunctions unless one of the three exceptions applies.

The Court repeatedly has emphasized that those exceptions are exclusive and that federal courts may not craft new ones. Any doubts should be resolved in favor of denying the injunction. *Roth,* 583 F.2d at 533 (citing *Atlantic Coast Line R.R.,* 398 U.S. at 286-87, 90 S.Ct. at 1743). Given the Court's consistently narrow interpretation of the Act, the presumption in favor of denying an injunction, and the absence of language in the statute suggesting that its application depends upon the time of filing of the state suit, we think *Roth* provides the better analysis. We conclude, therefore, that the Act applies whenever a state suit is pending, regardless of when it was filed.

[15][16] Because the Act applies even when the federal suit is filed first, we now must address Quinn-L's contention that our holding in *Jackson* mandates reversal here. Royal argues that because the federal suit was filed first in this case, *Jackson* is distinguishable and hence is not controlling here.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877                                                                                                    Page 9
(Cite as: 3 F.3d 877)

[FN6] To resolve this question, we return to policy concerns underlying our decision in *Jackson.*

> FN6. We reject Quinn-L's suggestion that Royal is judicially estopped from claiming that *Jackson* does not apply to the facts of this case. Royal merely offered a legal *opinion* regarding *Jackson's* application. As Royal properly argues, a statement of opinion on the law does not create a judicial estoppel. *Sturm v. Boker,* 150 U.S. 312, 336, 14 S.Ct. 99, 107, 37 L.Ed. 1093 (1893).

At oral argument, the parties characterized *Jackson* as a new type of abstention. We agree with this characterization, as no language in the Act or the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202 (1982), specifically commands the result in *Jackson.* [FN7] As we recently recognized, our decision in *Jackson* was based upon principles of federalism and comity. *Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n,* 996 F.2d 774, 776 (5th Cir.1993). [FN8]

> FN7. *See* ERWIN CHERMERINSKY, FEDERAL JURISDICTION § 12.1, at 593 (1989) ( "The term *abstention* refers to judicially created rules whereby federal courts may not decide some matters before them even though all jurisdictional and justiciability requirements are met.").

> FN8. *See also Garrett v. Hoffman,* 441 F.Supp. 1151, 1155-56 (E.D.Pa.1977) (declaratory judgment should be barred only where judgment would lead to unseemly interference with state court litigation).

**\*886** In *Jackson,* the federal suit offended principles of comity and federalism because the plaintiff sought an overruling of a state court decision on LHWCA preemption. 862 F.2d at 505. Here, Royal has not attempted to interfere with the state courts. Instead, it sued to enforce a prior federal judgment, and Quinn-L injected new state claims into the federal action. Royal sought relief

in federal court nearly six months before the state actions against Royal were filed. Moreover, significant proceedings took place during that time, including the filing of Royal's original and amended complaints, the filing of Quinn-L's answer, and the district court's consideration and denial of two motions for dismissal based on the lack of jurisdiction. The only interference results from the potential for a race to judgment. [FN9]

> FN9. A race to judgment often is condoned. *See Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983) (approving of parallel proceedings in all but exceptional circumstances); *PPG Indus. v. Continental Oil Co.,* 478 F.2d 674, 677 (5th Cir.1973) (citing *Kline v. Burke Constr. Co.,* 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922)).

Where the federal case is filed substantially prior to the state case, and significant proceedings have taken place in the federal case, we perceive little, if any, threat to our traditions of comity and federalism. *See Moses H. Cone Hosp.,* 460 U.S. at 21-22, 103 S.Ct. at 940 (fact that substantial proceedings have occurred is a relevant factor to consider in deciding whether to abstain). In fact, by filing a state suit after a federal action has been filed, the state plaintiff can be viewed as attempting to use the state courts to interfere with the jurisdiction of the federal courts. We agree with Royal that if we were to hold that *Jackson* applied in this scenario, litigants could use *Jackson* as a sword, rather than a shield, defeating federal jurisdiction merely by filing a state court action. Neither *Jackson* nor the concerns underlying it mandate such a result.

Citing *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 238, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984), Quinn-L argues that abstention doctrines apply regardless of when the state suit is filed. *See also Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975). We find this contention flawed for two reasons. First, Quinn-L mischaracterizes *Midkiff.* There, the Court noted that if substantial proceedings have occurred in federal court, that court need not abstain. 467 U.S. at 238, 104 S.Ct. at 2328. In other words, in some

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

3 F.3d 877                                                                                    Page 10
**(Cite as: 3 F.3d 877)**

cases the date on which the state court suit was filed can make a difference in the application of the abstention doctrine. Where substantial proceedings have begun, the federal court is allowed to proceed to prevent the state from employing abstention as a means to delay litigation.

Second, we find other types of abstention distinguishable. For example, in the case of *Younger* [FN10] abstention, the Court was concerned with federal court interference with a state's ability to conduct proceedings by blocking proceedings involving state governments, federal courts could interfere unduly with the state's ability to govern. These federalism concerns are implicated no matter when the federal and state suits are filed: A state's ability to conduct proceedings is compromised if the officials conducting those proceedings are involved in discovery in federal court.

> FN10. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

In *Jackson,* on the other hand, the filing of the federal suit demonstrated an attempt to overrule a decision by a state trial court. Federalism and comity concerns arose only because a litigant attempted to use the federal courts to interfere with ongoing state court proceedings. Thus, while the time of filing of the federal and state suits is irrelevant to the application of the Act, it can be an important consideration in determining whether to abstain under *Jackson.*

We conclude, however, that federal courts need not abstain from declaratory judgment actions under *Jackson* where the federal suit is filed substantially prior to any state suits, significant proceedings have taken place in the federal suit, and the federal suit has neither the purpose nor the effect of overturning a previous state court ruling. We recently characterized the rule in *Jackson* as applying only where "a declaratory defendant *887 has *previously* filed a cause of action in state court against the declaratory plaintiff." *Travelers,* 996 F.2d at 776 (emphasis added). Even where the state court suit is filed first, a class of exceptions to the *Jackson* rule exists. *Id.* at 776-79. Our decision today, declining to extend the rule to a case in which the federal suit has been the subject of significant proceedings before the state suit is even filed,

comports with the policy concerns that prompted our decision in *Jackson.* [FN11]

> FN11. The investors also argue that we should not give effect to the federal district court's declaratory judgment under the circumstances of this case, even though the federal court's judgment was rendered first. This is because, the investors argue, the federal court injunction prevented the state court from reaching judgment first.
> The district court rendered its summary judgment on December 20, 1990, about 3 1/2 months after the investors filed their state court actions on September 4, 1990. The state court set a tentative trial date for December 10 but, given the complexity of this action, we find it extremely unlikely that the state court could have tried this case and rendered judgment before December 20. We are persuaded, therefore, that the state court would not have entered judgment before the December 20 judgment of the federal district court, even if the federal court's October 30, 1990, injunction had not issued. Accordingly, we need not decide, in this case, whether the possibility that the state trial and judgment would have occurred first could be relevant under other circumstances.

### III.

[17] Quinn-L next contends that Royal was collaterally estopped from pursuing the second declaratory judgment action because it originally sought to reopen the first declaratory judgment action by filing a motion on January 3, 1990. In the February 28, 1990, order denying the request to reopen the first action, the district court stated the following: "Because this case has been closed and the issues may be litigated in the current state court litigation, the Court DENIES the Motion." Quinn-L argues that this order is determinative with respect to the forum in which the coverage issues are to be decided.

Quinn-L cites *New Orleans Pub. Serv. Co. v. Majoue,* 802 F.2d 166 (5th Cir.1986), for that proposition. In *Majoue,* the defendant removed a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

state court suit, but the district court remanded it. The defendant later filed a federal declaratory action directed to the state claims. We stated that the original order remanding the case was "res judicata as to the forum." *Id.* at 168.

We find *Majoue* distinguishable. A decision to remand to state court may not be appealed, and the district court may not later change its mind. *Id.* at 167. In *Majoue,* we relied upon the language of 28 U.S.C. § 1447(d) (1988), which states that a remand order is not reviewable on appeal or *otherwise.* By filing a declaratory judgment action, the party was attempting to attack the district court's remand order collaterally, an action that is prohibited by statute.

Here, on the other hand, the declaratory judgment is not an attempt to attack the prior order collaterally, nor does any statute prohibit the action. Moreover, as Royal argues, *Majoue* involved an attempt to evade a final judgment. Here there is no final judgment that could have any res judicata effect. We reason, accordingly, that the February 28, 1990, order does not collaterally estop Royal from pursuing this matter.

IV.

We next address Quinn-L's contention that the declaratory judgment and injunction must be vacated because the investors were not parties to the first declaratory judgment and because *Royal I* is not preclusive on the issue of coverage for negligently caused mental anguish and bodily injury. Royal argues that our decision in *Royal I* is law of the case as to both issues. Quinn-L disagrees and also argues that our decision was clearly erroneous. [FN12]

> FN12. We reject Quinn-L's contention that it did not have a full and fair opportunity to litigate these issues. *See Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Quinn-L had more than adequate representation and ample opportunity to litigate the coverage question.

[18] First, Quinn-L claims that the investors are not bound by the first declaratory judgment because they were not in privity with Quinn-L. We

disagree with Royal's *888 contention that *Royal I* establishes as law of the case that the investors were in privity with Quinn-L. As we noted in *Royal I,* the issue of privity is a question of fact for the trial court. 960 F.2d at 1297. Because the appeal was interlocutory, we reviewed that finding only for clear error. *Id.* Here, on the other hand, we review the district court's findings *de novo,* because that court has rendered summary judgment. As we discussed above, law of the case may not be established on issues of fact where a later appeal involves a more demanding standard of review.

[19] Reviewing the district court's decision *de novo,* we affirm. There is no material issue of fact as to privity, and the district court properly held that Quinn-L is the investors' virtual representative.

[20] Second, Quinn-L contends that our *Royal I* decision was clearly erroneous on the question of the scope of the first declaratory judgment. Here, we agree with Royal that our prior holding is law of the case, and we will not set it aside unless it is "clearly erroneous and would work manifest injustice." *North Miss. Communications v. Jones,* 951 F.2d 652, 656 (5th Cir.), *cert. denied,* 506 U.S. 863, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992). The res judicata effect of a prior judgment is an issue of law that depends upon an interpretation of the court's opinion. *See Chick Kam Choo v. Exxon Corp.,* 486 U.S. 140, 148, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127 (1988). Our decision in *Royal I* establishes a finding of law on the scope of the first declaratory judgment. In this situation, an interlocutory appeal establishes law of the case.

Nor do we perceive a reason to revisit *Royal I.* Quinn-L argues that in *Royal I* we ignored the requirement that an issue must be actually litigated and decided for issue preclusion to apply. *See Jackson,* 862 F.2d at 500. Quinn-L contends that the question of whether an accident had occurred was not litigated.

The term "occurrence" is defined in the policies as "an accident ... which results in bodily injury or property damage...." Quinn-L contends that a finding of no "occurrence" by the district court could mean either (1) that the pleading does not allege an "accident" or (2) that the accident alleged in the pleading is not alleged to have caused either "property damage" or "bodily injury." We agree with Quinn-L's characterization of a finding of "no

3 F.3d 877
(Cite as: 3 F.3d 877)

Page 12

occurrence": That finding could have either meaning.

Quinn-L goes on to contend that we assumed in *Royal I* that the first declaratory judgment determined that there had been no accident. Quinn-L argues that this issue was never litigated in the first declaratory judgment action. We disagree.

The district court made separate findings in the first declaratory judgment action, to the effect that the pleadings do not allege an "occurrence," "property damage," or "personal injury" as defined by the policies. If the finding of no occurrence does not constitute a finding that no accident occurred, there would have been no need to enter a separate finding that no property damage or personal injury had occurred. The only reasonable reading of the first declaratory judgment opinion is that the court decided both that there was no accident and that no property damage or personal injury had occurred. [FN13]

> FN13. *See also Royal I,* 960 F.2d at 1295 nn. 10, 11 (discussing footnote 3 of partial summary judgment opinion, which acknowledged mental anguish as personal injury but still concluded that such injury was not caused by an "occurrence").

Moreover, this allegation actually was litigated. In its motion for summary judgment, Royal requested that the court make separate findings that no "occurrence" had been alleged and, additionally, that no "personal injury" or "property damage" had been alleged. Again, if Royal was seeking to litigate only the absence of personal injury or property damage, it would not have needed to ask for both findings.

In addition, Quinn-L's counterclaim placed the issue of whether an "occurrence" was alleged before the district court. The district court obviously felt that the issue was before it, as it concluded that despite the allegation of mental anguish (an injury Royal conceded would be covered), no "occurrence" had been alleged. Finally, Quinn-L contends that we erred in *Royal I* by ignoring the "actually decided" requirement for collateral estoppel. Quinn-L claims that the issue *889 of coverage for mental anguish was not

"actually decided" by the court in the first declaratory judgment action. We disagree. As we explained in *Royal I,* the district court expressly indicated that any mental anguish was not caused by an occurrence within the meaning of the policy. 960 F.2d at 1295 & nn. 10, 11. The court did actually decide the issue.

### V.

Essentially for the reasons given by the district court, we agree that no material issue of fact exists as to the claims of waiver, estoppel, and negligence, and we affirm the district court's grant of summary judgment on those claims. We find Quinn-L's claim that the district court should have recused itself to be completely without merit and therefore affirm on that issue.

AFFIRMED.

3 F.3d 877

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT "C"
### (to be supplemented)

# EXHIBIT "D"

# In The Matter of:

*Frank Carrales and*
*Sandra Carrales*

*Vs.*

*Allstate Texas Lloyd's, et al.*

*Sandra Carrales*
*July 31, 2003*

*No. 2003-01-295-C*
*197th / Cameron County, Texas*

*Lisa Reynolds*
*Davidson & Moore Court Reporters, Inc.*
*6900 San Pedro Avenue, Suite 147*
*P.M.B. #314*
*San Antonio, Texas 78216*
*(210) 340-4655   Fax: (210) 340-4450*

## Word Index included with this CondenseIt



claim at the time. They did not know they needed to make a claim. Approximately 2½ years passed before her husband contacted an agent regarding the mold.

### History of Leaks

The A/C leak occurred approximately two to three years before her husband made the claim. She does not know specifically when the A/C leak occurred. For about a week she mopped the floor until it was fixed by Mr. Rosales. One reason they waited two to three years to make a claim was because they did not want their policy canceled.

The kitchen sink leaked, but she does not recall the date. Again, there was no claim. She felt it was their responsibility to maintain the house.

There was a water leak at the tub in bathroom no. 1 two to three years ago. This was never reported. She does not know who repaired the bathroom leak. However, a piece of plywood was placed over the wall where the leak was repaired. It has not leaked since.

### Complaints

Her only complaint is that it has taken too long to resolve the claim. She has no criticisms of the agent. She has no specific criticisms of the adjusters personally. They were all professional.

### Health Issues

She is not claiming damages for health issues in this lawsuit. She does believe her allergies are worse while she is in the home. Her family doctor is Dr. Myers in Harlingen. She has never been tested for allergies. Although she had had much anguish and worry about the claim, she is not seeking mental anguish damages in this lawsuit.

### Miscellaneous

- She accepts responsibility for damages caused by maintenance issues and age of the home.
- The HVAC was installed 19 years ago. The outside unit has been replaced, but not the inside.
- She only recalls the HVAC system being maintained twice in the past ten years, once by Mr. Rosales, and once by Benny's Air.
- Her husband's cousin is an Allstate agent in Freer, Texas. His name is Joe Carrales. They have their auto insurance with him. They have never spoken with him about mold.

**Page 1**

NO. 2003-01-295-C

| | |
|---|---|
| FRANK CARRALES AND ) | IN THE DISTRICT COURT |
| SANDRA CARRALES ) | |
| VS. ) | CAMERON COUNTY, TEXAS |
| ) | |
| ALLSTATE TEXAS LLOYDS, ) | |
| ET AL ) | 197TH JUDICIAL DISTRICT |

* * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

SANDRA CARRALES

JULY 31ST, 2003

Volume 1 of 1

* * * * * * * * * * * * * * * *

ORAL DEPOSITION of SANDRA CARRALES, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 31st of July 2003, from 1:30 p.m. to 2:30 p.m., before LISA REYNOLDS, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Martinez, Barrera Y Martinez, 1201 E. Van Buren, Brownsville, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:

    GILBERT M. PIETTE
    PEREZ & PIETTE
    436 PAREDES LINE ROAD
    BROWNSVILLE, TEXAS 78521

FOR THE DEFENDANT:

    DOUGLAS E. PENNEBAKER
    ADAMI, GOLDMAN & SHUFFIELD
    9311 SAN PEDRO, STE 900
    SAN ANTONIO, TEXAS 78216

ALSO PRESENT:

    FRANK CARRALES

**Page 3**

I N D E X

| | PAGE |
|---|---|
| Appearances | 2 |
| SANDRA CARRALES | |
|   Examination by Mr. Pennebaker | 4 |
| Signature and Changes | 49 |
| Reporter's Certificate | 50 |

**Page 4**

1 (TIME 1:30)
2         SANDRA CARRALES,
3 having been first duly sworn, testified as follows:
4         EXAMINATION
5 Questions by Mr. Pennebaker:
6   Q. Ma'am, could you please state your full name?
7   A. Sandra Carrales.
8   Q. My Carrales, as you know, my name is Doug
9 Pennebaker, and I'm here to take your deposition now as
10 a result of the lawsuit that you and your husband have
11 filed against Allstate. You had the benefit of sitting
12 through your husband's deposition, is that correct?
13   A. Yes.
14   Q. And you heard the instructions about the
15 deposition that we went over at the beginning of that
16 deposition?
17   A. Yes.
18   Q. Do you remember those instructions more or
19 less?
20   A. Yes.
21   Q. And can you agree to follow those instructions
22 during your deposition?
23   A. Yes.
24   Q. You are aware that you're under oath?
25   A. Yes.

Page 5

1 Q. Let me get some background information. What
2 is your date and place of birth?
3 A. Mercedes, Texas, 9-26-53, birthdate.
4 Q. Have you lived any where in your lifetime
5 other than the Valley or have you always lived here?
6 A. Always here.
7 Q. How long have you lived in the home made the
8 basis of this lawsuit?
9 A. Twenty-seven years.
10 Q. And were you married to Mr. Carrales when you
11 all bought the home?
12 A. Yes.
13 Q. When did you buy Allstate insurance?
14 A. Around '98, I believe.
15 Q. Who was your insurance company before that?
16 A. Republic. The agent was Cocozza.
17 Q. Could you spell that, please?
18 A. Cocozza?
19 Q. No? Okay.
20     MR. PIETTE: I can spell it for you, if
21 you want.
22     MR. PENNEBAKER: Okay. That's fine.
23     MR. PIETTE: C-o-c-o-z-z-a.
24 Q. Cocozza. Is that agent still in business?
25 A. No, I believe not.

Page 6

1 Q. No, they're not business anymore?
2 A. No.
3 Q. How long were you insured with Republic on
4 this property?
5 A. Oh, I'd say 15 -- 15 years or more.
6 Q. And did Republic drop you --
7 A. Yes.
8 Q. -- or cancel your policy?
9 A. Uh-huh.
10 Q. Is that a "yes"?
11 A. Yes.
12 Q. Why did they cancel your policy?
13 A. Because we had a dog.
14 Q. So you agree with your husband?
15 A. Yes, sir.
16 Q. Was there a period of time after you were
17 canceled by Republic that you went without homeowner's
18 insurance?
19 A. Maybe two or three weeks.
20 Q. Is that all?
21 A. Yes, sir.
22 Q. And how did you go about selecting Allstate
23 Insurance?
24 A. We just got it.
25 Q. I mean, did you know an agent or was it

Page 7

1 recommended?
2 A. No. No, we just -- there are so many in
3 Harlingen. We just picked one.
4 Q. And who is your agent now?
5 A. Tony Silva.
6 Q. Have you met with Tony Silva before?
7 A. I have talked to him, yes.
8 Q. Have you met face-to-face with him?
9 A. Yes.
10 Q. How long has he been your agent, since '98?
11 A. Yes, since '99, '98, something like that.
12 Q. When you first purchased insurance, did you go
13 to his office or did you call him on the phone?
14 A. We went to his office.
15 Q. Did you fill out an application or --
16 A. I don't remember.
17 Q. Did you ask for any particular type of
18 insurance or just homeowner's insurance?
19 A. Just a homeowner's, just a homeowner's policy.
20 Q. And were you told at that time by Mr. Silva or
21 anyone in his office what all the policy would cover
22 and what all the policy excluded?
23 A. I don't remember.
24 Q. Did you get a copy of the policy?
25 A. Yes, we did.

Page 8

1 Q. Have you ever read the policy?
2 A. Just skimmed through it.
3 Q. Are you aware that you have what is called an
4 HOB policy? You may not be.
5 A. No, I don't know what that is.
6 Q. You're probably not aware that the HOB policy
7 that you have was approved by the Department of
8 Insurance? No?
9 A. I don't know.
10 Q. Tell me what conversations that you have had
11 with your agent, Mr. Silva, or anyone in his office.
12 A. Well, we just asked him about getting a
13 policy, and he -- he just went over -- I believe he
14 just went over some -- the policy and that was it, but
15 nothing else.
16 Q. Do you have any criticisms of the policy that
17 he sold you?
18 A. No.
19 Q. Are you aware that Mr. Silva is not an
20 insurance adjuster?
21 A. No, I wasn't aware of that.
22 Q. Do you understand the difference between an
23 Allstate agent who sells the policy, for example, and
24 an Allstate adjuster --
25 A. Yeah.

Page 9

1  Q. -- who accepts and processes the claim?
2  A. Uh-huh.
3  Q. Is that a "yes"?
4  A. Yes. I'm sorry.
5  Q. Have you ever reported any previous claims to
6 Mr. Silva's office?
7  A. No.
8  Q. Are you aware of whether or not your husband
9 has reported prior claims?
10  A. Yes, he has.
11  Q. Do you know what prior claims he reported?
12  A. He reported the chimney, the windstorm, and
13 the water damages.
14  Q. What water damages?
15  A. The sink, the restroom, and the air
16 conditioning.
17  Q. Well, are you aware that the chimney issue is
18 not an issue in this lawsuit?
19  A. Right.
20  Q. What is your understanding then of the damages
21 that are at issue in this lawsuit?
22  A. My understanding is that they have caused
23 supposedly some mold I am told.
24  Q. Where? Well, let's not get into that yet.
25  A. Okay.

Page 10

1  Q. Let's not get into that yet. I'm sorry.
2 Because what I was intending to ask you is about prior
3 claims, and you told me that you were aware that your
4 husband had filed a prior claim for the chimney when
5 you had the wind and rain, right?
6  A. Right.
7  Q. Are you aware of any prior claims before these
8 --
9  A. No.
10  Q. -- that your husband made with Allstate?
11  A. No.
12  Q. What claims were made with Republic Insurance?
13  A. The roof.
14  Q. And when was that?
15  A. I don't know, 10, 15 years ago.
16  Q. Was the roof replaced?
17  A. It was fixed, yes.
18  Q. Have you had any roof leaks since that time?
19  A. No.
20  Q. So you haven't had any roof leaks, it's fair
21 to say, in the last 10 years?
22  A. Exactly.
23  Q. Do you recall any other claims that you and
24 your husband had with Republic?
25  A. Huh-uh.

Page 11

1  Q. Is that a "no"?
2  A. I'm sorry. No. I don't remember.
3  Q. It's okay. I'm just reminding you because --
4  A. Yes.
5  Q. -- it's not really clear what "huh-uh" is on
6 the record. Okay?
7  A. Okay.
8  Q. Have you been involved in any other lawsuits?
9  A. No.
10  Q. Have you ever given a deposition before?
11  A. No.
12  Q. What is your educational background, ma'am?
13  A. High school and two years of college.
14  Q. Where did you go to high school?
15  A. Mercedes.
16  Q. Mercedes High?
17  A. Uh-huh. Yes, sir.
18  Q. That's all right. And where did you go to two
19 years of college?
20  A. TSTC.
21  Q. What is that? I'm sorry.
22  A. Texas State Technical College.
23  Q. And what did you study there?
24  A. Secretary. Clerical secretary.
25  Q. And when did you do that, the two years that

Page 12

1 --
2  A. It was '72. 1972. Something like that.
3  Q. Have you worked as a secretary since that
4 time?
5  A. Yeah, about a year and a half.
6  Q. And who did you work for?
7  A. TSTC, Texas State Technical College.
8  Q. Have you been employed anywhere else?
9  A. Yes, sir.
10  Q. Where else have you been employed?
11  A. At City Hall in Mercedes.
12  Q. For how long?
13  A. About a year.
14  Q. Where else?
15  A. And Harlingen Consolidated School District.
16  Q. For how long?
17  A. Ten years.
18  Q. Anywhere else?
19  A. That's it.
20  Q. Who was your last employer?
21  A. Harlingen --
22  Q. The school district?
23  A. -- school district.
24  Q. And when did you leave that job?
25  A. About six -- when he retired and he got his

Page 13

1 cancer, seven years ago, something like that.
2   Q. And is that one of the reasons that you left
3 --
4   A. Yes.
5   Q. -- because he was diagnosed with cancer?
6   A. Right.
7   Q. Did you agree with your husband that there are
8 no receipts or invoices or documents that you all have
9 possession of?
10   A. Yes. I agree with him, yes.
11   Q. So in terms of actual receipts pertaining to
12 past repairs or plumbing work or air conditioning work,
13 there are just not going to be any?
14   A. Huh-uh. No -- no -- no receipts.
15   Q. Do you know how many square feet your home is?
16   A. No, sir.
17   Q. Do you have an opinion as to its fair market
18 value?
19   A. No, sir.
20   Q. Have you ever put it up for sale?
21   A. No, sir.
22   Q. You never had it listed with an insurance --
23   A. No, sir.
24   Q. -- I mean, not an insurance -- a real estate
25 agent?

Page 14

1   A. No, sir.
2   Q. What are you all's intentions to do with this
3 home?
4   A. Hopefully, get it fixed.
5   Q. Do you have any intentions of moving?
6   A. None at the moment.
7   Q. All of your children are grown?
8   A. Yes, sir.
9   Q. Do they have their own separate living?
10   A. Yes, sir.
11   Q. So they don't depend on you or your husband
12 for a place to live?
13   A. Not yet. No, they don't.
14   Q. Let's hope not, right?
15   A. Yes.
16   Q. That means you've done something right, that's
17 for sure. Now, I've got two recorded statements that
18 have been given previously by your husband. Have you
19 ever given any recorded statements?
20   A. No.
21   Q. Are you aware of any recorded statements of
22 anybody pertaining to this claim other than the two
23 given by your husband?
24   A. That's all I know.
25   Q. Have you had conversations with any Allstate

Page 15

1 people about the claim?
2   A. No, sir.
3   Q. Has that all been left up to your husband?
4   A. Yes, sir.
5   Q. So when your husband said that you handled the
6 insurance matters, what he meant is that you handled
7 purchasing the insurance --
8   A. Right. Paying the --
9   Q. -- and paying for the premiums?
10   A. -- yeah, paying -- paying the premiums and all
11 that, that's all.
12   Q. So Mr. Carrales has handled all of the
13 conversations with the Allstate agent and then the
14 adjusters, is that correct?
15   A. Yes, sir.
16   Q. Do you have a general idea of what mold looks
17 like?
18   A. I've been told it's like a black substance on
19 places, but I don't know.
20   Q. And have you seen that type of substance in
21 your house?
22   A. Oh, yes, sir.
23   Q. Where all have you seen that type of substance
24 that you presume to be mold?
25   A. In the kitchen sink, real bad in the bathroom,

Page 16

1 the bathroom doors.
2   Q. Which bathroom?
3   A. The -- the number 1 bathroom.
4   Q. Where else?
5   A. And in the air condition in the floor. The
6 air condition in the floor where the air -- whatever
7 that's called.
8   Q. You mean by the air conditioning closet?
9   A. Yeah, there on the floor.
10   Q. And where else?
11   A. And that's it.
12   Q. So you have seen what you think is mold under
13 the kitchen sink --
14   A. Right.
15   Q. -- in bathroom number 1 under the sink, and
16 where else in that bathroom?
17   A. The doors -- well, the only closet door.
18   Q. On the closet door?
19   A. Right.
20   Q. What about on the ceiling?
21   A. Some, yes.
22   Q. And then the only other place that you have
23 seen this is underneath the air conditioner?
24   A. Right.
25   Q. When did you notice this for the first time?

Sandra Carrales                    Condenseit!                    July 31, 2003

---

**Page 17**

1  A. I don't know. I don't remember.
2  Q. Has it been a long time ago?
3  A. No. Two or three years I guess. I really
4 can't tell you.
5  Q. What caused you to notice it?
6  A. The door, we had it -- well, in the restroom
7 the door was blue and all of a sudden it was black. We
8 didn't know what it was, and we still don't know. We
9 don't know if it's mold or not.
10  Q. What caused you to notice under the sink?
11  A. The smell.
12  Q. So did you notice what you believe is mold in
13 all these areas about two to three years ago?
14  A. More or less.
15  Q. All about the same time?
16  A. I think so, yeah.
17  Q. And what did you all do about it when you
18 noticed it for the first time?
19  A. I used bleach to clean the door and also under
20 the sink.
21  Q. And then what happened when you used bleach to
22 clean it?
23  A. It went away.
24  Q. It did go away?
25  A. Yeah.

**Page 18**

1  Q. So then what happened?
2  A. Well, then you still see spots everywhere but
3 that's it.
4  Q. Did it come back or did it stay?
5  A. I suppose it did because when I cleaned it the
6 first time it all went away and we painted the door,
7 but you can still see spots. So I don't know.
8  Q. When did you paint over what you thought was
9 mold?
10  A. About two or three years ago at the same time
11 that we saw it and cleaned it.
12  Q. Did you make a claim?
13  A. No.
14  Q. Why didn't you make a claim at that time?
15  A. Because I didn't think we needed to make a
16 claim.
17  Q. When did you decide that you needed to make a
18 claim or did you ever decide that, was that --
19  A. No, I never was -- my husband's the one that
20 said, you know, well, we need to do something about
21 this, and I agreed with him.
22  Q. How long was it after you all first noticed
23 what you thought was mold on those three areas before
24 you contacted Allstate approximately?
25  A. About two years, two and a half years,

**Page 19**

1 something like that.
2  Q. Let me ask you what water leaks you can
3 remember having. Do you remember having water leaks in
4 this house either from sinks or from air conditioners
5 or --
6  A. Yeah, from the air conditioner I remember.
7  Q. Tell me as best you can when you had the air
8 conditioning leak.
9  A. I don't remember, just --
10  Q. Do you remember having the air conditioning
11 leak?
12  A. Yeah.
13  Q. What do you remember about it?
14  A. That I had to go mop the floor because it was
15 always wet. We tried getting it fixed, and when they
16 did it, it stopped so --
17  Q. How long did it go on before you got the air
18 conditioner fixed?
19  A. Maybe a week.
20  Q. And you had to mop every day?
21  A. Uh-huh. Yeah.
22  Q. And then, finally, whose idea was it to get it
23 fixed?
24  A. Well, my husband because he's -- he's the one
25 that does that.

**Page 20**

1  Q. And do you remember who fixed it?
2  A. Huh-uh.
3  Q. Is that a "no"?
4  A. No, I don't. I'm sorry.
5  Q. That's all right. Do you remember whether any
6 building materials, flooring, two-by-fours, sheetrock,
7 paneling, things of that nature, got wet?
8  A. Yeah, the floor got -- got wet, and the -- a
9 pipe that comes out from the -- the condenser -- I
10 guess is what you call them -- it was -- you could see
11 the leak. You could see the gooey stuff.
12  Q. When you had the air conditioning fixed, did
13 you also replace any of the building materials like the
14 floor?
15  A. Yeah. Yeah, he had to.
16  Q. What all was replaced as you recall?
17  A. Some boards and they had to go down there and
18 put some pillars because -- to hold the boards up.
19  Q. Under the flooring?
20  A. Under the flooring, yeah.
21  Q. What else was replaced?
22  A. I don't remember anything else that I can --
23  Q. At the time that you had an air conditioning
24 leak, did you make a claim or --
25  A. No.

---

Davidson & Moore Court Reporters, Inc. (210) 340-4655                    Page 17 - Page 20

Page 21

1  Q. How long did you all wait after the air
2 conditioning leaked to make a claim?
3  A. I guess two or three years.
4  Q. And why did you wait two to three years to
5 make a claim?
6  A. Because we didn't think it was necessary to
7 make all these claims and, you know, get our policy
8 canceled.
9  Q. Is that the only reason?
10  A. Yeah.
11  Q. Have you ever had a policy canceled because
12 you made too many claims?
13  A. No, sir.
14  Q. Do you know anybody that had their policy
15 canceled because they made too many claims?
16  A. Several people, yes.
17  Q. You do?
18  A. Yes.
19  Q. Do you know anybody that's had their policy
20 canceled by Allstate because they made too many claims?
21  A. Not that I know of.
22  Q. What other water leaks or water problems do
23 you recall in this home besides the air conditioning
24 leak?
25  A. The sink, the kitchen sink.

Page 22

1  Q. And as best you can remember, when did the
2 kitchen sink leak?
3  A. I can't remember. I can't remember.
4  Q. How much water damage was there?
5  A. Well, I know that -- that they had to replace
6 the floor. They replaced the floor.
7  Q. What else was replaced there beside -- you
8 mean the floor of the cabinet?
9  A. Of the cabinet, yeah.
10  Q. Was any of the actual flooring replaced or
11 just underneath the cabinet?
12  A. Just underneath the cabinet.
13  Q. Was there anything else replaced that you can
14 remember?
15  A. Well, they put the new piping on there so I
16 guess --
17  Q. New piping and a new bottom of the cabinet?
18  A. Yeah.
19  Q. Anything else?
20  A. No.
21  Q. Did you personally do anything to dry it up or
22 was that taken care of?
23  A. Put fans when it first happened.
24  Q. Anything else?
25  A. No.

Page 23

1  Q. And you did not make a claim with Allstate for
2 that?
3  A. I didn't think it was necessary.
4  Q. And why did you not think it was necessary?
5  A. Well, it falls on our -- it's our
6 responsibility to keep up the maintenance on the house.
7  Q. What other water leaks or water events have
8 you had in the home besides the air conditioning leak
9 and the kitchen sink leak?
10  A. The restroom.
11  Q. What happened in the restroom?
12  A. We had a water leak in the tub area.
13  Q. And are we taking about bathroom 1?
14  A. Yes, sir.
15  Q. And tell me what kind of leak that was in
16 bathroom number 1.
17  A. I believe they replaced the pipe going to the
18 shower.
19  Q. Do you know who repaired that?
20  A. No, my husband dealt with those men and --
21  Q. When was that?
22  A. I don't know, two or three -- two or three
23 years ago, something like that.
24  Q. And that was never reported?
25  A. No.

Page 24

1  Q. What all was replaced as a result of that leak
2 that you had two to three years ago in bathroom 1?
3  A. The panel that goes to the shower, the pipe.
4  Q. The pipe itself?
5  A. The pipe itself and then they put plywood with
6 screws so we could -- if we needed to take it out
7 again.
8  Q. Did they have to take off some tile to get to
9 it?
10  A. Not in -- not inside.
11  Q. Did they go to it from the other side of the
12 wall?
13  A. Yeah.
14  Q. And so after they repaired it, they just put a
15 piece of plywood over it?
16  A. Right.
17  Q. And that way you could access it again if you
18 needed to, is that right?
19  A. Yes.
20  Q. And have you had to access it again?
21  A. No.
22  Q. Where else have you had water leaks or water
23 events of any kind?
24  A. That's it.
25  Q. That's all?

Page 25

1    A. That I know of.
2    Q. So none of these leaks were reported to
3 Allstate when they actually happened, is that right?
4    A. Oh, no, sir.
5    Q. Do you know when it was that your husband
6 contacted Allstate to make the claim?
7    A. I'm figuring it was like in the -- I'm saying
8 2000, but I'm not sure.
9    Q. Let me ask you this: Had it been a couple of
10 years since the leaks happened?
11    A. No, I don't think so.
12    Q. How long had it been since the leaks occurred
13 when your husband contacted Allstate?
14    A. I couldn't tell you. I don't remember.
15    Q. Do you have any idea when your husband
16 contacted Allstate to make the claim?
17    A. I don't remember.
18    Q. But I think I understood you to say that your
19 husband did not contact Allstate when any of these
20 events actually happened, correct?
21    A. Right. Because that's -- to my understanding,
22 that's what you do with your own home, you repair your
23 house, whatever happens to it.
24    Q. So what I'm trying to find out is how long was
25 it after these events happened was it before you all

Page 26

1 contacted Allstate?
2    A. I don't remember.
3    Q. And do you remember what it was specifically
4 that made you all contact Allstate?
5    A. A smell that we smelled, and we knew we had
6 some kind of water damage.
7    Q. Where have you seen water damage?
8    A. Pardon me?
9    Q. Where have you seen water damage in your home?
10    A. In the restroom, in the sink, and the air
11 conditioner.
12    Q. Is that all?
13    A. Yes, sir.
14    Q. The same places that you previously --
15    A. Yeah.
16    Q. -- told me you saw mold --
17    A. Yeah.
18    Q. -- is that right? Okay. So you never had any
19 conversations at all with an adjuster by the name of
20 Gary Seligman?
21    A. Huh-uh. No, sir.
22    Q. No conversations with Kevin Brown?
23    A. No, my husband's the one that had them.
24    Q. And no conversations with Cathy Bair?
25    A. I answered the phone once, and then I gave it

Page 27

1 to my husband but that was about it.
2    Q. Do you personally have any criticisms of any
3 of the people involved in the lawsuit?
4    A. No.
5    Q. Do you have criticisms of Allstate in terms of
6 the way the claim was handled?
7    A. Yes, sir. I think it's taken too long.
8    Q. Too long?
9    A. Yes, sir.
10    Q. Okay. Do you have any criticisms against the
11 agent, Mr. Silva?
12    A. No.
13    Q. Do you have any criticisms of Allstate other
14 than simply it's taken too long on the claim?
15    A. No, sir.
16    Q. Do you have an idea in your mind what Allstate
17 should pay on the claim?
18    A. No, sir.
19    Q. You are asking Allstate to pay some money on
20 the claim --
21    A. Yes.
22    Q. -- right?
23    A. Yes, sir.
24    Q. You're asking Allstate to pay money on the
25 claim that has been submitted, correct?

Page 28

1    A. Right.
2    Q. From your prospective, what is that money
3 going to be for?
4    A. Well, hopefully, to get -- get the areas done
5 where it supposedly has that water -- what they say is
6 mold. I don't know.
7    Q. So let me see if I can clarify that.
8    A. Okay.
9    Q. You're saying what Allstate should pay is for
10 what it is going to cost to repair the water damage and
11 the mold?
12    A. Right.
13    Q. Are you saying that Allstate should pay for
14 anything else besides the water damage and the mold?
15        MR. PIETTE: Objection, form.
16    Q. Let me rephrase that question. Are you saying
17 that Allstate should pay on the claim anything other
18 than for water damage and for mold repair?
19    A. Just what we're asking, I mean, you know, for
20 the mold -- not the mold but the water damage.
21    Q. Have you seen any estimates as to what it's
22 going to cost to make those repairs?
23    A. Just what MoldPro had but --
24    Q. You mean Quantum?
25    A. Yeah, Quantum.

July 31, 2003 | CondenseIt!™ | Sandra Carrales

Page 29

1   Q. Do you recall the amount of the Quantum
2 estimates?
3   A. No, sir.
4   Q. To your knowledge, has anybody else prepared
5 as estimate as to what it's going to cost besides
6 Quantum?
7   A. No, they're -- no, not yet.
8   Q. How long has it been since you all had a
9 mortgage on the house? Your home is paid for, is that
10 correct?
11   A. Yes, sir. I'd say about 15 years.
12   Q. And who was your mortgage company?
13   A. What's the name of the bank? I don't know the
14 name of the bank because we switched. I don't remember
15 the name of the bank.
16   Q. Do you remember the purchase price of the home
17 approximately?
18   A. How much it cost?
19   Q. Yeah, I know it was 26 years ago.
20   A. No.
21   Q. Are you still with your same insurance agent?
22   A. With Tony Silva?
23   Q. Yes, ma'am.
24   A. Yes. Yes.
25   Q. Do you have any plans of changing insurance

Page 30

1 agents?
2   A. No.
3   Q. Do you have your automobile insurance with
4 Allstate also?
5   A. Yes, sir.
6   Q. The same insurance agent?
7   A. No, sir.
8   Q. A different Allstate agent?
9   A. Yes.
10   Q. Who is that?
11   A. Joe Carrales.
12   Q. Why do you have a different agent?
13   A. Because he's our cousin -- my husband's cousin
14 in Freer, Texas.
15   Q. So your husband's cousin is an Allstate agent
16 in Freer?
17   A. Right.
18   Q. Does he sell homeowner's insurance also?
19   A. I don't know.
20   Q. Have you all had any conversations with Joe
21 Carrales about this claim?
22   A. Not that I know of.
23   Q. Does he know about the claim?
24   A. I don't know.
25   Q. How close are you all?

Page 31

1   A. We call each other maybe once a year or so.
2   Q. Oh, okay. How come you don't have your home
3 insurance with Mr. Carrales?
4   A. Because we just didn't bother to go way over
5 there to go get it.
6   Q. So you have never had a conversation with Joe
7 Carrales about the mold issue?
8   A. No.
9   Q. Are you claiming health damages for medical
10 expenses or health problems in this lawsuit?
11       MR. PIETTE: Objection, form.
12   A. Not right now.
13   Q. Do you have any reason to believe that your
14 health has been in any way affected because of the
15 condition of the house?
16   A. I don't know. I have allergies, and every
17 time I'm in my house, I sneeze and I cough and I have
18 real bad headaches, but I don't know if it's because of
19 that; but every time I'm out of there, I'm fine.
20   Q. How long do you have to be out of the house
21 before you're fine?
22   A. About an hour and I'm fine.
23   Q. Have you seen a doctor for allergies?
24   A. No.
25   Q. Who is your primary doctor?

Page 32

1   A. Right now, Dr. Myers.
2   Q. And where is Dr. Myers?
3   A. Family practice in Harlingen.
4   Q. How long has Dr. Myers been your family
5 doctor?
6   A. Let's see. About three years I think.
7   Q. And who was it before that?
8   A. Dr. Garza.
9   Q. And is Dr. Garza still in practice?
10   A. I don't know.
11   Q. Where was his office?
12   A. In San Benito.
13   Q. And why did you switch?
14   A. Because I didn't want to make trips to San
15 Benito anymore, and Harlingen was closer.
16   Q. Have you ever been tested for allergies?
17   A. No, sir.
18   Q. Are you taking any allergy medication?
19   A. I take over-the-counter medication.
20   Q. Like Claritin or --
21   A. Yes.
22   Q. Are you claiming that you have suffered mental
23 anguish as a result of the claim or the condition of
24 your home?
25   A. Both, yeah.

Page 33

1    Q. Can you describe that?
2    A. Well, there have been times that we've had to
3 worry about when we have to come and talk to Allstate
4 or whatever, and my husband has appointments at M.D.
5 Anderson, and we can't make contact with anybody and
6 having to worry with him and having to worry with
7 Allstate.
8    Q. Are you asking for money damages in this
9 lawsuit because of mental anguish?
10   A. Not right now.
11   Q. Is there anything that you want to accomplish
12 in the filing of this lawsuit other than getting your
13 home repaired?
14   A. I just want it resolved.
15   Q. Do you accept responsibility as the homeowner
16 for maintaining your home and keeping it in appropriate
17 upkeep?
18   A. Yes.
19   Q. To the extent that there are problems with the
20 home that are due to just the age of the home and
21 maintenance issues as opposed to something that is
22 covered by the policy, do you take responsibility for
23 that as a homeowner?
24   A. Yes.
25   Q. Are you aware of any problems with the home

Page 34

1 that are due to just the age and maintenance?
2    A. I don't know.
3    Q. I mean, over time, you know -- I think your
4 husband said this home -- or he was told the home was
5 built in the 1940s.
6    A. Right.
7    Q. Do you know when it was built?
8    A. No, that's what Tony told us.
9    Q. Do you believe that some things in a home have
10 to be replaced over time as they age and wear out?
11       MR. PIETTE: Objection, form.
12   A. Sure.
13   Q. Is there anything in your home that you know
14 of that needs to be replaced or that needs to be redone
15 just because of age and time?
16   A. Not that I know of.
17   Q. Do you all have two air conditioning units?
18   A. No, I think it's just one.
19   Q. So you've got the one unit on the inside and
20 then you have an outside unit, is that right, or do you
21 have a --
22   A. No, we have the -- the air conditioning unit
23 is outside, but we have the -- what do you call it, the
24 condenser or whatever?
25   Q. That's on the inside.

Page 35

1    A. Oh, okay. And then we have the --
2        MR. PIETTE: The compressor.
3    A. -- the compressor outside.
4    Q. Yeah, there are two parts to a central air
5 conditioner --
6    A. Yeah, well, that's --
7    Q. -- at least as I understand it.
8    A. Yeah.
9    Q. There's the inside and then there's the --
10   A. The one on the outside, that's what we have.
11   Q. Do you have any window units?
12   A. No, sir.
13   Q. How long have you had a central -- obviously,
14 this home didn't come with a central --
15   A. Right.
16   Q. -- air conditioner or did -- have you all
17 added that?
18   A. Let's see. My baby's 20, about 19 or 18 years
19 now.
20   Q. That air conditioner has been in the home for
21 19 years?
22   A. Approximately.
23   Q. Except the outside unit was replaced?
24   A. Right.
25   Q. But the inside has not been?

Page 36

1    A. No, sir.
2    Q. Has anybody told you that it was time to
3 replace the inside unit?
4    A. I don't think so.
5    Q. Who does the air conditioning maintenance at
6 the home?
7    A. My husband -- one of my husband's friends.
8    Q. Is that Mr. Rosales?
9    A. Rosales. Luis Rosales.
10   Q. How many times has Mr. Rosales been out say in
11 the past five years to do maintenance?
12   A. The past five years? He came in once in the
13 past five years.
14   Q. Was that to make a repair or general
15 maintenance?
16   A. General maintenance.
17   Q. Isn't he the person that fixed the leak?
18   A. Yes, he was.
19   Q. Is that the time you're talking about?
20   A. Probably so because he usually comes.
21   Q. Have you had other air conditioning leaks
22 besides that?
23   A. Not that I know of.
24   Q. Has Mr. Rosales been out to maintenance the
25 air conditioner more times than that one time when he

Page 37

1 fixed the leak?
2    A. I don't think so.
3    Q. Who else have you all used to maintenance the
4 air conditioner besides Mr. Rosales?
5    A. Bennie's Air.
6    Q. I know your husband said that Bennie's Air
7 replaced the outside unit.
8    A. Right.
9    Q. Have they done any other maintenance on the
10 home?
11    A. I think he came in, and he cleaned the
12 condenser or something, a coil or something.
13    Q. Do you know when?
14    A. About a year ago, a year and a half, something
15 like that.
16    Q. And Bennie's is out of Harlingen?
17    A. Yes, sir.
18    Q. Has anybody with Bennie's ever told you that
19 it was time to replace the inside unit or redo the duct
20 work?
21    A. Not that I know of.
22    Q. Do you have an idea in your mind as to how
23 much money you're asking for in this lawsuit from
24 Allstate?
25    A. No, sir.

Page 38

1    Q. Are you asking money for -- well, I assume
2 you're asking for attorney's fees, or are you?
3    A. I guess. I don't know.
4    Q. Have you signed an attorney-client contract?
5    A. I don't know.
6    Q. A contract for, you know, legal
7 representation?
8    A. I don't know that we have.
9    Q. Have you had to pay any attorney fees to date?
10    A. No, sir.
11    Q. Do you know how your attorney is supposed to
12 be compensated?
13    A. No, sir.
14    Q. When did you all first contact your attorney?
15    A. I think -- I don't know. I can't really tell
16 you.
17    Q. Let me show you the exhibit that we have
18 previously marked as Deposition Exhibit Three which is
19 the MoldPro report. Have you seen this?
20    A. Yes, sir.
21    Q. Well, actually, that's not what I wanted to
22 show you. I want to show you Deposition Exhibit Number
23 Four, which is the floor plan. Do you see where your
24 husband has marked in yellow highlighter where he has
25 seen suspect mold?

Page 39

1    A. Yes, sir.
2    Q. Do you agree with his locations?
3    A. Yes, sir.
4    Q. Are you aware of any others?
5    A. No.
6    Q. Do you see where your husband has marked areas
7 where he has noticed stains on the ceiling in green?
8    A. Right.
9    Q Do you agree with those?
10    A. Yes, sir.
11    Q. Do you know of any others?
12    A. No, sir.
13    Q. Were you present at home along with
14 Mr. Carrales when the various individuals came out to
15 do their inspections such as --
16    A. Yes, sir.
17    Q. -- Mr. Pena?
18    A. Yes, sir.
19    Q. And Mr. -- I think -- Kohl or Cole from
20 Quantum Restoration?
21    A. Somebody from air condition; he came from the
22 mold; and Mr. Kohl.
23    Q. Did all of those gentlemen conduct themselves
24 in a courteous and professional manner?
25    A. Yes.

Page 40

1    Q. Do you have any criticisms about the way they
2 went about their investigation process?
3    A. No, they were good, very nice.
4    Q. Has anybody with Allstate ever been rude to
5 you?
6    A. No, sir.
7    Q. To your knowledge, has Allstate or anyone
8 affiliated with Allstate ever been untruthful with you
9 and your husband about the claim?
10    A. No.
11    Q. Once you are finished with this claim, do you
12 intend to repair the mold and water damage in the home?
13    A. Yes.
14    Q. And is that what you're waiting on --
15    A. Yes.
16    Q. -- for this claim to be resolved?
17    A. Yeah.
18    Q. Do your and your husband have the financial
19 means to make these repairs to the water damage and
20 mold in the absence of insurance?
21    A. Huh-uh.
22    Q. Is that a "no"?
23    A. I'm sorry. No.
24    Q. I know that your husband said he does receive
25 retirement benefits --

Page 41

1  A. Right.
2  Q. -- as a result of his work.
3  A. Yes, sir.
4  Q. Do you get any kind of retirement benefits?
5  A. No, sir.
6  Q. You are also insured through Blue Cross/Blue?
7  A. Yes, sir.
8  Q. Do you all have any other sources of income?
9  A. No.
10 Q. What kind of work do your children do?
11 A. My children?  My oldest is a housewife, a
12 retired vet.  My --
13 Q. Retired vet?
14 A. Yes, she was in the Navy.
15 Q. Oh, okay.  Got it.
16 A. Uh-huh.  My middle -- my -- Christina is a
17 receptionist.  My son is a repo man, and my little one
18 right now is finding theirself trying to go to college.
19 Q. Are your parents still living?
20 A. Yes, sir.
21 Q. Where do they live?
22 A. Mercedes.
23 Q. Is Mercedes on 83?
24 A. Yes.
25 Q. So how far away from Mercedes is --

Page 42

1  A. 15 miles.
2  Q. 15 miles?
3  A. Yes.
4  Q. And so do you visit often?
5  A. Yes.
6  Q. Do they come to your home or do you go to
7  theirs?
8  A. Mainly, I go to their house.
9  Q. Are you claiming any damages to any of your
10 personal property in this lawsuit?
11 A. Personal like?
12 Q. I'm sorry.  I need to clarify what that means.
13 Personal property is things inside your home which is
14 separately insured under the insurance policy; for
15 example, you know, clothing, furniture, televisions,
16 anything in the home that is not part of the structure
17 really.
18 A. Not at this time because we don't know if it's
19 mold or, you know, if it was caused by the water damage
20 or what it is.  I mean --
21 Q. So is it fair to say that as we sit here
22 today, you're not aware of any water damage to the
23 personal property in the home?
24 A. Oh, no.
25 Q. Have you ever seen any water damage on it?

Page 43

1  A. Huh-uh.
2  Q. Has any of it ever gotten wet?
3  A. Huh-uh.
4  Q. Is that a "no"?
5  A. No, sir.  I'm sorry.
6  Q. In terms of your claim and the condition of
7  the home, there is a question that we have asked about
8  anybody that has knowledge of facts, anybody that may
9  know something about it, that's a common question to
10 ask in these kind of cases.  For example, obviously you
11 and your husband know about it, obviously, any of the
12 adjusters that handled the claim would be a person that
13 has knowledge of facts.  Do you know of anybody else
14 that you feel has knowledge of facts regarding the
15 claim with Allstate besides you and your husband?
16 A. Not that I know of, no.
17 Q. For example, do you have a close friend or
18 very -- I mean, it would be a close friend or close
19 neighbor that has knowledge about what your home is
20 like or what the claim has been like for you?
21 A. Probably my sister.
22 Q. And what is her name?
23 A. Rosemary.
24 Q. And what is her last name?
25 A. DelaCerda, D-e-l-a-C-e-r-d-a.

Page 44

1  Q. And where does she live?
2  A. Mercedes.
3  Q. And why does she know, just because you have
4  talked with her about it or --
5  A. About the claim?
6  Q. Yes.
7  A. Not really talked -- well, yeah, I guess talk
8  about it, but that's about it.
9  Q. Has she had a mold claim?
10 A. No.
11 Q. Do you know anybody else, besides you and your
12 husband, that have had mold claims?
13 A. I've heard of people, but I don't know
14 anybody.
15 Q. Do you watch TV down here?
16 A. Yeah.
17 Q. Do you read the paper?
18 A. Yeah.
19 Q. Have you seen stuff in the media about mold
20 claims?
21 A. Well, I've read in the newspaper but that's
22 about it.
23 Q. When did you first hear about mold claims
24 being asserted?
25 A. I don't know how long.  I don't know.

Page 45

1  Q. Have you spoken with any other attorneys about
2 the mold claim?
3  A. No.
4  Q. Have you kept any kind of notes or a diary
5 about the claim?
6  A. No, sir.
7  Q. You do have photographs?
8  A. Yes, we took some, and we gave them to
9 Gilbert.
10  Q. Do you have any photographs of the home that
11 you haven't turned over to your attorney?
12  A. Pardon me?
13  Q. I'm sorry. I was mumbling.
14  A. That's okay.
15  Q. Do you have any photographs of the home that
16 have not been turned over to your attorney?
17  A. No.
18  Q. Were you aware that Allstate had asked for you
19 and your husband's Examination Under Oath?
20  A. Yes.
21  Q. Do you know why or do you have a perspective
22 as to why the lawsuit was filed before an Examination
23 Under Oath was provided?
24  A. That was probably the time that he had an
25 appointment at M.D. Anderson, and we couldn't bring --

Page 46

1 go and do it.
2  Q. You couldn't go to the --
3  A. Right. So we --
4  Q. -- EUO because of the M.D. Anderson
5 appointment?
6  A. Yeah, it was during that time.
7  Q. Are there any structural problems that you
8 know about with the home?
9  A. No, not that I know of.
10 (Recess from 2:25 to 2:27)
11  Q. Ma'am, I really believe that I have covered
12 the questions that I have for you already today. Is
13 there anything in particular, any complaint that you
14 have about Allstate, that you want to voice today that
15 maybe I haven't asked you about?
16  A. No, just the fact that it hasn't been
17 resolved, and we wish we would have a -- you know, have
18 it resolved, that's all. It's taken too long.
19  Q. So it's fair to say that your whole issue in
20 this lawsuit is that it's taken too long to get a
21 resolution?
22      MR. PIETTE: Objection, form.
23  A. Exactly.
24  Q. And as far as you're concerned, have I treated
25 you and your husband with respect in you all's

Page 47

1 depositions today?
2  A. You did very nice.
3      MR. PENNEBAKER: All right. Well, thank
4 you, ma'am. I appreciate your time, and I'll pass the
5 witness.
6      MR. PIETTE: We'll reserve our questions
7 for trial.

Page 48

1           CHANGES AND SIGNATURE
2 PAGE  LINE  CHANGE      REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 49

1    I, SANDRA CARRALES, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.

3

4
                    SANDRA CARRALES
5

6  THE STATE OF TEXAS :

7  COUNTY OF _____:

8

9    Before me, _____ on this _____
   day personally appeared SANDRA CARRALES, known to me
10 (or proved to me under oath or through
   _____) (description of identity card or
11 other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
   consideration therein expressed.

13    Given under my hand and seal of office this
14 _____ day of _____, 2003.

15

16                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
17

18

19

20

21

22

23

24

25

Page 50

                    NO. 2003-01-295-C
1  FRANK CARRALES AND           )  IN THE DISTRICT COURT
2  SANDRA CARRALES              )
   VS                           )  CAMERON COUNTY, TEXAS
3                               )
   ALLSTATE TEXAS LLOYDS,
4  ET AL                        )  197TH JUDICIAL DISTRICT

5         REPORTER'S CERTIFICATION
          DEPOSITION OF SANDRA CARRALES
6            JULY 31ST, 2003

7

8

9    I, LISA REYNOLDS, a Certified Shorthand

10 Reporter in and for the State of Texas, do hereby

11 certify to the following:

12    That the witness, SANDRA CARRALES, was duly

13 sworn by the officer and that the transcript of the

14 oral deposition is a true record of the testimony given

15 by the witness;

16    That the deposition transcript was submitted

17 on _____ to the witness or to the attorney

18 for the witness for examination, signature and return

19 to me by _____.

20    That the amount of time used by each party at

21 the deposition is as follows:

22    Mr. Pennebaker - 58 minutes

23    Mr. Piette - 0

24    That pursuant to information given to the

25 deposition officer at the time said testimony was

Page 51

1  taken, the following includes counsel for all parties

2  of record:

3        Mr. Piette, Attorney for Plaintiff

4        Mr. Pennebaker, Attorney for Defendant

5        I further certify that I am neither counsel

6  for, related to, nor employed by any of the parties or

7  attorneys in the action in which this proceeding was

8  taken, and further that I am not financially or

9  otherwise interested in the outcome of the action.

10       Further certification requirements pursuant to

11 Rule 203 of TRCP will be certified to after they have

12 occurred.

13       Certified to by me this _____ of
   _____, 2003.

14

15       LISA REYNOLDS, CSR 3276
16       Expiration Date: 12-31-               03
         Davidson & Moore Court Reporters
17       PMB 314
         6900 San Pedro, Suite               147
18       San Antonio, Texas                   78216
         (210) 340-4655

19

20

21

22

23

24

25

Page 52

1        FURTHER CERTIFICATION UNDER RULE 203 TRCP

2

3        The original deposition was/was not returned

4  to the deposition officer on _____;

5        If returned, the attached Changes and

6  Signature page contains any changes and the reasons

7  therefor;

8        If returned, the original deposition was

9  delivered to _____, Custodial Attorney;

10       That $ _____ is the deposition officer's

11 charge to the Defendant for preparing the original

12 deposition transcript and any copies of exhibits;

13       That the deposition was delivered in

14 accordance with Rule 203.3, and that a copy of this

15 certificate was served on all parties shown herein and

16 filed with the Clerk.

17       Certified to by me this _____ of
   _____, 2003.

18

19       LISA REYNOLDS, CSR 3276
         Expiration Date: 12-31-               03
20       Davidson & Moore Court Reporters
         PMB 314
21       6900 San Pedro, Suite               147
         San Antonio, Texas                   78216

22       (210) 340-4655

23

24

25

**-$-**

$ [1]    52:10

**-'-**

'72 [1]    12:2
'98 [3]    5:14    7:10
7:11
'99 [1]    7:11

**-0-**

0 [1]    50:23

**-1-**

1 [7]    1:12    1:12
16:3    16:15    23:13
23:16    24:2
10 [2]    10:15    10:21
12-31-03 [2]    51:16
52:19
1201 [1] 1:21
147 [2]    51:17    52:21
15 [6]    6:5    6:5
10:15    29:11    42:1
42:2
18 [1]    35:18
19 [2]    35:18    35:21
1940s [1]    34:5
1972 [1] 12:2
197TH [2]    1:5
50:4
1:30 [2] 1:18    4:1

**-2-**

2 [1]    3:4
20 [1]    35:18
2000 [1] 25:8
2003 [6] 1:11    1:18
49:14    50:6    51:13
52:17
2003-01-295-C [1]
50:1
2003-O1-295-C [1]
1:1
203 [2]    51:11    52:1
203.3 [1]    52:14
210 [2]    51:18    52:22
26 [1]    29:19
2:25 [1] 46:10
2:27 [1] 46:10
2:30 [1] 1:19

**-3-**

314 [2]    51:17    52:20
31st [2] 1:11    1:18
50:6
3276 [2] 51:15    52:19
340-4655 [2]    51:18
52:22

**-4-**

4 [1]    3:7
436 [1]    2:5
49 [1]    3:9

**-5-**

50 [1]    3:10
58 [1]    50:22

**-6-**

6900 [2] 51:17    52:21

**-7-**

78216 [3]    2:9
51:18    52:21
78521 [1]    2:5

**-8-**

83 [1]    41:23

**-9-**

9-26-53 [1]    5:3
900 [1] 2:8
9311 [1] 2:8

**-A-**

above [1]    49:2
above-styled [1]
1:17
absence [1]    40:20
accept [1]    33:15
accepts [1]    9:1
access [2]    24:17
24:20
accomplish [1] 33:11
accordance [1] 52:14
acknowledged [1]
49:11
action [2]    51:7
51:9
actual [2]    13:11
22:10
ADAMI [1]    2:8
added [1]    35:17
adjuster [3]    8:20
8:24    26:19
adjusters [1]    15:14
43:12
affected [1]    31:14
affiliated [1]    40:8
affix [1] 49:1
again [1]    24:7
24:17    24:20
against [2]    4:11
27:10
age [4] 33:20    34:1
34:10    34:15

**agent** [15]    5:16
5:24    6:25    7:4
7:10    8:11    8:23
13:25    15:13    27:11
29:21    30:6    30:8
30:12    30:15
agents [1]    30:1
ago [9]    10:15    13:1
17:2    17:13    18:10
23:23    24:2    29:19
37:14
agree [6] 4:21    6:14
13:7    13:10    39:2
39:9
agreed [1]    18:21
air [30]    9:15    13:12
16:5    16:6    16:6
16:8    16:23    19:4
19:6    19:7    19:10
19:17    20:12    20:23
21:1    21:23    23:8
26:10    34:17    34:22
35:4    35:16    35:20
36:5    36:21    36:25
37:4    37:5    37:6
39:21
AL [2]    1:5    50:4
all's [2]    14:2    46:25
allergies [3]    31:16
31:23    32:16
allergy [1]    32:18
Allstate [40]    1:5
4:11    5:13    6:22
8:23    8:24    10:10
14:25    15:13    18:24
21:20    23:1    25:3
25:6    25:13    25:16
25:19    26:1    26:4
27:5    27:13    27:16
27:19    27:24    28:9
28:13    28:17    30:4
30:8    30:15    33:3
33:7    37:24    40:4
40:7    40:8    43:15
45:18    46:14    50:4
along [1]    39:13
always [3]    5:5
5:6    19:15
amount [1]    29:1
50:20
Anderson [3]    33:5
45:25    46:4
anguish [2]    32:23
33:9
answered [1]    26:25
Antonio [3]    2:9
51:18    52:21
Appearances [1]
3:4
appeared [1]    49:9
application [1] 7:15
appointment [1]
45:25    46:5
appointments [1]
33:4
appreciate [1]    47:4

**appropriate** [1] 33:16
approved [1]    8:7
area [2]    23:12
areas [4] 17:13    18:23
28:4    39:6
asserted [1]    44:24
assume [1]    38:1
attached [2]    1:24
52:5
attorney [9]    38:9
38:11    38:14    45:11
45:16    50:17    51:3
51:4    52:9
attorney's [1]    38:2
attorney-client [1]
38:4
attorneys [2]    45:1
51:7
automobile [1] 30:3
aware [14]    4:24
8:3    8:6    8:19
8:21    9:8    9:17
10:3    10:7    14:21
33:25    39:4    42:22
45:18
away [4] 17:23    17:24
18:6    41:25

**-B-**

baby's [1]    35:18
background [2] 5:1
11:12
bad [2]    15:25    31:18
Bair [1]    26:24
bank [3] 29:13    29:14
29:15
Barrera [1]    1:21
basis [1] 5:8
bathroom [9]    15:25
16:1    16:2    16:3
16:15    16:16    23:13
23:16    24:2
beginning [1]    4:15
benefit [1]    4:11
benefits [2]    40:25
41:4
Benito [2]    32:12
32:15
Bennie's [4]    37:5
37:6    37:16    37:18
beside [1]    22:7
best [2] 19:7    22:1
between [1]    8:22
birth [1] 5:2
birthdate [1]    5:3
black [2]    15:18
17:7
bleach [2]    17:19
17:21
blue [2] 17:7    41:6
boards [2]    20:17
20:18

**bother** [1]    31:4
bottom [1]    22:17
bought [1]    5:11
bring [1]    45:25
Brown [1]    26:22
Brownsville [2]
1:22    2:5
building [2]    20:6
20:13
built [2] 34:5    34:7
Buren [1]    1:22
business [2]    5:24
6:1
buy [1]    5:13

**-C-**

C [1]    2:1
C-o-c-o-z-z-a [1]
5:23
cabinet [5]    22:8
22:9    22:11    22:12
22:17
CAMERON [2]
1:4    50:3
cancel [2]    6:8
6:12
canceled [5]    6:17
21:8    21:11    21:15
21:20
cancer [2]    13:1
13:5
card [1] 49:10
care [1]    22:22
Carrales [23]    1:2
1:3    1:10    1:15
2:11    3:6    4:2
4:7    4:8    5:10
15:12    30:11    30:21
31:3    31:7    39:14
49:1    49:4    49:9
50:2    50:2    50:6
50:12
cases [1]    43:10
Cathy [1]    26:24
caused [1]    9:22
17:5    17:10    42:19
ceiling [1]    16:20
39:7
central [2]    35:4
35:13    35:14
certificate [2]    3:10
52:15
certification [3]
50:5    51:10    52:1
certified [4]    50:9
51:11    51:13    52:17
certify [1]    50:11
51:5
CHANGE [1]    48:2
changes [4]    3:9
48:1    52:5    52:6
changing [1]    29:25
charge [2]    52:11

children [3]        14:7
  41:10   41:11
chimney [3]        9:12
  9:17   12:11
Christina [1]      41:16
City [1] 12:11
Civil [1] 1:23
claim [34]         9:1
  10:4   14:22   15:1
  18:12   18:14   18:16
  18:18   20:24   21:2
  21:5   23:1   25:6
  25:16   27:6   27:14
  27:17   27:20   27:25
  28:17   30:21   30:23
  32:23   40:9   40:11
  40:16   43:6   43:12
  43:15   43:20   44:5
  44:9   45:2   45:5
claiming [1]       31:9
  32:22   42:9
claims [14]        9:5
  9:9   9:11   10:3
  10:7   10:12   10:23
  21:7   21:12   21:15
  21:20   44:12   44:20
  44:23
clarify [2]        28:7
  42:12
Claritin [1]       32:20
clean [2]          17:19
  17:22
cleaned [3]        18:5
  18:11   37:11
clear [1] 11:5
Clerical [1]       11:24
Clerk [1]          52:16
close [4] 30:25    43:17
  43:18   43:18
closer [1]         32:15
closet [1]         16:8
  16:17   16:18
clothing [1]       42:15
Cocozza [3]        5:16
  5:18   5:24
coil [1] 37:12
Cole [1] 39:19
college [5]        11:13
  11:19   11:22   12:7
  41:18
common [1]         43:9
company [2]        5:15
  29:12
compensated [1]
  38:12
complaint [1] 46:13
compressor [2] 35:2
  35:3
concerned [1]     46:24
condenser [3]     20:9
  34:24   37:12
condition [6]      16:5
  16:6   31:15   32:23
  39:21   43:6

conditioner [9] 16:23
  19:6   19:18   26:11
  35:5   35:16   35:20
  36:25   37:4
conditioners [1]
  19:4
conditioning [14]
  9:16   13:12   16:8
  19:8   19:10   20:12
  20:23   21:2   21:23
  23:8   34:17   34:22
  36:5   36:21
conduct [1]        39:23
consideration [1]
  49:12
Consolidated [1]
  12:15
contact [4]        25:19
  26:4   33:5   38:14
contacted [5]      18:24
  25:6   25:13   25:16
  26:1
contains [1]       52:6
contract [2]       38:4
  38:6
conversation [1]
  31:6
conversations [7]
  8:10   14:25   15:13
  26:19   26:22   26:24
  30:20
copies [1]         52:12
copy [2] 7:24      52:14
correct [6]        4:12
  15:14   25:20   27:25
  29:10   49:2
cost [4] 28:10     28:22
  29:5   29:18
cough [1]          31:17
counsel [2]        51:1
  51:5
COUNTY [3]         1:4
  49:7   50:3
couple [1]         25:9
Court [4]          1:2
  50:2   51:16   52:20
courteous [1]      39:24
cousin [3]         30:13
  30:13   30:15
cover [1]          7:21
covered [2]        33:22
  46:11
criticisms [6]     8:16
  27:2   27:5   27:10
  27:13   40:1
Cross/Blue [1] 41:6
CSR [3] 1:19       51:15
  52:19
Custodial [1]      52:9

_____ -D- _____

D [1]      3:1

D-e-l-a-C-e-r-d-a [1]
  43:25
damage [13]        22:4
  26:6   26:7   26:9
  28:10   28:14   28:18
  28:20   40:12   40:19
  42:19   42:22   42:25
damages [6]        9:13
  9:14   9:20   31:9
  33:8   42:9
date [4] 5:2       38:9
  51:16   52:19
Davidson [2]       51:16
  52:20
dealt [1] 23:20
decide [2]         18:17
  18:18
Defendant [4]      1:16
  2:6   51:4   52:11
DelaCerda [1]      43:25
delivered [2]      52:9
  52:13
Department [1] 8:7
depend [1]         14:11
deposition [22]    1:9
  1:15   4:9   4:12
  4:15   4:16   4:22
  11:10   38:18   38:22
  49:1   .50:6   50:14
  50:16   50:21   50:25
  52:3   52:4   52:8
  52:10   52:12   52:13
depositions [1]    47:1
describe [1]       33:1
description [1]    49:10
diagnosed [1]      13:5
diary [1]45:4
difference [1]     8:22
different [2]      30:8
  30:12
district [7]       1:2
  1:5   12:15   12:22
  12:23   50:2   50:4
doctor [3]         31:23
  31:25   32:5
document [1]       49:11
documents [1]      13:8
dog [1]   6:13
done [3] 14:16     28:4
  37:9
door [6] 16:17     16:18
  17:6   17:7   17:19
  18:6
doors [2]          16:1
  16:17
Doug [1]           4:8
DOUGLAS [1] 2:7
down [2]           20:17
  44:15
Dr [5]   32:1   32:2
  32:4   32:8   32:9
drop [1] 6:6
dry [1]   22:21

duct [1] 37:19
due [2] 33:20      34:1
duly [3] 1:17      4:3
  50:12
during [2]         4:22
  46:6

_____ -E- _____

E [5]    1:21   2:1
  2:1   2:7   3:1
educational [1] 11:12
either [1]         19:4
employed [3]       12:8
  12:10   51:6
employer [1]       12:20
estate [1]         13:24
estimate [1]       29:5
estimates [2]      28:21
  29:2
ET [2]   1:5   50:4
EUO [1] 46:4
events [4]         23:7
  24:23   25:20   25:25
everywhere [1]     18:2
Exactly [2]        10:22
  46:23
examination [5]
  3:7   4:4   45:19
  45:22   50:18
example [4]        8:23
  42:15   43:10   43:17
except [2]         35:23
  49:2
excluded [1]       7:22
executed [1]       49:12
exhibit [3]        38:17
  38:18   38:22
exhibits [1]       52:12
expenses [1]       31:10
Expiration [2]     51:16
  52:19
expressed [1]      49:12
extent [1]         33:19

_____ -F- _____

face-to-face [1]7:8
fact [1] 46:16
facts [3] 43:8     43:13
  43:14
fair [4] 10:20     13:17
  42:21   46:19
falls [1] 23:5
family [1]         32:3
  32:4
fans [1] 22:23
far [2] 41:25      46:24
fees [2] 38:2      38:9
feet [1] 13:15
figuring [1]       25:7
filed [4] 4:11     10:4

45:22   52:16
filing [1]         33:12
fill [1]   7:15
finally [1]        19:22
financial [1]      40:18
financially [1]    51:8
finding [1]        41:18
fine [4] 5:22      31:19
  31:21   31:22
finished [1]       40:11
first [9] 4:3      7:12
  16:25   17:18   18:6
  18:22   22:23   38:14
  44:23
five [3] 36:11     36:12
  36:13
fixed [9]10:17     14:4
  19:15   19:18   19:23
  20:1   20:12   36:17
  37:1
floor [10]         16:5
  16:6   16:9   19:14
  20:8   20:14   22:6
  22:6   22:8   38:23
flooring [4]       20:6
  20:19   20:20   22:10
follow [1]         4:21
following [2]      50:11
  51:1
follows [2]        4:3
  50:21
foregoing [2]      49:1
  49:11
form [4] 28:15     31:11
  34:11   46:22
Four [1] 38:23
FRANK [3]          1:2
  2:11   50:2
Freer [2]30:14     30:16
friend [2]         43:17
  43:18
friends [1]        36:7
full [1]   4:6
furniture [1]      42:15

_____ -G- _____

Gary [1] 26:20
Garza [2]          32:8
  32:9
general [3]        15:16
  36:14   36:16
gentlemen [1]      39:23
Gilbert [2]        2:4
  45:9
given [7]          11:10
  14:18   14:19   14:23
  49:13   50:14   50:24
goes [1] 24:3
GOLDMAN [1]
  2:8
good [1] 40:3
gooey [1]          20:11

green [1]                39:7
grown [1]               14:7
guess [3]               17:3
  20:10   21:3   22:16
  38:3   44:7

-H-

half [1]   12:5   18:25
  37:14
Hall [1]   12:11
hand [1] 49:13
handled [5]             15:5
  15:6   15:12   27:6
  43:12
Harlingen [6]           7:3
  12:15   12:21   32:3
  32:15   37:16
headaches [1]          31:18
health [1]              31:9
  31:10   31:14
hear [1] 44:23
heard [1]               4:14
  44:13
hereby [1]              49:1
  50:10
herein [1]             52:15
hereto [1]              1:24
high [3]   11:13   11:14
  11:16
highlighter [1] 38:24
HOB [2] 8:4   8:6
hold [1] 20:18
home [35]               5:7
  5:11   13:15   14:3
  21:23   23:8   25:22
  26:9   29:9   29:16
  31:2   32:24   33:13
  33:16   33:20   33:25
  34:4   34:4   34:9
  34:13   35:14   35:20
  36:6   37:10   39:13
  40:12   42:6   42:13
  42:16   42:23   42:7
  43:19   45:10   45:15
  46:8
homeowner [2] 33:15
  33:23
homeowner's [5]
  6:17   7:18   7:19
  7:19   30:18
hope [1] 14:14
hopefully [2]           14:4
  28:4
hour [1] 31:22
house [10]             15:21
  19:4   23:6   25:23
  29:9   31:15   31:17
  31:20   33:20   44:1
housewife [1] 41:11
huh-uh [8]             10:25
  11:5   13:14   20:2
  26:21   40:21   43:1
  43:3
husband [32]            4:10

6:14   9:8   10:4
10:10   10:24   13:7
14:11   14:18   14:23
15:3   15:5   19:24
23:20   25:5   25:13
25:15   25:19   27:1
33:4   34:4   36:7
37:6   38:24   39:6
40:9   40:18   40:24
43:11   43:15   44:12
46:25
husband's [7] 4:12
  18:19   26:23   30:13
  30:15   36:7   45:19

-I-

idea [5]   15:16   19:22
  25:15   27:16   37:22
identity [1]           49:10
includes [1]           51:1
income [1]             41:8
individuals [1] 39:14
information [1] 5:1
  50:24
inside [8]             24:10
  34:19   34:25   35:9
  35:25   36:3   37:19
  42:13
inspections [1] 39:15
instance [1]           1:16
instructions [1] 4:14
  4:18   4:21
instrument [1] 49:11
insurance [22]         5:13
  5:15   6:18   6:23
  7:12   7:18   7:18
  8:8   8:20   10:12
  13:22   13:24   15:6
  15:7   29:21   29:25
  30:3   30:6   30:18
  31:3   40:20   42:14
insured [1]            6:3
  41:6   42:14
intend [1]             40:12
intending [1] 10:2
intentions [1] 14:2
  14:5
interested [1] 51:9
investigation [1]
  40:2
invoices [1]           13:8
involved [1] 11:8
  27:3
issue [5] 9:17   9:18
  9:21   31:7   46:19
issues [1]             33:21
itself [2] 24:4   24:5

-J-

job [1]   12:24
Joe [2]   30:11   30:20
  31:6
JUDICIAL [2]   1:5

50:4
July [3]   1:11   1:18
  50:6

-K-

keep [1] 23:6
keeping [1]            33:16
kept [1] 45:4
Kevin [1]             16:22
kind [7]   23:15   24:23
  26:4   41:4   41:10
  43:10   45:4
kitchen [5]            15:25
  16:13   21:25   22:2
  23:9
knew [1]               26:5
knowledge [6] 29:4
  40:7   43:8   43:13
  43:14   43:19
known [1]              49:9
Kohl [2] 39:19   39:22

-L-

last [3]   10:21   12:20
  43:24
lawsuit [12]           4:10
  5:8   9:18   9:21
  27:3   31:10   33:9
  33:12   37:23   42:10
  45:22   46:20
lawsuits [1]           11:8
leak [13] 19:8   19:11
  20:11   20:24   21:24
  22:2   23:8   23:9
  23:12   23:15   24:1
  36:17   37:1
leaked [1]             21:2
leaks [11]             10:18
  10:20   19:2   19:3
  21:22   23:7   24:22
  25:2   25:10   25:12
  36:21
least [1] 35:7
leave [1] 12:24
left [2]   13:2   15:3
legal [1] 38:6
less [2]   4:19   17:14
lifetime [1]           5:4
LINE [2]               2:5
  48:2
LISA [4]               1:19
  50:9   51:15   52:19
listed [1]             13:22
live [3]   14:12   41:21
  44:1
lived [3] 5:4   5:5
  5:7
living [2]             14:9
  41:19
LLOYDS [1]             1:5
  50:4
locations [1] 39:2

looks [1]              15:16
Luis [1] 36:9

-M-

M [1]      2:4
M.D [3] 33:4   45:25
  46:4
ma'am [5]              4:6
  11:12   29:23   46:11
  47:4
machine [1]            1:20
maintaining [1] 33:16
maintenance [10]
  23:6   33:21   34:1
  36:5   36:11   36:15
  36:16   36:24   37:3
  37:9
man [1] 41:17
manner [1]            39:24
marked [3]            38:18
  38:24   39:6
market [1]            13:17
married [1]            5:10
Martinez [2]           1:21
  1:21
materials [1] 20:6
  20:13
matters [1]            15:6
may [2]   8:4   43:8
mean [9]               6:25
  13:24   16:8   22:8
  28:19   28:24   34:3
  42:20   43:18
means [1]             14:16
  40:19   42:12
meant [1]             15:6
media [1]             44:19
medical [1]            31:9
medication [2] 32:18
  32:19
men [1]   23:20
mental [2]            32:22
  33:9
Mercedes [8]           5:3
  11:15   11:16   12:11
  41:22   41:23   41:25
  44:2
met [2]   7:6   7:8
middle [1]            41:16
miles [1]             42:1
  42:2
mind [2] 27:16   37:22
minutes [1]           50:22
mold [26]              9:23
  15:16   15:24   16:12
  17:9   17:12   18:9
  18:23   26:16   28:6
  28:11   28:14   28:18
  28:20   28:20   31:7
  38:25   39:22   40:12
  40:20   42:19   44:9
  44:12   44:19   44:23
  45:2

MoldPro [2]           28:23
  38:19
moment [1]            14:6
money [6]             27:19
  27:24   28:2   33:8
  37:23   38:1
Moore [2]             51:16
  52:20
mop [2] 19:14   19:20
mortgage [2]           29:9
  29:12
moving [1]            14:5
mumbling [1] 45:13
Myers [2]             32:1
  32:2   32:4

-N-

N [2]     2:1   3:1
name [9]               4:6
  4:8   26:19   29:13
  29:14   29:15   43:22
  43:24   49:11
nature [1]            20:7
Navy [1]              41:14
necessary [3]          21:6
  23:3   23:4
need [2] 18:20   42:12
needed [4]            18:15
  18:17   24:6   24:18
needs [1]             34:14
  34:14
neighbor [1]          43:19
neither [1]            51:5
never [5]              16:22
  18:19   23:24   25:18
  31:6
new [3]   22:15   22:17
  22:17
newspaper [1] 44:21
nice [2] 40:3   47:2
none [2] 14:6   25:2
nor [1]   51:6
NOTARY [1]            49:15
noted [1]             49:2
notes [1]             45:4
nothing [1]            8:15
notice [4]            16:25
  17:5   17:10   17:12
noticed [1]           17:18
  18:22   39:7
now [3]   14:17   7:4
  14:17   31:12   32:1
  33:10   35:19   41:18
number [4]            16:3
  16:15   23:16   38:22
numbered [1] 1:18

-O-

oath [4] 4:24   45:19
  45:23   49:10
Objection [4] 28:15

obviously - Seligman                    CondenseIt!™                    Sandra Carrales
July 31, 2003

| | | |
|---|---|---|
| 31:11    34:11    46:22 | **pay** [7]    27:17    27:19 | 15:10 |
| **obviously** [3]    35:13 | 27:24    28:9    28:13 | **prepared** [1]    29:4 |
| 43:10    43:11 | 28:17    38:9 | **preparing** [1]    52:11 |
| **occurred** [2]    25:12 | **paying** [4]    15:8 | **present** [2]    2:10 |
| 51:12 | 15:9    15:10    15:10 | 39:13 |
| **off** [1]    24:8 | **Pedro** [3]    2:8 | **presume** [1]    15:24 |
| **office** [7]    7:13 | 51:17    52:21 | **previous** [1]    9:5 |
| 7:14    7:21    8:11 | **Pena** [1]    39:17 | **previously** [3]    14:18 |
| 9:6    32:11    49:13 | **Pennebaker** [8]    2:7 | 26:14    38:18 |
| **officer** [3]    50:13 | 3:7    4:5    4:9 | **price** [1] 29:16 |
| 50:25    52:4 | 5:22    47:3    50:22 | **primary** [1]    31:25 |
| **officer's** [1]    52:10 | 51:4 | **problems** [5]    21:22 |
| **offices** [1]    1:21 | **people** [4]    15:1 | 31:10    33:19    33:25 |
| **often** [1] 42:4 | 21:16    27:3    44:13 | 46:7 |
| **oldest** [1]    41:11 | **PEREZ** [1]    2:4 | **Procedure** [1]    1:23 |
| **once** [4] 26:25    31:1 | **period** [1]    6:16 | **proceeding** [1]    51:7 |
| 36:12    40:11 | **person** [3]    36:17 | **process** [1]    40:2 |
| **one** [11]    7:3    13:2 | 43:12    49:11 | **processes** [1]    9:1 |
| 18:19    19:24    26:23 | **personal** [4]    42:10 | **produced** [1]    1:16 |
| 34:18    34:19    35:10 | 42:11    42:13    42:23 | **professional** [1] |
| 36:7    36:25    41:17 | **personally** [2]    42:11 | 39:24 |
| **opinion** [1]    13:17 | 27:2    49:9 | **property** [4]    6:4 |
| **opposed** [1]    33:21 | **perspective** [1] 45:21 | 42:10    42:13    42:23 |
| **oral** [3]    1:9    1:15 | **pertaining** [2]    13:11 | **prospective** [1]    28:2 |
| 50:14 | 14:22 | **proved** [1]    49:10 |
| **original** [3]    52:3 | **phone** [1]    7:13 | **provided** [1]    45:23 |
| 52:8    52:11 | 26:25 | **provisions** [1]    1:23 |
| **otherwise** [1]    51:9 | **photographs** [3] | **PUBLIC** [1]    49:15 |
| **outcome** [1]    51:9 | 45:7    45:10    45:15 | **purchase** [1]    29:16 |
| **outside** [5]    34:20 | **picked** [1]    7:3 | **purchased** [1]    7:12 |
| 34:23    35:3    35:10 | **piece** [1] 24:15 | **purchasing** [1]    15:7 |
| 35:23    37:7 | **Piette** [12] | **purposes** [1]    49:12 |
| **over-the-counter** [1] | 2:4    5:20    5:23 | **pursuant** [3]    1:22 |
| 32:19 | 28:15    31:11    34:11 | 50:24    51:10 |
| **own** [2]    14:9    25:22 | 35:2    46:22    47:6 | **put** [6]    13:20    20:18 |
| | 50:23    51:3 | 22:15    22:23    24:5 |
| **-P-** | **pillars** [1]    20:18 | 24:14 |
| | **pipe** [5]    20:9    23:17 | **repo** [1]    41:17 |
| **P** [2]    2:1    2:1 | 24:3    24:4    24:5 | **report** [1]    38:19 |
| **p.m** [2]    1:18    1:19 | **piping** [1]    22:15 | **reported** [7]    1:20 |
| **page** [3]    3:3    48:2 | 22:17 | 9:5    9:9    9:11 |
| 52:6 | **place** [3]    5:2 | 9:12    23:24    25:2 |
| **paid** [1]    29:9 | 14:12    16:22 | **Reporter** [2]    50:10 |
| **paint** [1] 18:8 | **places** [1]    15:19 | **Reporter's** [2]    3:10 |
| **painted** [1]    18:6 | 26:14 | 50:5 |
| **panel** [1]    24:3 | **Plaintiff** [2]    2:3 | **Reporters** [2]    51:16 |
| **paneling** [1]    20:7 | 51:3 | 52:20 |
| **paper** [1]    44:17 | **plan** [1] 38:23 | **representation** [1] |
| **Pardon** [2]    26:8 | **plans** [1]    29:25 | 38:7 |
| 45:12 | **plumbing** [1]    13:12 | **Republic** [6]    5:16 |
| **PAREDES** [1]    2:5 | **plywood** [1]    24:5 | 6:3    6:6    6:17 |
| **parents** [1]    41:19 | 24:15 | 10:12    10:24 |
| **part** [1]    42:16 | **PMB** [2] 51:17    52:20 | **requirements** [1] |
| **particular** [2]    7:17 | **policy** [19]    6:8 | 51:10 |
| 46:13 | 6:12    7:19    7:21 | **reserve** [1]    47:6 |
| **parties** [3]    51:1 | 7:22    7:24    8:1 | **resolution** [1]    46:21 |
| 51:6    52:15 | 8:4    8:6    8:13 | **resolved** [3]    33:14 |
| **parts** [1] 35:4 | 8:14    8:16    8:23 | 40:16    46:17    46:18 |
| **party** [1] 50:20 | 21:7    21:11    21:14 | **respect** [1]    46:25 |
| **pass** [1]    47:4 | 21:19    33:22    42:14 | **responsibility** [3] |
| **past** [4]    19:12    36:11 | **possession** [1]    13:9 | 23:6    33:15    33:22 |
| 36:12    36:13 | **practice** [2]    32:3 | **Restoration** [1] 39:20 |
| | 32:9 | |
| **premiums** [2]    15:9 | |

| | |
|---|---|
| 15:10 | **receive** [1]    40:24 |
| **prepared** [1]    29:4 | **receptionist** [1] 41:17 |
| **preparing** [1]    52:11 | **Recess** [1]    46:10 |
| **present** [2]    2:10 | **recommended** [1] |
| 39:13 | 7:1 |
| **presume** [1]    15:24 | **record** [4]    1:24 |
| **previous** [1]    9:5 | 11:6    50:14    51:2 |
| **previously** [3]    14:18 | **recorded** [3]    14:17 |
| 26:14    38:18 | 14:19    14:21 |
| **price** [1] 29:16 | **redo** [1] 37:19 |
| **primary** [1]    31:25 | **redone** [1]    34:14 |
| **problems** [5]    21:22 | **regarding** [1]    34:14 |
| 31:10    33:19    33:25 | **related** [1]    51:6 |
| 46:7 | **remember** [24]    4:18 |
| **Procedure** [1]    1:23 | 7:16    7:23    11:2 |
| **proceeding** [1]    51:7 | 17:1    19:3    19:3 |
| **process** [1]    40:2 | 19:6    19:9    19:10 |
| **processes** [1]    9:1 | 19:13    20:1    20:5 |
| **produced** [1]    1:16 | 20:22    22:1    22:3 |
| **professional** [1] | 22:3    22:14    25:14 |
| 39:24 | 25:17    26:2    26:3 |
| **property** [4]    6:4 | 29:14    29:16 |
| 42:10    42:13    42:23 | **reminding** [1]    11:3 |
| **prospective** [1]    28:2 | **repair** [5]    25:22 |
| **proved** [1]    49:10 | 28:10    28:18    36:14 |
| **provided** [1]    45:23 | 40:12 |
| **provisions** [1]    1:23 | **repaired** [3]    23:19 |
| **PUBLIC** [1]    49:15 | 24:14    33:13 |
| **purchase** [1]    29:16 | **repairs** [3]    13:12 |
| **purchased** [1]    7:12 | 28:22    40:19 |
| **purchasing** [1]    15:7 | **rephrase** [1]    28:16 |
| **purposes** [1]    49:12 | **replace** [4]    20:13 |
| **pursuant** [3]    1:22 | 22:5    36:3    37:19 |
| 50:24    51:10 | **replaced** [13]    10:16 |
| **put** [6]    13:20    20:18 | 20:16    20:21    22:6 |
| 22:15    22:23    24:5 | 22:7    22:10    22:13 |
| 24:14 | 23:17    24:1    34:10 |
| **repo** [1]    41:17 | 34:14    35:23    37:7 |

**-Q-**

| | |
|---|---|
| **Quantum** [5]    28:24 | **restroom** [5]    9:15 |
| 28:25    29:1    29:6 | 17:6    23:10    23:11 |
| 39:20 | 26:10 |
| **questions** [3]    4:5 | **result** [4]    4:10 |
| 46:12    47:6 | 24:1    32:23    41:2 |
| | **retired** [3]    12:25 |
| **-R-** | 41:12    41:13 |
| | **retirement** [2]    40:25 |
| **R** [1]    2:1 | 41:4 |
| **rain** [1]    10:5 | **return** [1]    50:18 |
| **read** [4]    8:1    44:17 | **returned** [3]    52:3 |
| 44:21    49:1 | 52:5    52:8 |
| **real** [3]    13:24    15:25 | **REYNOLDS** [4] |
| 31:18 | 1:19    50:9    51:15 |
| **really** [6]    11:5 | 52:19 |
| 17:3    38:15    42:17 | **right** [34]    9:19 |
| 44:7    46:11 | 10:5    10:6    11:18 |
| **reason** [3]    21:9 | 13:6    14:14    14:16 |
| 31:13    48:2 | 15:8    16:14    16:19 |
| **reasons** [3]    13:2 | 16:24    20:5    24:16 |
| 52:6 | 24:18    25:3    25:21 |
| **receipts** [3]    13:8 | 26:18    27:22    28:1 |
| 13:11    13:14 | 28:12    30:17    31:12 |
| | 32:1    33:10    34:6 |
| | 34:20    35:15    35:24 |
| | 37:8    39:8    41:1 |
| | 41:18    46:3    47:3 |
| | **ROAD** [1]    2:5 |
| | **roof** [4]    10:13    10:16 |
| | 10:18    10:20 |
| | **Rosales** [6]    36:8 |
| | 36:9    36:9    36:10 |
| | 36:24    37:4 |
| | **Rosemary** [1]    43:23 |
| | **rude** [1]    40:4 |
| | **Rule** [3]    51:11    52:1 |
| | 52:14 |
| | **Rules** [1]    1:22 |

**-S-**

| | |
|---|---|
| **S** [1]    2:1 | |
| **sale** [1]    13:20 | |
| **San** [8]    2:8    2:9 | |
| 32:12    32:14    51:17 | |
| 51:18    52:21    52:21 | |
| **Sandra** [12]    1:3 | |
| 1:10    1:15    3:6 | |
| 4:2    4:7    49:1 | |
| 49:4    49:9    50:2 | |
| 50:6    50:12 | |
| **saw** [2]    18:11    26:16 | |
| **school** [5]    11:13 | |
| 11:14    12:15    12:22 | |
| 12:23 | |
| **screws** [1]    24:6 | |
| **seal** [1]    49:13 | |
| **secretary** [3]    11:24 | |
| 11:24    12:3 | |
| **see** [9]    18:2    18:7 | |
| 20:10    20:11    28:7 | |
| 32:6    35:18    38:23 | |
| 39:6 | |
| **selecting** [1]    6:22 | |
| **Seligman** [1]    26:20 | |

sell [1]    30:18
sells [1]  8:23
separate [1]    14:9
separately [1]    42:14
served [1]    52:15
seven [1]    13:1
Several [1]    21:16
sheetrock [1]    20:6
shorthand [1]    1:20
=50:9
show [3] 38:17    38:22
38:22
shower [2]    23:18
24:3
shown [1]    52:15
SHUFFIELD [1]
2:8
side [1]    24:11
signature [5]    3:9
48:1    49:1    50:18
52:6
signed [1]    38:4
Silva [7] 7:5    7:6
7:20    8:11    8:19
27:11    29:22
Silva's [1]    9:6
simply [1]    27:14
sink [11] 9:15    15:25
16:13    16:15    17:10
17:20    21:25    21:25
22:2    23:9    26:10
sinks [1]    19:4
sister [1]    43:21
sit [1]    42:21
sitting [1]    4:11
six [1]    12:25
skimmed [1]    8:2
smell [2]    17:11
26:5
smelled [1]    26:5
sneeze [1]    31:17
sold [1]  8:17
son [1]    41:17
sorry [9] 9:4    10:1
11:2    11:21    20:4
40:23    42:12    43:5
45:13
sources [1]  41:8
specifically [1] 26:3
spell [2] 5:17    5:20
spoken [1]    45:1
spots [2] 18:2    18:7
square [1]    13:15
stains [1]    39:7
state [7] 1:20    4:6
11:22    12:7    49:6
49:16    50:10
statements [3]    14:17
14:19    14:21
stay [1]    18:4
STE [1] 2:8

still [7]    5:24    17:8
18:2    18:7    29:21
32:9    41:19
stopped [1]    19:16
structural [1]    46:7
structure [1]    42:16
study [1]    11:23
stuff [2] 20:11    44:19
submitted [1]    27:25
50:16
subscribed [1]    39:11
substance [3]    15:18
15:20    15:23
such [1] 39:15
sudden [1]    17:7
suffered [1]    32:22
Suite [2] 51:17    52:21
suppose [1]    18:5
supposed [1]    38:11
supposedly [2] 9:23
28:5
suspect [1]    38:25
switch [1]    32:13
switched [1]    29:14
sworn [3]    1:17
4:3    50:13

-T-

taking [2]    23:13
32:18
Technical [2]    11:22
12:7
televisions [1]    42:15
Ten [1]    12:17
terms [3]    13:11
27:5    43:6
tested [1]    32:16
testified [1]    4:3
testimony [2]    50:14
50:25
Texas [17]    1:4
1:5    1:20    1:22
1:22    2:5    2:9
5:3    11:22    12:7
30:14    49:6    50:3
50:4    50:10    51:18
52:21
thank [1]    47:3
theirs [1]    42:7
theirself [1]    41:18
themselves [1]    39:13
therefor [1]    52:7
therein [1]    49:12
thought [2]    18:8
18:23
three [12]    6:19
17:3    17:13    18:10
18:23    21:3    21:4
23:22    23:22    24:2
32:6    38:18
through [4]    2:9
8:2    41:6    49:10

tile [1]    24:8
times [3]    33:2
36:10    36:25
today [4]    42:22
46:12    46:14    47:1
Tony [4] 7:5    7:6
29:22    34:8
too [8]    21:12    21:15
21:20    27:7    27:8
27:14    46:18    46:20
took [1] 45:8
transcript [3]    50:13
50:16    52:12
TRCP [2]    51:11
52:1
treated [1]    46:24
trial [1] 47:7
tried [1]    19:15
trips [1] 32:14
true [2] 49:2    50:14
trying [2]    25:24
41:18
TSTC [2]    11:20
12:7
tub [1]    23:12
turned [2]    45:11
45:16
TV [1]    44:15
Twenty-seven [1]
5:9
two [18] 6:19    11:13
11:18    11:25    14:17
14:22    17:3    17:13
18:10    18:25    18:25
21:3    21:4    23:22
23:22    24:2    34:17
35:4
two-by-fours [1]
20:6
type [3] 7:17    15:20
15:23

-U-

under [13]    4:24
16:12    16:15    17:10
17:19    20:19    20:20
42:14    45:19    45:23
49:10    49:13    52:1
underneath [3]    16:23
22:11    22:12
understand [2]    8:22
35:7
understood [1]    25:18
unit [7]    34:19    34:20
34:22    35:23    36:3
37:7    37:19
units [2] 34:17    35:11
untruthful [1]    40:8
up [5]    12:10    15:3
20:18    22:21    23:6
upkeep [1]    33:17
used [4] 17:19    17:21
37:3    50:20

usually [1]    36:20

-V-

Valley [1]    5:5
value [1]    13:18
Van [1]    1:21
various [1]    39:14
vet [2] 41:12    41:13
visit [1] 42:4
voice [1]    46:14
Volume [1]    1:12
VS [2]    1:4    50:3

-W-

wait [2] 21:1    21:4
waiting [1]    40:14
wall [1]    24:12
was/was [1]    52:3
watch [1]    44:15
water [25]    9:13
9:14    19:2    19:3
21:22    21:22    22:4
23:7    23:7    23:12
24:22    24:22    26:6
26:7    26:9    28:5
28:10    28:14    28:18
28:20    40:12    40:19
42:19    42:22    42:25
wear [1] 34:10
week [1] 19:19
weeks [1]    6:19
wet [4]    19:15    20:7
20:8    43:2
whole [1]    46:19
wind [1] 10:5
window [1]    35:11
windstorm [1] 9:12
wish [1] 46:17
without [1]    6:17
witness [6]    1:16
47:5    50:12    50:15
50:17    50:18
worked [1]    12:3
worry [3]    33:3
33:6    33:6

-X-

X [1]    3:1

-Y-

Y [1]    1:21
year [5] 12:5    12:13
31:1    37:14    37:14
years [27]    5:9
6:5    10:15    10:21
11:13    11:19    11:25
12:17    13:1    17:3
17:13    18:10    18:25
18:25    21:3    21:4
23:23    24:2    25:10
29:11    29:19    32:6

35:18    35:21    36:11
36:12    36:13
yellow [1]    38:24
yet [4]    9:24    10:1
14:13    29:7

# EXHIBIT "E"

# In The Matter of:

*Frank Carrales and*
*Sandra Carrales*

*Vs.*

*Allstate Texas Lloyd's, et al.*

---

*Frank Carrales*
*July 31, 2003*

*No. 2003-01-295-C*
*197th / Cameron County, Texas*

---

*Lisa Reynolds*
*Davidson & Moore Court Reporters, Inc.*
*6900 San Pedro Avenue, Suite 147*
*P.M.B. #314*
*San Antonio, Texas 78216*
*(210) 340-4655   Fax: (210) 340-4450*

**Word Index included with this CondenseIt**



**Page 1**

```
 1           NO. 2003-01-295-C

 2
   FRANK CARRALES AND    )    IN THE DISTRICT COURT
 3 SANDRA CARRALES       )

 4 VS.                   )    CAMERON COUNTY, TEXAS
                         )
 5 ALLSTATE TEXAS LLOYDS,)
   ET AL                 )    197TH JUDICIAL DISTRICT
 6

 7

 8        * * * * * * * * * * * * * * * *

 9             ORAL DEPOSITION OF

10              FRANK CARRALES

11             JULY 31ST, 2003

12             Volume 1 of 1

13        * * * * * * * * * * * * * * * *

14          ORAL DEPOSITION of FRANK CARRALES,

15 produced as a witness at the instance of the Defendant,

16 and duly sworn, was taken in the above-styled and

17 numbered cause on the 31st of July 2003, from 10:07

18 a.m. to 12:10 p.m., before LISA REYNOLDS, CSR in and

19 for the State of Texas, reported by machine shorthand,

20 at the offices of MARTINEZ, BARRERA Y MARTINEZ, 1201 E.

21 Van Buren, Brownsville, Texas, pursuant to the Texas

22 Rules of Civil Procedure and the provisions stated on

23 the record or attached hereto.

24

25
```

**Page 2**

```
 1        A P P E A R A N C E S

 2

 3 FOR THE PLAINTIFF:

 4      GILBERT M. PIETTE
        PEREZ & ASSOCIATES
 5      436 PAREDES LINE ROAD
        BROWNSVILLE, TEXAS 78523
 6
   FOR THE DEFENDANT:
 7
        DOUGLAS E. PENNEBAKER
 8      ADAMI, GOLDMAN & SHUFFIELD
        9311 SAN PEDRO, STE 900
 9      SAN ANTONIO, TEXAS 78216

10 ALSO PRESENT:

11      SANDRA CARRALES

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
 1              I N D E X

 2

 3                              PAGE

 4 Appearances                   2

 5

 6 FRANK CARRALES

 7      Examination by Mr. Pennebaker    4

 8

 9 Signature and Changes         79

10 Reporter's Certificate        80

11

12          E X H I B I T S

13 Exhibit One                   4

14      5-25-02 Statement

15 Exhibit Two                   4

16      7-12-02 Statement

17 Exhibit Three                 4

18      MoldPro Report

19 Exhibit Four

20      Floor Plan               4

21

22

23

24

25
```

**Page 4**

1 (TIME 10:07)
2            FRANK CARRALES,
3 having been first duly sworn, testified as follows:
4            EXAMINATION
5 Questions by Mr. Pennebaker:
6 (Exhibits One, Two, Three and Four marked)
7    Q. Sir, could you please state your full name?
8    A. Francisco Carrales.
9    Q. Mr. Carrales, my name is Doug Pennebaker.  We
10 just met before the deposition.  I'm here on behalf of
11 Allstate as a result of a lawsuit that you and your
12 wife have filed against them.  Do you understand that,
13 sir?
14    A. Yes.
15    Q. I'm a lawyer from San Antonio, and I'll be
16 taking both you and your wife's deposition today.  Have
17 you ever given a deposition before or is this the first
18 time?
19    A. This is the first time.
20    Q. As you can see, there is a Court Reporter who
21 is sitting to your right, and she's going to be writing
22 down everything that you and I say today.  So it's
23 important to give verbal responses to all the questions
24 as opposed to like shaking your head or something of
25 that nature.  Okay, sir?

July 31, 2003                    CondenseIt!™                    Frank Carrales

Page 5

1  A. Okay.
2  Q. It's also important that you understand the
3 question before you try to answer it. The reason for
4 that is, you are under oath today, and we can rely upon
5 the answers that are given in this deposition for
6 purposes of trial. Do you understand that?
7  A. I do.
8  Q. I want you to be comfortable during the
9 deposition today. So if you need to take a break for
10 whatever reason, just let me know, and that will be
11 fine. Okay?
12  A. Okay.
13  Q. We tend to talk over each other in everyday
14 conversation. It's not being rude or anything. We
15 just do that. You anticipate my question, for example,
16 and you start answering before I finish it. We have to
17 make an effort not to do that today because she can
18 only take down what one of us is saying at one time.
19 Okay?
20  A. All right.
21  Q. Do you have any questions about the deposition
22 process before we go any further?
23  A. Not that I can recall that I need to ask.
24  Q. What is your date and place of birth, please?
25  A. My place of birth is Rio Bravo, Tamaulipas,

Page 6

1 Mexico, 6-21-37.
2  Q. How long have you lived in the United States?
3  A. All my life.
4  Q. Are you a U.S. citizen?
5  A. Yes, sir.
6  Q. What is your social security number?
7  A. I don't know, but I can look.
8  Q. You must not have been in the military.
9  A. I was in the military, but we didn't use
10 social security numbers, that was --
11  Q. Oh, you didn't? I found out I needed to know
12 my social security number pretty fast. They were using
13 social security numbers when I came along.
14  A. 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.
15  Q. Thank you, sir. What is your current address?
16  A. 8359 Business 83.
17  Q. And that's in Harlingen?
18  A. In Harlingen, Texas.
19  Q. How long have you lived at that address
20 approximately?
21  A. 26, 27 years.
22  Q. And your wife is here in the deposition with
23 you today?
24  A. Yes, sir.
25  Q. And what is her name?

Page 7

1  A. Sandra Carrales.
2  Q. Approximately, how long have you and
3 Ms. Carrales been married?
4  A. 27 years, I guess.
5  Q. Do you all have children?
6  A. Yes, sir.
7  Q. How many children do you have?
8  A. Four.
9  Q. What are their names and ages, please?
10  A. Melissa Marie Carrales, that's one -- one --
11  Q. Oh, one -- one --
12  A. Yeah.
13  Q. -- one lady. Okay.
14  A. Right.
15  Q. Yes, sir.
16  A. Veronica -- Christina. I'm sorry. Christina
17 Veronica, Francisco Javier, and Raymond Elvira.
18  Q. Do you know their ages, sir?
19  A. No, sir.
20  Q. Are they all adults?
21  A. Yes.
22  Q. Do any of the children live with you?
23  A. No, sir.
24  Q. Do they live in the Valley?
25  A. One does -- two, Francisco and Christina.

Page 8

1  Q. Where do they live, what town?
2  A. Harlingen.
3  Q. Are you employed?
4  A. Retired.
5  Q. What did you do before you retired?
6  A. I worked for Texas State Technical College as
7 an instructor.
8  Q. And what kind of instructor?
9  A. Welding.
10  Q. And how long were you a welding instructor
11 there?
12  A. 27 years.
13  Q. And do you receive retirement benefits as a
14 result of your 27 years of employment there?
15  A. Yes, I do.
16  Q. Do you have health benefits as well?
17  A. Yes, sir.
18  Q. Who is your health insurance company?
19  A. Blue Cross/Blue Shield.
20  Q. What is your educational background generally?
21  A. High school.
22  Q. And where did you go to high school?
23  A. Premont.
24  Q. And did you graduate?
25  A. No, sir.

Page 9

1   Q. How far did you go in high school?
2   A. 11th grade.
3   Q. Sir, have you ever filed any other lawsuits
4 besides this one?
5   A. No.
6   Q. Has your wife ever filed any lawsuits to your
7 knowledge?
8   A. I don't know.
9   Q. Is anybody in your family in the legal
10 business?
11   A. No.
12   Q. Is anybody in your family in the construction
13 business?
14   A. No.
15   Q. Does your wife work?
16   A. Housewife.
17   Q. Has she worked in the last 10 years?
18   A. I'm not sure. I don't think so. I really
19 don't know that.
20   Q. One thing that I did not tell you at the
21 beginning of the deposition that I should have is that
22 I may ask you some questions today that you don't know
23 the answer to, and if you don't know the answer to it,
24 that's okay, just tell me. You don't have to know the
25 answer to all the questions.

Page 10

1   A. Okay.
2   Q. Why did you file this lawsuit against
3 Allstate?
4   A. We found some water draining from the air
5 conditioning system and the -- we saw some
6 moldy-looking stuff under the kitchen sink.
7   Q. When did you find water draining from the air
8 conditioning system?
9   A. Dates, I don't have a clue. I don't know.
10   Q. So are you saying that you filed a lawsuit
11 against Allstate because you found water coming from
12 the air conditioning system and because you saw mold
13 under the kitchen sink?
14   A. I filed, I guess, a claim. A claim.
15   Q. And what did you file the claim for?
16   A. There was water damage and black stuff under
17 the sink.
18   Q. The kitchen sink?
19   A. Uh-huh. Yes, sir.
20   Q. And who did you file the claim with?
21   A. Allstate. The --
22   Q. How long have you had Allstate insurance?
23   A. I don't know how many years.
24   Q. My records show that you were not insured on
25 this home with Allstate until 1998. Do you have any

Page 11

1 reason to disagree with that?
2   A. I don't remember.
3   Q. Does your wife handle the insurance matters?
4   A. Yes, sir.
5   Q. Did you have an insurance company on this home
6 before Allstate?
7   A. Yes, we did.
8   Q. And who was that?
9   A. It used to be Republic.
10   Q. How long did you have Republic as the
11 insurance company?
12   A. I don't know how long we had it. Because the
13 insurance company we were insured with, Cocozza,
14 Shepherd and Conley, you know, changed insurance, and
15 we were still insured with -- I don't know.
16   Q. I'm sorry. I didn't understand what you just
17 said.
18   A. The insurance people that sell the insurance?
19   Q. The agent?
20   A. The agent, yeah. The agent, I think, was
21 Shepherd, Cocozza and Conley or somebody, and they had
22 Republic, that's the policy we bought, and I think that
23 that's the only policy we've had besides Allstate. I'm
24 not sure though.
25   Q. But the name of the agent when you had the

Page 12

1 Republic policy was Shepherd --
2   A. Shepherd, Cocozza, and another guy.
3   Q. Ocosa?
4   A. Cocozza.
5   Q. Cocozza. Do you have any idea how to spell
6 that?
7   A. C-o-c-c-o-z-a [sic], I think.
8   Q. Are they still in business?
9   A. I have no idea.
10   Q. Where was their office located?
11   A. In Harlingen.
12   Q. How old is the home?
13   A. I was told that it was built in the 1940's or
14 thereabouts.
15   Q. Who told you that?
16   A. Allstate.
17   Q. But you've only owned it for 26 years?
18   A. 26 or 27 years.
19   Q. Is the home paid for?
20   A. Yes.
21   Q. How long has it been since you've had a
22 mortgage?
23   A. No clue.
24   Q. What was the purchase price for the home?
25   A. I don't remember.

July 31, 2003                          CondenseIt!™                          Frank Carrales

### Page 13

1  Q. Do you have any idea?
2  A. I'm sorry. I don't remember.
3  Q. How many square feet is the house?
4  A. I don't know that either. I really don't know
5  that.
6  Q. How many bedrooms do you have?
7  A. Three.
8  Q. How many bathrooms?
9  A. One and a half.
10 Q. And as I recall, this is a pier and beam home?
11 A. Yes.
12 Q. Does it have a central air conditioner or not?
13 A. Yes, sir.
14 Q. When was that put in?
15 A. Many years ago. I don't know when.
16 Q. Who is your current Allstate agent?
17 A. I think it's Bennie Silva or --
18 Q. Tony Silva?
19 A. Tony Silva. Okay.
20 Q. Have you ever had any conversations with Tony
21 Silva?
22 A. No, sir.
23 Q. Have you ever had any conversations with
24 anybody in Tony Silva's office?
25 A. With the secretary.

### Page 14

1  Q. And who was that?
2  A. I don't know the lady's name.
3  Q. What conversations did you have with his
4  secretary?
5  A. We just talked to her about the problem we
6  were having.
7  Q. Did you talk to her about the problems you
8  were having or did your wife do that?
9  A. I don't recall exactly. I think we may have
10 both talked to her.
11 Q. Do you remember what you told her?
12 A. No, sir.
13 Q. Do you remember what she told you?
14 A. No, I don't.
15 Q. How many insurance claims have you made
16 against Allstate in the past?
17 A. I know we made one on the chimney.
18 Q. And when was that?
19 A. I don't know any dates.
20 Q. Do you know a year?
21 A. I guess maybe three years ago. I'm not sure.
22 Q. And what was the chimney claim for?
23 A. The wind blew over the chimney.
24 Q. Was that during a rain?
25 A. A windstorm, rain-type thing, I think.

### Page 15

1  Q. Was there water damage as a result of that
2  windstorm and rain?
3  A. I think the water come in a little bit, but I
4  don't recall.
5  Q. Did an Allstate adjuster come out and inspect
6  the home?
7  A. Yes, he did.
8  Q. Do you remember who that was?
9  A. Not at all.
10 Q. Did you speak with that Allstate adjuster?
11 A. Yeah, he asked where the damage was at and I
12 showed him.
13 Q. Did Allstate pay that claim?
14 A. Yes, they did.
15 Q. What did they pay for?
16 A. What did they pay for?
17 Q. Yes, sir. What repairs did Allstate pay for?
18 A. Oh, for the -- for the chimney and for the
19 shingles that was needed there and that's all I
20 remember.
21 Q. So they paid for, I guess, putting the chimney
22 back up?
23 A. No, they took the chimney completely down, and
24 they put a wall there. They put a wall there.
25 Q. So they paid, I guess, to take the chimney off

### Page 16

1  and put a wall up?
2  A. Right.
3  Q. And did you say they paid to replace some
4  shingles?
5  A. Yes.
6  Q. Did they pay to replace any of the interior
7  drywall or ceiling or paneling that may have gotten wet
8  as a result of that?
9  A. I don't recall.
10 Q. Did you replace any of the ceiling or
11 sheetrock or paneling that got wet from that windstorm
12 and rain?
13 A. Yes, I did.
14 Q. What did you replace?
15 A. The ceiling and walls.
16 Q. Did you replace the ceiling and the walls or
17 did you paint over the wall damage?
18 A. No. When this was done, I put sheetrock.
19 When we had that little damage, we just went ahead and
20 sheetrocked everything.
21 Q. Tell me exactly what you replaced.
22 A. Well, we replaced, I think, some two-by-fours
23 -- a couple of two-by-fours in the wall.
24 Q. In which room?
25 A. In that -- right there joining the chimney --

Page 17

1 where we deleted the chimney.
2    Q. Is that the den?
3    A. Right. The sewing room, I think, my wife
4 calls it.
5    Q. And what did you replace besides two-by-fours?
6    A. We put a floor, part of a floor, where the
7 chimney was at.
8    Q. And was that a wood floor?
9    A. A wooden floor.
10   Q. What else did you replace?
11   A. We bricked up where the chimney was at on the
12 outside. We had that all bricked up and taken care of.
13   Q. Did you replace all of the interior wall and
14 sheetrock that got wet from that windstorm and rain or
15 did you leave part of the building materials in the
16 home that got wet?
17       MR. PIETTE: Objection, form.
18   A. I don't understand what you're asking me.
19   Q. You said that part of the building materials
20 on the inside of the house got wet from that windstorm
21 and rain, is that right?
22   A. Yes.
23   Q. Did you replace all of the building materials
24 that got wet or did you leave some of those wet
25 building materials in the home?

Page 18

1    A. We replaced everything that we needed to.
2    Q. But my question is: Did you replace all of
3 the building materials that got wet --
4    A. Yes.
5    Q. -- or did you leave some of those wet building
6 materials?
7    A. All that we saw that was wet was replaced.
8    Q. Do you know how much Allstate paid on that
9 claim?
10   A. No, sir.
11   Q. Were you satisfied with the way that Allstate
12 handled that claim?
13   A. Yes, I was.
14   Q. Do you remember any other prior or previous
15 claims that you made with Allstate besides the claim
16 for the chimney?
17   A. I don't recall.
18   Q. Have you made other insurance claims in the
19 past perhaps with Republic?
20   A. Yes, we did.
21   Q. What claims did you make with Republic?
22   A. It's so far back. I don't remember.
23   Q. For -- let me see if I can help -- did you
24 make a roof claim with Republic for damage to the roof?
25   A. I think we did, but I'm not positive. I think

Page 19

1 we did.
2    Q. When was the roof replaced?
3    A. I don't know any dates.
4    Q. Has the roof been replaced in the past 10
5 years?
6    A. I think we replaced it -- I think it was 10
7 years ago. No. The roof or shingles? What --
8    Q. Well, the shingles.
9    A. I don't -- I don't recall. I don't think. I
10 don't recall.
11   Q. Do you recall the names of any of the
12 contractors or workers that have come out to do work on
13 the home in the last 10 years, for example, roofers,
14 plumbers?
15       MR. PIETTE: Objection, form.
16   A. Like -- can you repeat the question again
17 because I don't understand what you're saying that --
18   Q. I'll repeat the question. Do you recall the
19 names of any contractors or workers that have come out
20 to do work on the home in the last 10 years?
21   A. One plumber years ago but I don't know how
22 long back.
23   Q. And who was that?
24   A. A man by the name of Cayo.
25   Q. Cairo?

Page 20

1    A. Cayo, C-a-y-o, that was his nickname. I don't
2 know what his name is.
3    Q. Do you have any idea where he is?
4    A. He's dead.
5    Q. When is the last time you had anyone come out
6 to do plumbing work on the house other than Cayo?
7    A. I had city water installed about -- maybe a
8 year ago.
9    Q. When is the last time you had somebody come
10 out to repair any plumbing problems?
11   A. I don't remember.
12   Q. Have you ever made plumbing repairs yourself?
13   A. I changed the -- the faucet -- not the faucet,
14 the cutoff outside for my sprinkler, for my -- what do
15 you call it -- where you take the hose off.
16   Q. Anything else?
17   A. I don't know plumbing.
18   Q. You don't know plumbing. Okay. Let me see if
19 I can help with this. I'm going to show you what I
20 have marked as Deposition Exhibit Number One and
21 Deposition Exhibit Number Two. Those are typed up
22 statements that you have given to Allstate
23 representatives in the past. Have you had a chance to
24 review those statements before the deposition?
25   A. Yes, we reviewed them briefly.

Page 21

1  Q. Are those, to your knowledge, true and correct
2  statements that you have previously given to Allstate
3  in this case?
4  A. As far as I can remember, yes.
5  Q. So to the extent that it's been a while since
6  you gave those statements, would it be okay for us to
7  rely upon the answers that you gave to those questions
8  in terms of when various problems occurred with the
9  home?
10        MR. PIETTE: Objection, form.
11  A. I can't remember them, all of this, unless I'm
12  looking directly at it, probably.
13  Q. And that's what I'm saying. You gave the
14  statement that I have marked as Deposition Exhibit
15  Number One back on May 25th of 2002. Do you remember
16  giving that statement to an adjuster by the name of
17  Kevin Brown?
18  A. This?
19  Q. Yes.
20  A. Yes, I think so.
21  Q. And were all of your answers to Mr. Brown's
22  questions accurate to the best of your knowledge at
23  that time?
24  A. At that time, they were.
25  Q. And do you remember giving another statement

Page 22

1  to Mr. Brown on July the 12th of 2002?
2  A. I remember giving him a statement. I don't
3  know when I did it, but --
4  Q. All right. That's fair. But you did give him
5  a second statement?
6  A. Yes.
7  Q. And were your answers to his questions in that
8  second statement accurate to the best of your knowledge
9  at that time?
10  A. As far as I remembered, yes.
11  Q. Let me ask you: Do you have an opinion as to
12  the fair market value of your home?
13        MR. PIETTE: Objection, form.
14  A. I don't know what the -- what it's worth, no.
15  Q. Have you had it appraised in the last, oh,
16  five years?
17  A. No.
18  Q. Are you aware that the Cameron County
19  Appraisal District appraises your home for purposes of
20  taxes?
21  A. Yes.
22  Q. Do you know what the Cameron County Appraisal
23  Board has appraised your home at?
24  A. No, I don't.
25  Q. Have you ever contested the appraised value of

Page 23

1  the home with the Tax Review Board?
2  A. Repeat that again.
3  Q. I sure will. Have you ever contested -- gone
4  and protested, should I say, the appraised value of
5  your home with the appraisal authority here?
6  A. I did something, but I don't know what it was
7  because I was 65, but I don't recall that.
8  Q. I think in Bexar County we have a deal where
9  if you're over 65 you get another exemption or
10  something of that nature. Is that what you may have
11  done?
12  A. That may be. I don't know.
13        THE WITNESS: I need to be excused.
14        MR. PENNEBAKER: You need to take a
15  break? Yes, sir.
16  (Recess from 10:38 to 10:40)
17  Q. Mr. Carrales, let me ask you, before we go any
18  further, what is your goal? What do you want to
19  accomplish by filing this lawsuit?
20  A. I just want the -- to see what the -- you
21  know, some type of closure or something to this thing,
22  to find out, you know, what's going to happen.
23  Q. In other words, you want to get everything
24  resolved?
25  A. Exactly.

Page 24

1  Q. From your perspective, what does Allstate need
2  to do to get everything resolved on your claim with
3  you?
4  A. I've never gone through this so I don't know
5  what -- you know, I just -- I just want to get it
6  resolved, whatever that might be.
7  Q. Are you asking for damages in this lawsuit
8  other than what it is going to cost to repair your
9  home?
10        MR. PIETTE: Objection, form.
11  A. Say that again.
12  Q. Yes, sir. Are you asking for damages from
13  Allstate other than what it is going to cost to repair
14  your home?
15  A. I don't think so. I want my house liveable.
16  Q. You want it what?
17  A. I said I want to be able to live in my house.
18  Q. You want to live in it? Is that what you
19  said?
20  A. Yeah.
21  Q. Are you living in it now?
22  A. Yes.
23  Q. Have you gotten any estimates for what it will
24  cost to repair the home?
25  A. Allstate sent somebody down for remediation,

Frank Carrales                        Condenseit!™                        July 31, 2003

Page 25

1 and they sent a lot of figures down.
2    Q. There's a company, I think, that I saw in the
3 file named Quantum.
4    A. Quantum. Exactly.
5    Q. Quantum?
6    A. Yeah, Quantum.
7    Q. Did you or did Allstate get Quantum to give an
8 estimate?
9    A. Allstate.
10   Q. Did you recommend Quantum?
11   A. I don't know Quantum.
12   Q. You don't know anybody at Quantum?
13   A. I don't know anybody at Quantum.
14   Q. Do you know who with Allstate sent Quantum out
15 to do an estimate?
16   A. Who the person was?
17   Q. Yes. Was it Kevin Brown or somebody else?
18   A. Who Quantum sent out?
19   Q. No, sir. Do you know who at Allstate sent
20 Quantum Restoration out? You may not.
21   A. I guess Kevin or Cathy. I don't know who sent
22 them out.
23   Q. Who reported the original claim to Allstate,
24 was that you or your wife?
25   A. I think I did.

Page 26

1    Q. And that claim was reported to somebody in the
2 agent's office, but you don't know who, correct?
3    A. Right.
4    Q. Tell me, as best you can recall today, what
5 the claim was that you reported when you contacted your
6 agent.
7    A. I told them that I had water damage in the
8 house and what I thought might be mold or something,
9 some black stuff, under the sink.
10   Q. Where did you report water damage in the
11 house?
12   A. To the person I talked to?
13   Q. Yes.
14   A. In the air conditioning closet and, as I
15 recall, in the bathroom lavatory.
16   Q. And when you reported these damages to the
17 agent, do you remember -- well, do you remember what
18 year that was?
19   A. No, sir.
20   Q. When you reported these damages to the agent,
21 did the agent send some adjuster out to inspect the
22 home?
23   A. No, they did not.
24   Q. But then what happened?
25   A. I called whatever number I got and talked to

Page 27

1 Cathy Blair or Bair.
2    Q. Did the agent give you a number to call?
3    A. I don't recall if it was an agent or someone
4 else.
5    Q. How long after you contacted the agent was it
6 before you called that number and spoke with Cathy
7 Bair?
8    A. I'm going to say it was months before I found
9 out that I could call somebody else.
10   Q. So when you contacted the agent, did you tell
11 them you wanted to make a claim?
12   A. The agent in Harlingen?
13   Q. Yes, sir.
14   A. Yes, I told them that I needed somebody to
15 look at it.
16   Q. And what did they tell you?
17   A. I think the lady said, you have to prove to us
18 that it's mold but -- something to that effect.
19   Q. And what did you say?
20   A. I said, I don't know what's mold or what's not
21 mold. I said I just need somebody to check it, as far
22 as I can remember.
23   Q. And what was the response to that?
24   A. You show us.
25   Q. So how was that phone call ended?

Page 28

1    A. Well, thank you. And so I decided, well, I'm
2 going to call somebody else.
3    Q. At that point in time, you decided to call
4 someone else?
5    A. Right.
6    Q. And who did you call?
7    A. I didn't. I was mad.
8    Q. You were mad at that lady, I assume?
9    A. I thought they would send somebody out.
10   Q. Did she ever tell you that she would send
11 somebody out?
12   A. Not that I recall.
13   Q. Did you ever ask to speak to your actual
14 agent?
15   A. No, I did not.
16   Q. And you don't remember this lady's name?
17   A. No.
18   Q. Did she identify herself as an agent or
19 secretary or anything?
20   A. When you call the office, they say,
21 "Allstate."
22   Q. Did she say what her role was there?
23   A. As I recall, the receptionist said let me talk
24 to -- whoever that lady was. She said, you can talk to
25 her about that.

Page 29

1    Q. So you spoke to a receptionist at this agency
2 who put you through to this other lady?
3    A. Right.
4    Q. And this other lady told you that you needed
5 to prove to them that you had mold?
6    A. Yes.
7    Q. And she never told you that she would report
8 the claim or pass the claim along to an adjuster?
9    A. I don't recall her saying anything like that.
10    Q. In any event, there was no adjuster that came
11 out for a couple of months after you contacted the
12 agent, is that right?
13    A. I don't know how long it was, but I finally
14 got a hold of Cathy, and then she sent somebody out.
15    Q. Do you remember how you got a hold of Cathy
16 Bair?
17    A. Somebody gave me the number. They said, why
18 don't you call the main office or something, an (800)
19 number.
20    Q. Was it somebody at Allstate that gave you
21 Cathy Bair's number?
22    A. No, at a restaurant.
23    Q. At a restaurant?
24    A. At a restaurant.
25    Q. And who was that?

Page 30

1    A. I -- I don't know. It --
2    Q. Was it a friend or an acquaintance or a
3 lawyer?
4    A. No, no, no. I just don't recall who it was.
5 Somehow I got that number and I called.
6    Q. Once you got a hold of Cathy Bair, what did
7 you tell her?
8    A. I told her that I had water damage and what I
9 thought may ever be mold or something, something -- black
10 material under the sink.
11    Q. Did you tell her where you had water damage?
12    A. I think I did.
13    Q. And what did she tell you?
14    A. It's been so far back.
15    Q. Do you not remember?
16    A. I don't remember what she said, no.
17    Q. Did she send somebody out to do an inspection
18 though?
19    A. She did send somebody out.
20    Q. And who did she send out, Kevin Brown?
21    A. I guess that's -- yeah.
22    Q. And how long was it before she sent Kevin
23 Brown out there, do you recall?
24    A. I don't recall that.
25    Q. Were you at home when Kevin Brown came out to

Page 31

1 do his inspection?
2    A. I think he called the day before if I would be
3 available and I was.
4    Q. And did you walk Mr. Brown through the house?
5    A. Yes.
6    Q. And did you point out the various water
7 damages to him during that process?
8    A. As I recall, yes.
9    Q. Did Mr. Brown conduct himself in a
10 professional manner?
11    A. Yes, he did.
12    Q. Did Ms. Bair conduct herself professionally?
13    A. Yes.
14    Q. Let me show you what I have marked as
15 Deposition Exhibit Number Four and ask you to take a
16 look at this and tell me whether that is a fair and
17 accurate representation of your floor plan at your
18 home?
19    A. Yes, it is.
20    Q. Thank you, sir. Let me show you what I have
21 marked as Deposition Exhibit Number Three which is a
22 MoldPro report dated August 6th, 2002 and ask you if
23 you have seen this report before today?
24    A. I think so.
25    Q. Did anybody with Allstate ever go over that

Page 32

1 MoldPro report with you?
2    A. I recall the report. I just don't remember
3 who or if anybody went over it with me.
4    Q. Well, that's fine. Have you had a chance to
5 look at that report?
6    A. Yes, I have.
7    Q. Did you read through the report?
8    A. For what I understood, yes.
9    Q. Did you ever contact Allstate to talk about
10 the report or any problems or mistakes with the report?
11    A. I made so many calls with people. I don't
12 remember who I talked to or what I did.
13    Q. Do you remember people from MoldPro coming out
14 to do their inspection?
15    A. Do I remember? Yes.
16    Q. I think there was a fella by the name of John
17 Pena?
18    A. Yes.
19    Q. Did you have conversations with Mr. Pena?
20    A. Talking about -- asking me -- asked him
21 questions or --
22    Q. Or him asking you questions.
23    A. Yes, I asked him what that gadget was that he
24 had outside, and he said -- and then he said, well, we
25 test the outside first to compare what's on the inside,

Page 33

1 basically.
2    Q. Well, the reason I ask is because in this
3 report under paragraph 2, there is some discussion
4 about various water events that you had reported, and I
5 want to go over those with you because I think maybe
6 that will help us get through this. I'll stand up a
7 little. I'm going to go through this with you. The
8 first paragraph indicates, Mr. Carrales reported that a
9 water line leak occurred under the kitchen sink. He
10 stated the leak affected the base of the cabinet,
11 floor, and sub-floor, and wall adjacent to the sink.
12 The leak occurred six years prior to the investigation
13 and was repaired at the same time. Mr. Carrales stated
14 that he had observed visible suspect mold on the wall
15 and base of the cabinet.
16    A. Yes, not at that time though. I noticed that
17 when we called them, when I had Allstate look at it.
18    Q. So the leak under the kitchen sink happened
19 about six years before the MoldPro investigation, but
20 you're saying that you did not notice mold until the
21 time you contacted Allstate to make the claim, is that
22 correct?
23        MR. PIETTE: Objection, form.
24    Q. When did this kitchen sink leak occur?
25    A. I'm saying six years ago.

Page 34

1    Q. When did you notice the mold?
2    A. After I saw the leak on the air conditioning,
3 I think, as I recall, and then, I looked it over for --
4 where the pipes were at.
5    Q. Why did you not notice the mold before the air
6 conditioner situation?
7    A. I just didn't.
8    Q. Did you ever open the kitchen sink cabinet?
9    A. I don't the kitchen sink. My wife does all
10 that -- all that when that leak was there.
11    Q. Did you have somebody repair that leak six
12 years ago?
13    A. Yes.
14    Q. Do you remember who that was?
15    A. Somebody was recommended to me from one of my
16 colleagues there at the college that does -- who did
17 plumbing work.
18    Q. Do you have any receipts from that repair?
19    A. No, I don't keep receipts.
20    Q. Do you know when that mold developed?
21    A. I don't know.
22    Q. Did you ever remove any cabinets or sheetrock
23 underneath the kitchen sink when you had that leak?
24    A. Cabinets? No, I didn't remove cabinets.
25    Q. Can you describe the leak that happened

Page 35

1 underneath the kitchen sink six years ago -- or
2 approximately six years ago?
3    A. I think the thing was leaking right where the
4 faucets are. From the bottom, it was leaking down, and
5 that's how we found it.
6    Q. How much water are we talking about?
7    A. I don't know. It was all wet on the bottom of
8 that -- where those pipes are at.
9    Q. Could you see the pipes?
10    A. Yeah.
11    Q. What did you do about it?
12    A. I had the plumber come in and repair it.
13    Q. Did you do anything else besides repair the
14 plumbing leak?
15    A. Like what?
16    Q. Like remove wet sheetrock, remove wet
17 cabinets.
18    A. I don't think there's sheetrock under there --
19 the kitchen sink.
20    Q. Did the cabinets get wet?
21    A. Yes, they did.
22    Q. Did you remove any of the cabinets?
23    A. No.
24    Q. Did you put in any kind of heaters or dryers?
25    A. A fan or fans.

Page 36

1    Q. You put a fan on it?
2    A. When -- when they -- they sopped that stuff up
3 -- they turned the water off and sopped it up, we put
4 fans on it. When they repaired it, they said, just
5 leave it like that for a couple of days to dry out.
6    Q. Did the floor get wet?
7    A. I didn't see under the cabinets. I'm sure --
8    Q. Well, did the floor --
9    A. -- I'm sure the floor got wet, but I -- I
10 can't say -- I didn't see it wet, that's -- I hired
11 him. He didn't tell me anything so --
12    Q. So even though you didn't see it, you knew the
13 floor got wet?
14        MR. PIETTE: Objection, form.
15    A. I -- I don't know that. I didn't fix it.
16    Q. When did you observe visible mold on the wall
17 and base of the cabinet under the kitchen sink?
18    A. I think that's when I found the water leaking
19 in the AC closet that I --
20    Q. And when was that?
21    A. I don't know.
22    Q. Let's go to the next one. According to Mr.
23 Carrales, a water line leaked in the shower in bathroom
24 number 1 affecting the north wall, west wall, floor,
25 and shower tub. He stated that this leak occurred

## Page 37

1 approximately three years prior to the investigation.
2 The bathtub, tile, north wall, and west wall were
3 replaced following the leak. Mr. Carrales reported
4 that he had observed visible suspect mold on the
5 ceiling in bathroom number 1. Is that accurate?
6    A. That's probably right, yes.
7    Q. Did you ever report a claim for that bathroom
8 shower leak?
9    A. No.
10    Q. Were you insured by Allstate at that time?
11    A. I guess I was. I don't take care of the
12 insurance, my wife does.
13    Q. Why did you not report a claim for the
14 bathroom shower leak?
15    A. If you make too many reports, they drop you,
16 and, you know, if you can get it fixed, you know --
17    Q. And so you just decided to fix that on your
18 own?
19    A. Just fix it on my own, yes. I thought that
20 would be part of the maintenance of the house, you
21 know.
22    Q. And were you able to get that repaired for
23 less than a thousand dollars or how much did it cost?
24    A. Oh, I don't know how much it cost. It
25 probably was less. I don't know.

## Page 38

1    Q. Who repaired it?
2    A. Another plumber.
3    Q. Do you know who that was?
4    A. No, sir.
5    Q. Where was the leak exactly?
6    A. I don't know where the leak was. I know that
7 there was water there, and -- and we called the plumber
8 -- or one of the plumbers and -- to come by and repair
9 it.
10    Q. How did you discover it?
11    A. There was water coming out inside the -- the
12 shower, and there's like a little linen closet there,
13 and it was wet there. So we had it checked, and there
14 was a water leak in it.
15    Q. So water was coming into the linen closet from
16 the shower?
17    A. It's adjoining the shower.
18    Q. And water was coming into the linen closet?
19    A. On the bottom, right.
20    Q. What all got wet from the shower leak?
21    A. All I saw was the water on the -- on the
22 floor, and I reported -- I don't know what got wet, if,
23 you know, anything.
24    Q. What caused the leak, do you know?
25    A. I do not know what caused it.

## Page 39

1    Q. Do you know what he did to repair the leak?
2    A. No, I don't know that either.
3    Q. The next paragraph says that Mr. Carrales
4 reported a water line leak in the bathroom 1 sink that
5 occurred approximately two years prior to the
6 investigation. The floor, wall, and cabinet of the
7 bathroom were affected. The cabinet had been replaced
8 approximately two years prior to the investigation.
9 Mr. Carrales reported that he had observed visible
10 suspect mold on the cabinet. Is that accurate?
11    A. That's probably right, yes.
12    Q. So about two years before the home test
13 investigation, there was some kind of water leak under
14 the bathroom number 1 sink, is that right?
15    A. Yes.
16    Q. That's the same bathroom as you had the shower
17 leak?
18    A. Yes.
19    Q. Did you have somebody repair that?
20    A. Yes.
21    Q. And do you remember who repaired it?
22    A. No.
23    Q. No receipts?
24    A. None.
25    Q. Did you, in fact, replace the cabinet?

## Page 40

1    A. No, I think we dried it. We dried everything
2 that was there, but I think it's separated. As I
3 recall now, it still is separated.
4    Q. I'm sorry?
5    A. I think the plywood on the cabinet I think is
6 still separated, some is separated. We just dried it
7 out.
8    Q. With fans or with towels?
9    A. Fan.
10    Q. Did you remove any sheetrock or building
11 materials?
12    A. No.
13    Q. Back on the other leak in the shower of
14 bathroom number 1, when this says that the bathroom
15 tile, north wall, and west wall were replaced following
16 the leak, were those materials actually replaced or
17 just dried?
18    A. I think that's when we put the tile on. We
19 replaced it, as I recall. I remember -- I think I did
20 that. I think -- I think we did that already.
21    Q. Did you ever report the leak under the
22 bathroom sink?
23    A. To Allstate?
24    Q. Yes.
25    A. No.

**Page 41**

1 Q. Why did you not report that claim?
2 A. Because as far as house maintenance, I
3 thought, you know, to take care of the house.
4 Q. The next paragraph says, approximately one
5 year prior to the investigation, the HVAC drain plugged
6 in the HVAC closet and leaked water onto the floor,
7 beams, sub-floor, and the wood floor outside the
8 closet. The floor, sub-floor, and beams were replaced
9 at the time of the leak. Mr. Carrales reported that he
10 had observed visible suspect mold on the floor,
11 sub-floor, and beams in the HVAC closet. Is that
12 accurate?
13 A. As much as I remember, yes, I think it is,
14 because I replaced the boards in there.
15 Q. So in approximately August of 2001, there was
16 some kind of leak from the air conditioning drain?
17 A. I think that's correct.
18 Q. And is that when you noticed the mold under
19 the kitchen sink?
20 A. Yes, because I -- I looked there, and then I
21 said, if there's water, I'm going to check the rest of
22 the stuff, and that's how I checked it, I think.
23 Q. And is that when you noticed mold underneath
24 the --
25 A. Well, what I thought was mold. I -- you know,

**Page 42**

1 just some black stuff that was there so --
2 Q. So that's when you observed what you thought
3 was suspect mold --
4 A. Right.
5 Q. -- underneath the air conditioning unit, is
6 that right?
7 A. Yes.
8 Q. Did you have somebody repair the air
9 conditioning?
10 A. Yes, they blew out the drain pipe and repaired
11 it.
12 Q. Who did you have do that?
13 A. An air conditioning man by the name of
14 Rosales.
15 Q. How do you know him?
16 A. We worked together at the college.
17 Q. Did he charge you?
18 A. I think he did at that time.
19 Q. Have you had anybody else service your air
20 conditioner besides Mr. Rosales?
21 A. Since?
22 Q. Or before, either.
23 A. I had one -- one outside unit replaced because
24 that burned up, and then I had Bennie's Air -- they're
25 from Harlingen -- replace another unit, and that -- I

**Page 43**

1 don't know how long that's been. It's been within the
2 last year or so, I think.
3 Q. What is Mr. Rosales's first name?
4 A. Luis.
5 Q. Luis? And where does he live?
6 A. Harlingen.
7 Q. Does he have an air conditioning repair
8 company?
9 A. I think he works on -- you know, moonlights
10 that work. He's retired.
11 Q. Do you know how to get in touch with him?
12 A. I used to.
13 Q. Are you all still in contact with each other?
14 A. We're not any longer.
15 Q. Do you have any receipts from the repair work
16 that he did?
17 A. I don't keep receipts.
18 Q. You told me that already. Do you have checks
19 or did you pay him cash?
20 A. No, I paid him cash.
21 Q. The next paragraph indicates that Mr.
22 Carrales reported a water line leak in bathroom number
23 2 sink that occurred approximately one and a half years
24 prior to the investigation. The floor, wall, and
25 cabinet of the bathroom were affected. The cabinet had

**Page 44**

1 been replaced shortly after the leak. Mr. Carrales
2 reported that he had not observed visible, suspect mold
3 related to the incident. Is that accurate?
4 A. That's the half bath you're talking about?
5 Q. It must be. It must be. That would be
6 bathroom number 2 right there.
7 A. Yeah, that's a half bath. Yeah.
8 Q. So is that paragraph accurate?
9 A. Yes.
10 Q. Did you have the sink cabinet replaced at that
11 time?
12 A. I think we did. I'm not sure.
13 Q. Who repaired that leak?
14 A. One of the plumbers that we got.
15 Q. Do you know who that was?
16 A. No, I don't.
17 Q. And did you not report that because you felt
18 it was maintenance issues?
19 A. Yeah, it was very small. I didn't.
20 Q. The next paragraph indicates that Mr.
21 Carrales reported a water stain on the living room,
22 which was the result of a roof leak that occurred
23 approximately eight years prior to the investigation.
24 Is that accurate?
25 A. Yes.

July 31, 2003            CondenseIt!™            Frank Carrales

Page 45

1   Q. The next paragraph indicates that the entire
2 house was leveled two months prior to the
3 investigation. The house was also leveled twice in
4 1997. Mr. Carrales says that the floors are not level
5 again. There was a crack in the brick perimeter beam.
6 Is that accurate?
7   A. Yes.
8   Q. Who did you have level the house in 1997?
9   A. Alexander.
10   Q. Alexander House Leveling?
11   A. Yes.
12   Q. Where are they located?
13   A. They're in -- they have a Harlingen number. I
14 think they come out of San Antonio, but I'm not sure.
15   Q. How much did they charge you?
16   A. I'm going to say $1,500. I think that's
17 pretty close.
18   Q. Did you ever make a claim for that?
19   A. No.
20   Q. Did anyone ever determine the cause of the
21 foundation movement?
22   A. I just had it leveled.
23   Q. So nobody ever determined the cause of it?
24   A. If they did, they didn't tell me about it.
25   Q. Did anybody look at the foundation besides

Page 46

1 people from Alexander's?
2   A. No.
3   Q. How long have you noticed a musty, wet-like
4 odor in bedroom number 2 and the kitchen and the
5 laundry room as indicated in the MoldPro report?
6   A. Can you repeat that again?
7   Q. Yes, sir. How long have you noticed a musty,
8 wet-like odor in bedroom number 1 and the kitchen and
9 the laundry room as indicated in this report?
10   A. For some time now. I'm not good on dates. I
11 can't remember.
12   Q. Are those all of the water events that you can
13 remember ever having at this house, the ones that we
14 just went over that were identified in MoldPro's
15 report?
16   A. That I can remember, yes.
17   Q. Now, you're on a septic tank, is that right?
18   A. Yes, sir.
19   Q. How long has that septic tank been there?
20   A. I have no idea.
21   Q. Was it there when you bought the home?
22   A. It was there when I bought the house.
23   Q. Do you have anybody maintenance that?
24   A. Clean it out. I think we did that when we
25 first moved into the house and one other time when we

Page 47

1 had a big rain.
2   Q. How did you know you needed to clean it out
3 when you moved in?
4   A. We just thought to clean it out.
5   Q. What about when you had that rain, was there
6 an overflow or something that made you know you needed
7 to clean it out at that time?
8   A. No, but there was water all over there, all
9 over the place there. So we decided to have the -- you
10 know, after the water drained, we just drained it all
11 out because, you know, we thought it would fill up or
12 something.
13   Q. Water was all over what?
14   A. It was all over the yard.
15   Q. Is the septic under your house or out in the
16 yard?
17   A. No, it's halfway under the house and halfway
18 out of the house.
19   Q. The house was already built over the septic
20 when you bought it, right?
21   A. Yeah, the house is the way it is now, yeah.
22   Q. You haven't added on to the house, have you?
23   A. No.
24   Q. Have you had any plumbing repairs done since
25 you received the MoldPro report?

Page 48

1   A. No, except I just got city water, if that's
2 part of the plumbing.
3   Q. Has Allstate paid any money to you for any
4 repairs to date on the claims made the basis of your
5 suit?
6   A. On this claim?
7   Q. Yes, sir.
8   A. No, sir.
9   Q. No money has been paid, is that right?
10   A. That's correct.
11   Q. Has anybody advised you to move out of the
12 house because of suspect mold?
13   A. No.
14   Q. Have you ever asked Allstate if you could move
15 out?
16   A. No.
17   Q. That's never been an issue?
18   A. I never asked.
19   Q. Are you claiming any health problems as a
20 result of any suspect mold in this home?
21   A. Not at this time.
22   Q. Is your wife?
23   A. You need to ask her.
24   Q. All right. Okay. I will. Has she complained
25 to you about any health problems that she attributes to

Condenseit!

Page 49

1 suspect mold?
2    A. We don't know that that's what's causing it.
3 I'm not qualified to say that, but we get in the house,
4 and she gets kind of like an allergy or stuff that she
5 takes a medication for, and sneezes a lot sometimes.
6    Q. Now, are you having any health problems today?
7    A. Due to this?
8    Q. Anything.
9    A. Well, I had cancer. I needed an operation for
10 that.
11    Q. When were you diagnosed with cancer?
12    A. Six years ago. I don't -- I don't remember
13 dates.
14    Q. That's fine, sir. And you have been receiving
15 treatment for that?
16    A. They operated on me, and about a month ago
17 they said I was cancer-free.
18    Q. Wonderful. And where did you have the
19 operation?
20    A. M.D. Anderson.
21    Q. What kind of cancer was it?
22    A. Sarcoma.
23    Q. And what period of time did you have radiation
24 treatments, do you know? How long was that, a year?
25    A. What, when I first had the radiation?

Page 50

1    Q. Did you have radiation treatment for a year?
2    A. Yeah, but right shortly after my surgery and
3 -- for a month. The surgery I had six years ago, but
4 I don't know when -- you know, they gave me radiation
5 thereafter.
6    Q. Are you having any health issues today, any
7 other health -- I mean, thankfully the cancer -- you
8 have been declared cancer-free. Do you have any other
9 health issues or --
10    A. Not at this time.
11    Q. Do you have any other chronic health issues
12 like diabetes or anything like that?
13    A. Not that I know about.
14    Q. I want to go over some of the photographs with
15 you that are part of MoldPro's report that we have
16 already marked as an exhibit. Photograph number 6, is
17 that the stain on the living room that you noticed
18 about eight years ago from a roof leak?
19    A. If that's the living room, yes.
20    Q. I think it -- I mean, all I can do is -- I'm
21 going to show you photograph number 7 and ask you if
22 that's what underneath your kitchen sink looks like or
23 is that what it looked like at the time of MoldPro's
24 inspection?
25    A. Yes.

Page 51

1    Q. How long has your sink looked like that?
2    A. I don't get under the sink, that is the
3 problem.
4    Q. I'm sorry?
5    A. I don't get under the sink, and this is the
6 problem, you know, and we found the problem; and we had
7 it fixed, the leak.
8    Q. And you noticed that problem as shown in
9 photograph number 7 at the same time of the air
10 conditioning leak, correct?
11    A. When I found the air conditioning, yeah, I
12 looked at that.
13    MR. PIETTE: Objection, form.
14    Q. I'm going to show you photograph number 12.
15 Photograph number 12 is a photograph of the cabinet
16 under the sink in bathroom number 1. How long has
17 underneath the cabinet in bathroom number 1 looked like
18 that?
19    A. I don't know.
20    Q. Did you notice that at the same time of the
21 air conditioning leak?
22    A. I suppose I did because I looked at
23 everything, and there was water.
24    Q. Is it fair to say that when you had the air
25 conditioning leak or around that time that's when you

Page 52

1 began to look around for suspect water damage or mold
2 in the house?
3    MR. PIETTE: Objection, form.
4    A. How do you mean?
5    Q. Well, what I'm asking you is it sounds like,
6 from what you have said so far, that when you had the
7 air conditioning leak, that's when you started noticing
8 suspect mold growth under the kitchen sink, for
9 example, and under the bathroom number 1 sink, and so
10 my suspicion is that when you had that leak from the
11 air conditioning that something about that prompted you
12 to start looking in other places in your home to see if
13 you had, you know, suspect mold growth in other areas
14 of your home. Is that accurate?
15    A. I was looking for water, and since I saw water
16 there, I thought, well, I -- since the sink is there, I
17 better look and see if there's any more leaks.
18    Q. Okay. And you were looking --
19    A. I guess basically I started looking for that.
20    Q. So as you were looking for other water damage
21 from that air conditioning problem, that's when you
22 discovered the suspect mold in the other areas?
23    A. Yes, I think so.
24    Q. Is there something that you heard in the media
25 or read in the paper or anything like that that caused

## Page 53

1 you to be concerned about mold around that time?
2   A. I don't remember anything like that. It just
3 smelled bad, you know, so --
4   Q. When did you contact an attorney for the first
5 time?
6   A. After so long, I thought, well, Allstate is
7 not doing anything. I don't know what I'm doing. I'm
8 going to contact an attorney.
9   Q. And who did you contact?
10   A. Gilbert Piette.
11   Q. And how do you know Gilbert?
12   A. He used to be my priest.
13   Q. You're kidding, right?
14   A. No, I'm serious.
15       MR. PENNEBAKER: You went from being a
16 priest to a lawyer?
17       MR. PIETTE: Yeah, from the heights to
18 the depths.
19   Q. So I take it he's not your priest anymore?
20   A. No.
21       MR. PENNEBAKER: You can't be lawyer and
22 a priest.
23 (Discussion off record from 11:30 to 11:32)
24   Q. Do you have any idea of the time frame that
25 you contacted Gilbert about this particular claim?

## Page 54

1   A. Months and months is all I can tell you.
2   Q. Months and months after you made the claim or
3 --
4   A. Well, yeah, I made the claim and nothing
5 happened.
6   Q. Did you talk to anybody about this claim other
7 than the adjuster, Kevin Brown, and Cathy Bair?
8       MR. PIETTE: Objection, form. At
9 Allstate or --
10       MR. PENNEBAKER: Yes. I meant to say
11 adjusters.
12   Q. Did you talk the any other adjusters about
13 this claim besides Cathy Bair or Kevin Brown?
14   A. Yes, there was a -- the last time that Kevin
15 Brown come in, he come in with another person, and they
16 were both there at the house.
17   Q. Do you know who that was?
18   A. No, two different people, come to think of it.
19   Q. What are your complaints against Allstate? Do
20 you have any complaints against Allstate in terms of
21 the handling of your claim?
22   A. Well, it just seems like it has taken forever,
23 and I don't know what's happening.
24   Q. You're aware that a lawsuit has been filed
25 now?

## Page 55

1   A. Yes.
2   Q. Were you aware that a lawsuit had been filed
3 when it was filed?
4   A. When I talked to my attorney?
5   Q. Yeah.
6   A. Yes.
7   Q. Do you have any other complaints against
8 Allstate in this lawsuit besides the fact that you said
9 it's taken, it seems like, forever? For example, I
10 mean, just let me give you -- did anybody ever treat
11 you poorly or treat you with disrespect?
12   A. I called Cathy Brown [sic] on several
13 occasions, and she never returned my call. I had a
14 complaint there, but that was -- that was it.
15   Q. Was it Cathy Blair?
16   A. Bair. Blair?
17   Q. You said Brown.
18   A. Bair.
19       MR. PIETTE: Bair.
20       THE WITNESS: Bair?
21   Q. Cathy Bair?
22   A. Bair.
23   Q. So a couple of times she didn't return your
24 call?
25   A. Uh-huh.

## Page 56

1   Q. Did she ever treat you with disrespect?
2   A. I don't think so.
3   Q. Did Mr. Brown?
4   A. No.
5   Q. Did anybody at Allstate ever lie to you about
6 any part of the claim?
7   A. Like give me an example.
8   Q. I can't. I mean, were they ever untruthful in
9 any way about the claim?
10   A. How am I supposed to know what's truthful and
11 what's not?
12   Q. Okay. Well, maybe a better question would be
13 then are you aware of any situations where Allstate was
14 ever untruthful with you?
15   A. No, I'm not aware.
16   Q. Did anybody at Allstate ever explain to you
17 what would or what would not be covered under the
18 policy as far as mold is concerned?
19   A. I don't think I was worried so much about the
20 mold as I was the water problem. It was the water that
21 was rotting my wood, I thought.
22   Q. Which water are you talking about?
23   A. From the HVAC closet, you know, and then under
24 the sinks that I thought rotted my wood.
25   Q. How long have you known that water can rot

## Page 57

1  wood?
2  A. I don't know that.
3  Q. You assume that water can rot wood?
4  A. That's what I'm assuming.
5  Q. How long have you assumed that water could rot
6  wood?
7  A. I just -- I've just heard that it can rot the
8  wood.
9  Q. Is that something you've known all your life?
10  A. Well, basically, you know, they say it's
11  gotten rotten, you know, because it's got a lot of
12  water on it, but --
13  Q. So is that something that you've known could
14  happen all your life pretty much?
15  A. As far as I've heard, yes.
16  Q. Back when you had the kitchen sink leak about
17  six years before the investigation, did you replace any
18  of the building materials?
19  A. As I recall, the bottom board where the pipes
20  go through to the floor, I think that was replaced.
21  Q. Was it --
22  A. But I don't remember that because I didn't do
23  it. I had it done.
24  Q. So you don't know whether it was or not?
25  A. I know it was done, but I don't know about

## Page 58

1  when it was done or anything. That's what I remember
2  that the bottom board, as I recall, was replaced.
3  Q. Is that all?
4  A. I don't know, but I knew that was replaced. I
5  knew that that part was replaced, as I recall. I don't
6  know if they replaced the sides or anything. I don't
7  know.
8  Q. Has it leaked since then?
9  A. It hasn't leaked since the last time it was
10  fixed, whenever that was, no.
11  Q. Was that about six years ago?
12  A. According to what's there I guess, you know.
13  Q. When you had the shower leak in bathroom
14  number 1, did you have any part of the building
15  materials replaced at that time?
16  A. I think -- I think they replaced the back
17  sheetrock between the -- where the faucets go and the
18  linen closet with a piece of plywood. I think that's
19  -- yeah, there is plywood there. They replaced it
20  with plywood instead of sheetrock.
21  Q. Is that all that was replaced?
22  A. That's all that I know that they replaced. I
23  don't know if they replaced any more.
24  Q. Didn't you say that they maybe replaced some
25  tiles?

## Page 59

1  A. The tiles were replaced -- on the wall or --
2  are they talking about the tiles that fell down from
3  the wall, or what?
4  Q. When did tiles fall down from the wall in the
5  bathroom?
6  A. The last time I remember that happened was
7  when -- I think it was -- the guy, Juan, was telling us
8  that the house needed a lot of -- you know, all this
9  has to be repaired and everything, and we were in the
10  dining room, and some of those tiles fell off; and we
11  almost fell out of our britches, you know, trying to
12  take off.
13  Q. Do you know why the tiles fell off?
14  A. I don't know why they fell off.
15  Q. When you had the air conditioning leak about a
16  year before MoldPro's investigation -- this report says
17  that water leaked onto the floor, the beams, the
18  sub-floor, and the wood outside of the closet, and the
19  report also says that the floor, the sub-floor, and the
20  beams were replaced at the time of the leak. Do you
21  remember the floor and the sub-floor and the beams
22  being replaced at the time of the air conditioning
23  leak?
24  A. You keep asking me dates, and I don't even
25  remember my birthday, you know.

## Page 60

1  Q. Let me ask you this then: Do you remember
2  whether the floor and the sub-floor and the beams were
3  replaced as a result of the air conditioning leak?
4  A. Let me answer it. They -- they put some
5  two-by-fours in there, and they took out the hardwood
6  -- I know there's a floor before that, and then
7  there's a hardwood floor. They replaced that part of
8  it, and they put a regular, I guess, pine, put on, just
9  to stop the hole that was there, and then that thing
10  was -- he said it was -- the guy from Quantum said
11  there was a leak in between the two floors back down
12  the hallway.
13  Q. The air conditioner you mean?
14  A. The air conditioning had gotten -- the water
15  had gotten between the two floors, that's what the guy
16  from Quantum said, but, of course, I don't know that it
17  warped the wood there.
18  Q. What conversations do you recall having with
19  the man from Quantum?
20  A. The one that was very vivid, I remember, he
21  said, you've got a lot of repairs to be done here. He
22  said, I'm going to have to make up a report. He said,
23  you've got to replace probably -- he said -- all of
24  this, all through the hallway. I've got Igo floors,
25  and he looked into the kitchen, and he looked into the

**Page 61**

1 bathroom. That's all I remember talking to him about.
2    Q. Do you agree that you have a lot of repairs to
3 do at the home?
4    A. That I'm told I have, yes.
5    Q. Do you have an opinion as the homeowner as to
6 what repairs Allstate should pay for and then what
7 repairs you should pay for as part of the, you know,
8 ordinary maintenance and upkeep of the home?
9    A. I can only tell you that what -- or when
10 anything has happened, I've tried to keep the
11 maintenance up on the house, you know.
12    Q. Let me ask you this: Are there things that
13 need to be repaired at the home that are simply old and
14 worn out and need to be repaired or do you attribute
15 all of the damage at the home to something that
16 Allstate should pay?
17    A. Oh, I don't know that. I don't know that.
18 All I know is -- is that report that was given to me or
19 was told to me by Quantum.
20    Q. Has anybody told you that the foundation needs
21 to be repaired?
22    A. No, I've had it leveled.
23    Q. To your knowledge, does the foundation need to ·
24 be repaired?
25    A. I don't know that. I don't get under the

**Page 62**

1 house.
2    Q. Are you claiming that you have suffered mental
3 anguish as a result of this claim?
4    A. That mental anguish, do you mean am I upset
5 because they haven't done anything about this thing
6 that we're talking about?
7    Q. Well, I'm not sure that's mental anguish, if
8 you're upset because it hasn't been done. Let me ask
9 you --
10    A. Well, then clarify it a little more, and let
11 me see if I can understand.
12    Q. Let me see if I can.
13    A. Yeah. Thanks.
14    Q. I'll see if I can. Have you had a lot of
15 worry or anxiety because of this claim?
16    A. Yes, I have because I like things done right
17 right away.
18    Q. Are you asking for Allstate to pay damages in
19 this lawsuit because of worry or anxiety that you have
20 had?
21    A. Not at this time, no.
22    Q. Do you know what it's going to cost to repair
23 your home or to fix the water damage?
24    A. I don't know what it's going to cost.
25    Q. Do you have anybody in mind that you could get

**Page 63**

1 an estimate from?
2    A. No, I don't.
3    Q. You said you had been in the military. Did
4 you say you were in the military earlier?
5    A. What did you ask me?
6    Q. I thought I -- didn't I ask you before we
7 started the deposition if you had been in the military
8 or something?
9    A. (Indicating).
10    Q. No, I didn't? Okay. Have you ever been in
11 the military?
12    A. Yes.
13    Q. What branch, Army?
14    A. Air Force.
15    Q. How long were you in the Air Force?
16    A. Six months.
17    Q. And were you honorably discharged?
18    A. General.
19    Q. Why did you get a general discharge as opposed
20 to an horrible discharge?
21    A. I didn't like it, and they let us out, and I
22 think it was '57. There was overcrowding anyway so --
23    Q. I'm sorry?
24    A. There was overcrowding anyway. We were in pup
25 tents so they let us out.

**Page 64**

1    Q. Do you have any photographs of the house that
2 show the condition before you had these water damages
3 outlined in the MoldPro report?
4    A. I don't have them.
5    Q. Have you or your wife or anybody on your
6 behalf taken any pictures of any of the damages?
7    A. Yes, we have.
8    Q. When did you take those pictures?
9    A. Several months back or maybe a year back;
10 something like that. I don't know dates.
11    Q. Have you provided those pictures to your
12 attorney?
13    A. Yes, I have.
14    Q. And what were those pictures supposed to show?
15    A. Just the areas that we have talked about.
16    Q. Have you had any roof leaks since the roof was
17 replaced?
18    A. Not to my knowledge.
19    Q. Do you have any complaints against your
20 insurance agent, Tony Silva?
21    A. No.
22    Q. Is Tony Silva still your agent?
23    A. Yes.
24    Q. So you're not making any complaints against
25 Mr. Silva in this lawsuit?

/h/ljg/231001107/carrales-frank.ds
8/2/03/DEP/jsd

RE:        Carrales v. Allstate
              Our File No. 23100.1107

## SUMMARY OF THE ORAL DEPOSITION OF FRANK CARRALES

On July 31, 2003 we secured the oral deposition of Frank Carrales ("Carrales").  He comes across more sophisticated and well-mannered than expected.  He has a somewhat distinguished appearance.  He is very bad with dates.  He will make an excellent witness on his behalf at the time of trial.  During the deposition, he testified as follows:

### Background

He was born in 1937 in Mexico.  His social security number is 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.  He has lived at 8359 Business 83 in Harlingen, Texas for the past 26 years.  He and Sandra Carrales have been married for 27 years.  They have four adult children.

He completed the eleventh grade at Premont High School.  He was a welding instructor at Texas State Technical College for 27 years.  He retired six years ago when he was diagnosed with cancer.  After undergoing surgery and radiation therapy, he has been declared cancer free.  His insurer is Blue Cross-Blue Shield.  He has not filed any other lawsuits or given depositions.  No one in his family is in the legal or construction business.

### Home Purchase

The home was built in the 1940s.  He purchased the home approximately 26 years ago.  He does not recall the purchase price.  It has three bedrooms and 1½ baths.  It is a pier and beam foundation home.

### Insurance History

His insurance agent is currently Tony Silva out of Harlingen.  He does not know how long Allstate has been his insurer.  It may have been since 1998.  The previous insurer was Republic.

His previous insurance agent was Shepard & Cossoza in Harlingen.  They were canceled by Republic for having a rottweiler dog.

### Prior Claims

Approximately three years ago he filed a claim when wind and rain blew a chimney over.  This may have been 1999.  Allstate paid for the chimney and shingles.  He removed the chimney and installed a brick wall and flooring in its place.  He claims that all the wet building materials were replaced.  He was satisfied with Allstate's handling of the claim.

There was also a prior claim for roof damage. This may have been while he was insured with Republic. Shingles were replaced. He does not recall the contractor.

### History of Leaks

He had a very poor memory regarding when prior water events occurred. Therefore, during deposition, we used the Mold Pros' report as a guide. He confirmed the following:

1. Kitchen sink leak six years prior to Mold Pros' investigation.
2. Shower bath leak in bathroom no. 1 three years prior to Mold Pros' investigation.
3. Sink leak at bathroom no. 1 two years prior to Mold Pros' investigation.
4. HVAC leak one year prior to Mold Pros' investigation.
5. Sink leak at bathroom no. 2 18 months prior to Mold Pros' investigation.
6. Stain on living room ceiling eight years prior to Mold Pros' investigation as a result of a roof leak.

He does not have any receipts for the plumbing repairs. He did not make a claim regarding any of the water events at the time they occurred. A plumber repaired the kitchen sink leak and put a new board under the cabinet. He also put a fan. Otherwise, there were no repairs.

A Mr. Lewis Rosales repaired his air conditioning leak. He also replaced some boards under the HVAC that got wet. Mr. Rosales lives in Harlingen.

He did not report these leaks when they occurred because he felt they were just part of normal home maintenance. He does not recall who repaired the other leaks.

### The Claim

He called his agent to report water damage in the A/C closet, bathroom lavatory, and kitchen sink. He thought the black stuff under the sinks might be mold. He does not remember the year. His agent said he had to prove it was mold. His agent did not send an adjuster to inspect. He got mad. Several months later he contacted adjuster Kathy Bair by calling the main number. She sent adjuster Kevin Brown to do an inspection.

Kevin Brown inspected the home on several occasions. He was very courteous and professional. Carrales verified the two recorded statements previously given to Mr. Brown.

No one advised him to move out of the home. He has never asked to move. He is not claiming health effects.

### Mold Manifestation

He noticed mold under the air conditioner, kitchen sink and bathroom sink about the time of the A/C leak. He verified that he previously told John Pena of Mold Pros that the HVAC leak occurred approximately one year prior to Mold Pros' inspection. Therefore, the mold must have also manifested at that time. The smell of mold is what originally caused him concern.

2

### Attorney Contact

He contacted attorney Gilbert Piette several months after making the claim. He contacted an attorney because so much time had passed, and he knew so little. Gilbert Piette used to be the Plaintiff's priest.

### Visible Mold

He has seen visible mold under the kitchen sink, bathroom lavatories, and HVAC closet. There is also mold on the ceiling of the bathroom, but there are no plumbing pipes above. He is not aware of any other visible mold.

### Personal Property

He has not seen any water damage or mold on any of the contents. He is not making a claim for damages to contents at this time.

### Complaints

His only complaint is that it is taking forever to resolve the claim. Kathy Bair and Kevin Brown always treated him with courtesy and respect. The contractor from Quantum and Mold Pro were courteous and professional. He does not know of any untruthful information from any Allstate representative. He has no criticisms of the agent. He just wants to recover costs of repairing the house.

### Miscellaneous

- He has no opinion on the fair market value of what the home is worth.
- It was actually Allstate that sent Quantum Restoration to prepare an estimate. He had never heard of Quantum.
- He did not submit to an examination under oath prior to filing a lawsuit because he did not know what he was getting into. He did not know that an EUO was a condition of the policy.
- He has not made any plumbing repairs since receiving the Mold Pro report.
- Tony Silva is still his Allstate agent. According to Mr. Carrales, he contacted a lady in Silva's office to make a mold claim at some unidentified time. She allegedly told him that he had to prove that it was mold. She never sent an adjuster. Therefore, he ultimately contacted Kathy Bair by calling the main number. The agent never sent anyone to inspect. Nevertheless, he has no criticisms of the agent.

3

Page 65

1 A. No.
2 Q. Are you aware of any estimates to repair this
3 home other than the estimates from Quantum Restoration?
4 A. No.
5 Q. Have you seen the Quantum Restoration
6 estimates?
7 A. Well, I've seen a lot of figures, yes.
8 Q. Do those figures look high to you?
9 A. Say again?
10 Q. Do those figures look high to you?
11 A. I have no proof what it would take to fix the
12 house.
13 Q. Who put in your central air conditioning
14 system? Did I ask you that already?
15 A. Bennie's Air is the one that repaired it.
16 Q. They repaired it?
17 A. That's the one -- you asked me that a while
18 ago.
19 Q. I thought you said a Mr. Rosales's repaired
20 the leak.
21 A. Rosales is one person that repaired a leak.
22 Bennie's Air put in a new unit outside.
23 Q. Oh, okay. Okay. Do you have any records of
24 contacting somebody in the agent's office like notes or
25 diaries or anything like that?

Page 66

1 A. Not that I can recall.
2 Q. Have you received a copy of your insurance
3 policy?
4 A. I think we did, yes.
5 Q. Have you ever read your insurance policy?
6 A. Yes. I don't understand it.
7 Q. Are you aware that under the insurance
8 contract, as the homeowner, you have an obligation to
9 protect the home?
10 A. Yes.
11 Q. Are you aware that you have an obligation to
12 promptly report or provide prompt notice of any covered
13 losses?
14 A. Well, every time you do that, they drop you so
15 I thought, why -- why, you know -- why report it when I
16 can have it repaired right here. You know, it's not
17 that --
18     MR. PENNEBAKER: Let me object to the
19 extent that's not responsive.
20 Q. Are you aware that under the policy you have
21 an obligation to provide a prompt notice of covered
22 losses?
23 A. No.
24 Q. Has any insurance company ever dropped you?
25 A. Yes.

Page 67

1 Q. What insurance company dropped you?
2 A. Republic.
3 Q. And why did Republic drop you?
4 A. Because we owned a Rottweiler dog.
5 Q. Is that the only reason Republic dropped you?
6 A. Yes.
7 Q. Was there a dog bite or something?
8 A. No.
9 Q. How many claims did you file with Republic?
10 A. I don't know that.
11 Q. Are you aware that before this lawsuit was
12 filed Allstate had requested your Examination Under
13 Oath?
14 A. Yes.
15 Q. Why was the lawsuit filed before you submitted
16 to an Examination Under Oath?
17 A. Clarify that for me.
18 Q. Yes, sir. The lawsuit was ultimately filed
19 before you had provided Allstate with an Examination
20 Under Oath. Are you aware of that?
21 A. You're saying that Allstate asked me to do
22 what I'm doing now, or what?
23 Q. It's actually not exactly like -- not exactly,
24 but very similar, yes, sir. Allstate asked you to
25 provide an Examination Under Oath for purposes of

Page 68

1 stating under oath all the facts and circumstances of
2 the claim before the lawsuit was filed.
3 A. Uh-huh.
4 Q. Are you aware of that?
5 A. Yes.
6 Q. Are you aware that the lawsuit was filed
7 before you actually submitted to an Examination Under
8 Oath?
9 A. I guess so, yes.
10 Q. My question is: Why was the lawsuit filed
11 before you gave an Examination Under Oath?
12 A. I've never done that. I didn't know what I
13 was getting into.
14 Q. Were you aware that a suit was going to be
15 filed even though you had not yet given an Examination
16 Under Oath?
17 A. I don't understand.
18 Q. Are you aware that a lawsuit was going to be
19 filed even though you had not yet given an Examination
20 Under Oath as requested?
21 A. I don't know how to answer that.
22 Q. Why?
23 A. I just don't understand the question. You're
24 saying that did I know that there was going to be a
25 lawsuit filed before I gave you a -- whatever you call

## Page 69

1 this?
2    Q. Yes, sir. Let me go back. You're aware that
3 before the lawsuit was filed Allstate had asked you to
4 submit to what's called an Examination Under Oath. Are
5 you aware of that?
6    A. Yes.
7    Q. And you're also aware that the lawsuit was
8 going to be filed, correct?
9    A. Yes.
10    Q. So did you know that the suit was being filed
11 before you had yet given an Examination Under Oath?
12    A. Yes.
13    Q. And are you aware that submitting to an
14 Examination Under Oath is one of the conditions of the
15 policy?
16    A. No, I didn't. I don't understand the policies
17 anyway so --
18    Q. So you did not know than an EUO or an
19 Examination Under Oath was a condition of the policy?
20    A. No.
21    Q. Why did you not submit to an Examination Under
22 Oath?
23    A. I have never done it. I didn't know what I
24 was getting myself into.
25    Q. So were you -- I'm just asking. Were you

## Page 70

1 scared to give an Examination Under Oath?
2    A. No, I wasn't scared. I just didn't know what
3 I was getting into.
4    Q. Is that why you did not give an Examination
5 Under Oath before the suit was filed?
6    A. I suppose so.
7    Q. Can you tell me where you have visible mold in
8 your home today?
9    A. Can I tell you where we have visible --
10    Q. Where you --
11    A. I don't know that it is mold as of -- you
12 know, I talked to them about this -- this black stuff
13 that was all under the sinks and the ceiling in the --
14 in the -- in the bathroom.
15    Q. Tell me where you have seen what looks to you
16 like visible mold.
17    A. Under the kitchen sink, in the ceiling of the
18 bathroom, under the lavatory in the bathroom, and then
19 there's some stains in some of the other rooms, but I
20 don't know if that's mold or not. I don't know that.
21 What I thought was mold was -- those pictures show that
22 the spots were real back and -- but that's what I
23 thought.
24    Q. Do you have any plumbing pipes running above
25 the ceiling in the bathroom?

## Page 71

1    A. No.
2    Q. They're all below?
3    A. All below.
4    Q. So do you have any idea what's caused the mold
5 on the ceiling of the bathroom?
6    A. I have no idea. I thought it was water stains
7 that, you know --
8    Q. You thought what?
9    A. I thought it was water stains, but I don't
10 know.
11    Q. Have you had any roof leaks above the
12 bathroom?
13    A. No.
14    Q. Could you take this little yellow highlighter
15 -- I know it's shaped funny -- but could you take it
16 and mark on this floor plan, Deposition Exhibit Four,
17 the locations where you have just described seeing what
18 you believe is visible mold.
19    A. Okay. Right here and the pipes in here, I
20 think, under here. I don't recall if there was
21 anything under here. I don't remember that, in the
22 half bath. I think thought there was some in here. I
23 think that.
24    Q. So you have marked with the yellow highlighter
25 where you have seen suspect mold?

## Page 72

1    A. What I thought, yes.
2    Q. Yes. Can you now take the green highlighter
3 and show us on Deposition Exhibit Four where you have
4 seen stains on the ceiling? For example, I know there
5 was one referenced in the living room.
6    A. In the living room. Yeah, there was -- I
7 think it was in here, was one, and I think there was
8 one in here. I don't know -- those pictures would
9 indicate the rest of them I guess because I don't -- I
10 don't know for -- I can't remember.
11    Q. But those are the ones that you remember?
12    A. These are the ones that I remember, yeah.
13      MR. PENNEBAKER: Thank you, sir.
14 (Recess from 12:05 to 12:07)
15    Q. Mr. Pena, who came out to inspect for MoldPro
16 apparently, did he conduct himself in a professional
17 manner?
18    A. Yes.
19    Q. Do you have any criticisms of the manner in
20 which he went about his inspection of your home?
21    A. No.
22    Q. And the individual that came out from Quantum
23 Restoration, do you remember his name?
24    A. Kohl. Kohl.
25    Q. Kohl?

Page 73

1   A. Yeah, K-h-o-l, or something.
2   Q. Did Mr. Kohl conduct himself in a professional
3 manner?
4   A. I think so.
5   Q. And do you have any criticisms of the way he
6 went about his inspection?
7   A. No.
8   Q. So as we sit here today, basically what it
9 boils down to, is to the extent that there is a loss or
10 damage to your home that's covered by the policy, you
11 want Allstate to pay it?
12   A. Well, I want it resolved, yes.
13   Q. To the extent that there are damages to your
14 home that are related to maintenance issues, normal
15 upkeep, do you take responsibility for those?
16   A. Does that mean had I kept up with the
17 maintenance of the house?
18   Q. That's not -- no, sir. My question is: To
19 the extent that there are problems today with the home
20 that are simply because of the age of the home or
21 maintenance or upkeep, do you as the homeowner accept
22 responsibility for those?
23   A. Yes.
24   Q. So then from your perspective, what needs to
25 be done is we need to figure out what water damage and

Page 74

1 mold is attributable to something covered by the policy
2 and then something that's just ordinary, routine
3 maintenance --
4       MR. PIETTE: Objection, form.
5   Q. -- is that -- is that right?
6   A. I don't understand the difference in the two
7 questions.
8   Q. That's fine. So to the extent that you have
9 had repairs done on the air conditioning and plumbing
10 in the past, there are no receipts at all?
11   A. I don't have any, no.
12   Q. Are there any documents at all that we can
13 look at that can tell us specifically what was done to
14 repair these past plumbing leaks or air conditioning
15 leaks, any notes kept by you or your wife?
16   A. I paid Bennie's Air with a check. This was
17 the last one done recently.
18   Q. But that one is not going to have anything to
19 do with the water damage because that was just
20 replacing the outside unit, is that right?
21   A. Yeah.
22   Q. In terms of plumbing leaks or air conditioning
23 leaks that have caused some water damage inside the
24 home, are there any documents that you know about
25 anywhere that we can look at to give us information

Page 75

1 about when the leaks happened, what was paid, what was
2 repaired?
3   A. No, I don't.
4   Q. Nothing at all?
5   A. Not a thing.
6   Q. When is the first time that you contacted
7 Allstate to make a claim for the damages that are
8 referenced in your lawsuit?
9   A. When is the first time I called them about the
10 leaks and stuff that we had?
11   Q. When is the first time that you contacted
12 anybody affiliated with Allstate whether it be an
13 Allstate adjuster or an Allstate agent to report the
14 water damage or mold that you're claiming in this
15 lawsuit?
16   A. I don't know when we did that. I know it's
17 been months ago -- months and months ago, but I don't
18 know when it was.
19   Q. But you don't know when it was?
20   A. I certainly don't.
21   Q. Who was the most active in handling the claim
22 made the basis of this lawsuit? Would that have been
23 you or your wife?
24   A. I guess I was the one that was doing the
25 calling.

Page 76

1   Q. When is the first time that you met face to
2 face with somebody affiliated with Allstate about the
3 claims made the basis of this suit?
4   A. Cathy Brown sent --
5   Q. Cathy Bair?
6   A. Cathy Bair sent Kevin Brown.
7   Q. So Mr. Brown was the first one?
8   A. Was the first one as I recall.
9   Q. Who replaced your roof, do you recall? Did I
10 ask you that already?
11   A. No, I don't. I think we helped them, but I
12 don't know who did it. When my chimney fell down, or
13 what, or --
14   Q. No, sir. No, sir. When you put new shingles
15 on.
16   A. I don't know.
17   Q. Have you seen any water damage or mold on any
18 of the contents in your home?
19   A. Have I seen any?
20   Q. Yes, sir.
21   A. I really haven't looked for any, no.
22   Q. To your knowledge, are any of the contents
23 damaged by water?
24   A. I don't know that.
25   Q. You haven't seen any?

July 31, 2003      CondenseIt!™      **Frank Carrales**

---

Page 77

1  A. I haven't seen any.

2  Q. Are you making a claim for damage to any of

3 your contents in this lawsuit?

4  A. Not at this time because I don't know what

5 it's going to take.

6  MR. PENNEBAKER: Thank you, sir. I

7 appreciate your time today. That's all my questions.

8  THE WITNESS: Thank you very much.

9  MR. PIETTE: We'll reserve our questions

10 till trial.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 79

1  I, FRANK CARRALES, have read the foregoing
   deposition and hereby affix my signature that same is
2 true and correct, except as noted above.

3

4  _____

5  FRANK CARRALES

6 THE STATE OF TEXAS :

7 COUNTY OF _____ :

8

9  Before me, _____, on this
   day personally appeared FRANK CARRALES, known to me (or
10 proved to me under oath or through _____
   _____) (description of identity card or
11 other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
   consideration therein expressed.

13

   Given under my hand and seal of office this
14 _____ day of _____, 2003.

15  _____

16  NOTARY PUBLIC IN AND FOR
    THE STATE OF _____

17

18

19

20

21

22

23

24

25

---

Page 78

1  CHANGES AND SIGNATURE

2 PAGE  LINE  CHANGE  REASON

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

---

Page 80

1  NO. 2003-01-295-C

   FRANK CARRALES AND      )  IN THE DISTRICT COURT
2 SANDRA CARRALES         )
   VS                      )  CAMERON COUNTY, TEXAS
3                          )
   ALLSTATE TEXAS          )
4 LLOYDS, ET AL            )  197TH JUDICIAL DISTRICT

5  REPORTER'S CERTIFICATION
   DEPOSITION OF FRANK CARRALES
6  JULY 31ST, 2003

7

8

9  I, LISA REYNOLDS, a Certified Shorthand

10 Reporter in and for the State of Texas, do hereby

11 certify to the following:

12  That the witness, FRANK CARRALES, was duly

13 sworn by the officer and that the transcript of the

14 oral deposition is a true record of the testimony given

15 by the witness;

16  That the deposition transcript was submitted

17 on _____ to the witness or to the attorney

18 for the witness for examination, signature and return

19 to me by _____.

20  That the amount of time used by each party at

21 the deposition is as follows:

22  Mr. Pennebaker - 1 hour: 57 minutes

23  Mr. Piette - 0

24  That pursuant to information given to the

25 deposition officer at the time said testimony was

---

Frank Carrales                                Condenselt!™                                July 31, 2003

Page 81

1 taken, the following includes counsel for all parties
2 of record:
3        Mr. Piette, Attorney for Plaintiff
4        Mr. Pennebaker, Attorney for Defendant
5        I further certify that I am neither counsel
6 for, related to, nor employed by any of the parties or
7 attorneys in the action in which this proceeding was
8 taken, and further that I am not financially or
9 otherwise interested in the outcome of the action.
10        Further certification requirements pursuant to
11 Rule 203 of TRCP will be certified to after they have
12 occurred.
   Certified to by me this _____ of
13 _____, 2003.
14
15    LISA REYNOLDS, CSR 3276
      Expiration Date: 12-31-          03
16    Davidson & Moore Court Reporters
      PMB 314
17    6900 San Pedro, Suite            147
      San Antonio, Texas               78216
18    (210) 340-4655
19
20
21
22
23
24
25

Page 82

1     FURTHER CERTIFICATION UNDER RULE 203 TRCP
2
3        The original deposition was/was not returned
4 to the deposition officer on _____;
5        If returned, the attached Changes and
6 Signature page contains any changes and the reasons
7 therefor;
8        If returned, the original deposition was
9 delivered to _____, Custodial Attorney;
10        That $ _____ is the deposition officer's
11 charge to the Defendant for preparing the original
12 deposition transcript and any copies of exhibits;
13        That the deposition was delivered in
14 accordance with Rule 203.3, and that a copy of this
15 certificate was served on all parties shown herein and
16 filed with the Clerk.
   Certified to by me this _____ of
17 _____, 2003.
18
19    LISA REYNOLDS, CSR 3276
      Expiration Date: 12-31-          03
20    Davidson & Moore Court Reporters
      PMB 314
21    6900 San Pedro, Suite            147
      San Antonio, Texas               78216
22        (210) 340-4655
23
24
25

Davidson & Moore Court Reporters,Inc. (210) 340-4655                    Page 81 - Page 82

**Frank Carrales**                                                                                    **$ - bathroom**
                                                                                                      **July 31, 2003**

**-$-**

$ [1]        82:10
$1,500 [1]           45:16

**-'-**

'57 [1]    63:22

**-0-**

0 [1]    80:23

**-1-**

1 [13]        1:12    1:12
36:24    37:5    39:4
39:14    40:14    46:8
51:16    51:17    52:9
58:14    80:22
10 [5]     9:17    19:4
19:6    19:13    19:20
10:07 [2]           1:17
4:1
10:38 [1]           23:16
10:40 [1]           23:16
11:30 [1]           53:23
11:32 [1]           53:23
11th [1] 9:2
12 [2]    51:14    51:15
12-31-03 [2]    81:16
82:19
1201 [1] 1:20
12:05 [1]           72:14
12:07 [1]           72:14
12:10 [1]           1:18
12th [1] 22:1
147 [2] 81:17    82:21
1940's [1]           12:13
197TH [2]           1:5
80:4
1997 [2] 45:4    45:8
1998 [1] 10:25

**-2-**

2 [5]        3:4    33:3
43:23    44:6    46:4
2001 [1] 41:15
2002 [3] 21:15    22:1
31:22
2003 [6] 1:11    1:17
79:14    80:6    81:13
82:17
2003-01-295-C [1]
80:1
2003-O1-295-C [1]
1:1
203 [2]    81:11    82:1
203.3 [1]           82:14
210 [2]    81:18    82:22
25th [1] 21:15
26 [3]    6:21    12:17

12:18
27 [5]     6:21    7:4
8:12    8:14    12:18

**-3-**

314 [2]    81:17    82:20
31st [3]    1:11    1:17
80:6
3276 [2] 81:15    82:19
340-4655 [2]    81:18
82:22

**-4-**

4 [5]        3:7    3:13
3:15    3:17    3:20
436 [1] 2:5
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 [1]
6:14

**-5-**

5-25-02 [1]           3:14
57 [1]    80:22

**-6-**

6 [1]    50:16
6-21-37 [1]           6:1
65 [2]    23:7    23:9
6900 [2] 81:17    82:21
6th [1]    31:22

**-7-**

7 [2]    50:21    51:9
7-12-02 [1]    3:16
78216 [2]           2:9
81:18    82:21
78523 [1]           2:5
79 [1]    3:9

**-8-**

80 [1]    3:10
800 [1] 29:18
83 [1]    6:16
8359 [1] 6:16

**-9-**

900 [1] 2:8
9311 [1] 2:8

**-A-**

a.m [1]    1:18
able [2] 24:17    37:22
above [1]           70:24
71:11    79:2
above-styled [1]
1:16
AC [1]    36:19
accept [1]           73:21

accomplish [1] 23:19
accordance [1] 82:14
According [2]    36:22
58:12
accurate [11]           21:22
22:8    31:17    37:5
39:10    41:12    44:3
44:8    44:24    45:6
52:14
acknowledged [1]
79:11
acquaintance [1]
30:2
action [2]           81:7
81:9
active [1]           75:21
actual [1]           28:13
ADAMI [1]    2:8
added [1]           47:22
address [2]           6:15
6:19
adjacent [1]           33:11
adjoining [1]    38:17
adjuster [8]           15:7
15:10    21:16    26:21
29:8    29:10    54:7
75:13
adjusters [2]    54:11
54:12
adults [1]           7:20
advised [1]           48:11
affected [3]           33:10
39:7    43:25
affecting [1]           36:24
affiliated [2]    75:12
76:2
affix [1] 79:1
again [6]           19:16
23:2    24:11    45:5
46:6    65:9
against [9]           4:12
10:2    10:11    14:16
54:19    54:20    55:7
64:19    64:24
age [1]    73:20
agency [1]           29:1
agent [20]           11:19
11:20    11:20    11:25
13:16    26:6    26:17
26:20    26:21    27:2
27:3    27:5    27:10
27:12    28:14    28:18
29:12    64:20    64:22
75:13
agent's [2]           26:2
65:24
ages [2] 7:9    7:18
ago [17] 13:15    14:21
19:7    19:21    20:8
33:25    34:12    35:1
35:2    49:12    49:16
50:3    50:18    58:11
65:18    75:17    75:17
agree [1]61:2

ahead [1]           16:19
air [35]    10:4    10:7
10:12    13:12    26:14
34:2    34:5    41:16
42:5    42:8    42:13
42:19    42:24    43:7
51:9    51:11    51:21
51:24    52:7    52:11
52:21    59:15    59:22
60:3    60:13    60:14
63:14    63:15    63:13
65:15    65:22    74:9
74:14    74:16    74:22
AL [2]    1:5    80:4
Alexander [2]    45:9
45:10
Alexander's [1]
46:1
allergy [1]           49:4
Allstate [62]           1:5
4:11    10:3    10:11
10:21    10:22    10:25
11:6    11:23    12:16
13:16    14:16    15:5
15:10    15:13    15:17
18:8    18:11    18:15
20:22    21:2    24:1
24:13    24:25    25:7
25:9    25:14    25:19
25:23    28:21    29:20
31:25    32:9    33:17
33:21    37:10    40:23
48:3    48:14    53:6
54:9    54:19    54:20
55:8    56:5    56:13
56:16    61:6    61:16
62:18    67:12    67:19
67:21    67:24    69:3
73:11    75:7    76:2
75:13    75:13    76:2
80:4
almost [1]           59:11
along [2]           6:13
29:8
amount [1]           80:20
Anderson [1]    49:20
anguish [3]           62:3
62:4    62:7
answer [6]           5:3
9:23    9:23    9:25
60:4    68:21
answering [1]    5:16
answers [4]           5:5
21:7    21:21    22:7
anticipate [1]    5:15
Antonio [5]           2:9
4:15    45:14    81:18
82:21
anxiety [2]           62:15
62:19
anyway [3]           63:22
63:24    69:17
Appearances [1]
3:4
appeared [1]           79:9
appraisal [3]    22:19

22:22    23:5
appraised [4]           22:15
22:23    22:25    23:4
appraises [1]    22:19
appreciate [1]    77:7
areas [3] 52:13    52:22
64:15
Army [1]           63:13
ASSOCIATES [1]
2:4
assume [2]           28:8
57:3
assumed [1]           57:5
assuming [1]    57:4
attached [2]           1:23
82:5
attorney [8]           53:4
53:8    55:4    64:12
80:17    81:3    81:4
82:9
attorneys [1]    81:7
attributable [1] 74:1
attribute [1]    61:14
attributes [1]    48:25
August [2]           31:22
41:15
authority [1]    23:5
available [1]    31:3
aware [19]           22:18
54:24    55:2    56:13
56:15    65:2    66:7
66:11    66:20    67:11
67:20    68:4    68:6
68:14    68:18    69:2
69:5    69:7    69:13
away [1] 62:17

**-B-**

B [1]    3:12
background [1] 8:20
bad [1]    53:3
Bair [15] 27:1    27:7
29:16    30:6    31:12
54:7    54:13    55:16
55:18    55:19    55:20
55:21    55:22    76:5
76:6
Bair's [1]           29:21
BARRERA [1] 1:20
base [3] 33:10    33:15
36:17
basis [3] 48:4    75:22
76:3
bath [3] 44:4    44:7
71:22
bathroom [27]    26:15
36:23    37:5    37:7
37:14    39:4    39:7
39:14    39:16    40:14
40:14    40:22    43:22
43:25    44:6    51:16
51:17    52:9    58:13
59:5    61:1    70:14

bathrooms - damages
July 31, 2003
CondenseIt!™
Frank Carrales

70:18    70:18    70:25
71:5    71:12
**bathrooms** [1]    13:8
**bathtub** [1]    37:2
**beam** [2]    13:10
45:5
**beams** [7]    41:7
41:8    41:11    59:17
59:20    59:21    60:2
**bedroom** [4]    46:4
46:8
**bedrooms** [1]    13:6
**began** [1]    52:1
**beginning** [1]    9:21
**behalf** [1]    4:10
64:6
**below** [2]    71:2
71:3
**benefits** [2]    8:13
8:16
**Bennie** [1]    13:17
**Bennie's** [4]    42:24
65:15    65:22    74:16
**best** [3]    21:22    22:8
26:4
**better** [2]    52:17
56:12
**between** [3]    58:17
60:11    60:15
**Bexar** [1]    23:8
**big** [1]    47:1
**birth** [2]    5:24    5:25
**birthday** [1]    59:25
**bit** [1]    15:3
**bite** [1]    67:7
**black** [5]    10:16
26:9    30:9    42:1
70:12
**Blair** [3] 27:1    55:15
55:16
**blew** [2] 14:23    42:10
**Blue** [1] 8:19
**board** [4]    22:23
23:1    57:19    58:2
**boards** [1]    41:14
**boils** [1] 73:9
**bottom** [5]    35:4
35:7    38:19    57:19
58:2
**bought** [4]    11:22
46:21    46:22    47:20
**branch** [1]    63:13
**Bravo** [1]    5:25
**break** [2]    5:9
23:15
**brick** [1] 45:5
**bricked** [2]    17:11
17:12
**briefly** [1]    20:25
**britches** [1]    59:11
**Brown** [17]    21:17
22:1    25:17    30:20

30:23    30:25    31:4
31:9    54:7    54:13
54:15    55:12    55:17
56:3    76:4    76:6
76:7
**Brown's** [1]    21:21
**Brownsville** [2]
1:21    2:5
**building** [9]    17:15
17:19    17:23    17:25
18:3    18:5    40:10
57:18    58:14
**built** [2] 12:13    47:19
**Buren** [1]    1:21
**burned** [1]    42:24
**business** [4]    6:16
9:10    9:13    12:8

———————————

**-C-**

**C** [1]    2:1
**C-a-y-o** [1]    20:1
**C-o-c-c-o-z-a** [1]
12:7
**cabinet** [14]    33:10
33:15    34:8    36:17
39:6    39:7    39:10
39:25    40:5    43:25
43:25    44:10    51:15
51:17
**cabinets** [7]    34:22
34:24    34:24    35:17
35:20    35:22    36:7
**Cairo** [1]    19:25
**calls** [2] 17:4    32:11
**Cameron** [4]    1:4
22:18    22:22    80:3
**cancer** [4]    49:9
49:11    49:21    50:7
**cancer-free** [2] 49:17
50:8
**card** [1] 79:10
**care** [3]    17:12    37:11
41:3
**Carrales** [31]    1:2
1:3    1:10    1:14
2:11    3:6    4:2
4:8    4:9    7:1
7:3    7:10    23:17
33:8    33:13    36:23
37:3    39:3    39:9
41:9    43:22    44:1
44:21    45:4    79:1
79:4    79:9    80:2
80:2    80:6    80:12
**case** [1] 21:3
**cash** [2] 43:19    43:20
**Cathy** [15]    25:21
27:1    27:6    29:14
29:15    29:21    30:6
54:7    54:13    55:12
55:15    55:21    76:4
76:5    76:6
**caused** [5]    38:24
38:25    52:25    71:4
74:23

**causing** [1]    49:2
**Cayo** [3] 19:24    20:1
20:6
**ceiling** [10]    16:7
16:10    16:15    16:16
37:5    70:13    70:17
70:25    71:5    72:4
**central** [2]    13:12
65:13
**certainly** [1]    75:20
**certificate** [2]    3:10
82:15
**certification** [3]
80:5    81:10    82:1
**certified** [4]    80:9
81:11    81:13    82:17
**certify** [2]    80:11
81:5
**chance** [2]    20:23
32:4
**CHANGE** [1]    78:2
**changed** [2]    11:14
20:13
**changes** [4]    3:9
78:1    82:5    82:6
**charge** [3]    42:17
45:15    82:11
**check** [3]    27:21
41:21    74:16
**checked** [2]    38:13
41:22
**checks** [1]    43:18
**children** [3]    7:5
7:7    7:22
**chimney** [13]    14:17
14:22    14:23    15:18
15:21    15:23    15:25
16:25    17:1    17:7
17:11    18:16    76:12
**Christina** [3]    7:16
7:16    7:25
**chronic** [1]    50:11
**circumstances** [1]
68:1
**citizen** [1]    6:4
**city** [2] 20:7    48:1
**Civil** [1] 1:22
**claim** [37]    10:14
10:14    10:15    10:20
14:22    15:13    18:9
18:12    18:15    18:24
24:2    25:23    26:1
26:5    27:11    29:8
29:8    33:21    37:7
37:13    41:1    45:18
48:6    53:25    54:2
54:4    54:6    54:13
54:21    56:6    56:9
62:3    62:15    68:2
75:7    75:21    77:2
**claiming** [3]    48:19
62:2    75:14
**claims** [7]    14:15
18:15    18:18    18:21
48:4    67:9    76:3

**clarify** [2]    62:10
67:17
**clean** [4]    46:24
47:2    47:4    47:7
**Clerk** [1]    82:16
**close** [1] 45:17
**closet** [11]    26:14
36:19    38:12    38:15
38:18    41:6    41:8
41:11    56:23    58:18
59:18
**closure** [1]    23:21
**clue** [2]    10:9    12:23
**Cocozza** [5]    11:13
11:21    12:2    12:4
12:5
**colleagues** [1]    34:16
**college** [3]    8:6
34:16    42:16
**comfortable** [1]
5:8
**coming** [5]    10:11
32:13    38:11    38:15
38:18
**company** [8]    8:18
11:5    11:11    11:13
25:2    43:8    66:24
67:1
**compare** [1]    32:25
**complained** [1] 48:24
**complaint** [1]    55:14
**complaints** [5] 54:19
54:20    55:7    64:19
64:24
**completely** [1]    15:23
**concerned** [2]    53:1
56:18
**condition** [2]    64:2
69:19
**conditioner** [4] 13:12
34:6    42:20    60:13
**conditioning** [25]
10:5    10:8    10:12
26:14    34:2    41:16
42:5    42:9    42:13
43:7    51:10    51:11
51:21    51:25    52:7
52:11    52:21    59:15
59:22    60:3    60:14
65:13    74:9    74:14
74:22
**conditions** [1]    69:14
**conduct** [4]    31:9
31:12    72:16    73:2
**Conley** [2]    11:14
11:21
**consideration** [1]
79:12
**construction** [1]
9:12
**contact** [5]    32:9
43:13    53:4    53:8
53:9
**contacted** [8]    26:5
27:5    27:10    29:11

33:21    53:25    75:6
75:11
**contacting** [1]    65:24
**contains** [1]    82:6
**contents** [3]    76:18
76:22    77:3
**contested** [2]    22:25
23:3
**contract** [1]    66:8
**contractors** [2] 19:12
19:19
**conversation** [1]
5:14
**conversations** [5]
13:20    13:23    14:3
32:19    60:18
**copies** [1]    82:12
**copy** [2] 66:2    82:14
**correct** [8]    21:1
26:2    33:22    41:17
48:10    51:10    69:8
79:2
**cost** [7]    24:8    24:13
24:24    37:23    37:24
62:22    62:24
**counsel** [2]    81:1
81:5
**County** [6]    1:4
22:18    22:22    23:8
79:7    80:3
**couple** [4]    16:23
29:11    36:5    55:23
**course** [1]    60:16
**Court** [5]    1:2
4:20    80:2    81:16
82:20
**covered** [5]    56:17
66:12    66:21    73:10
74:1
**crack** [1]    45:5
**criticisms** [2]    72:19
73:5
**Cross/Blue** [1] 8:19
**CSR** [3]    1:18    81:15
82:19
**current** [2]    6:15
13:16
**Custodial** [1]    82:9
**cutoff** [1]    20:14

**-D-**

**D** [1]    3:1
**damage** [21]    10:16
15:1    15:11    16:17
16:19    18:24    26:7
26:10    30:8    30:11
52:1    52:20    61:15
62:23    73:10    73:25
74:19    74:23    75:14
76:17    77:2
**damaged** [1]    76:23
**damages** [10]    24:7
24:12    26:16    26:20
31:7    62:18    64:2

64:6    73:13    75:7
date [4]    5:24    48:4
81:16    82:19
dated [1]    31:22
dates [7] 10:9    14:19
19:3    46:10    49:13
59:24    64:10
Davidson [2]    81:16
82:20
days [1] 36:5
dead [1] 20:4
deal [1] 23:8
decided [4]    28:1
28:3    37:17    47:9
declared [1]    50:8
Defendant [4]    1:15
2:6    81:4    82:11
deleted [1]    17:1
delivered [2]    82:9
82:13
den [1] 17:2
deposition [31] 1:9
1:14    4:10    4:16
4:17    5:5    5:9
5:21    6:22    9:21
20:20    20:21    20:24
21:14    31:15    31:21
63:7    71:16    72:3
79:1    80:6    80:14
80:16    80:21    80:25
82:3    82:4    82:8
82:10    82:12    82:13
depths [1]    53:18
describe [1]    34:25
described [1]    71:17
description [1] 79:10
determine [1]    45:20
determined [1] 45:23
developed [1]    34:20
diabetes [1]    50:12
diagnosed [1]    49:11
diaries [1]    65:25
difference [1]    74:6
different [1]    54:18
dining [1]    59:10
directly [1]    21:12
disagree [1]    11:1
discharge [2]    63:19
63:20
discharged [1]    63:17
discover [1]    38:10
discovered [1]    52:22
discussion [2]    33:3
53:23
disrespect [2]    55:11
56:1
District [5]    1:2
1:5    22:19    80:2
80:4
document [1]    79:11
documents [2]    74:12
74:24

dog [2]    67:4    67:7
dollars [1]    37:23
done [16]    16:18
23:11    47:24    57:23
57:25    58:1    60:21
62:5    62:8    62:16
68:12    69:23    73:23
74:9    74:13    74:17
Doug [1]    4:9
DOUGLAS [1] 2:7
down [11]    4:22
5:18    15:23    24:25
25:1    35:4    59:2
59:4    60:11    73:9
76:12
drain [3] 41:5    41:16
42:10
drained [2]    47:10
47:10
draining [2]    10:4
10:7
dried [4] 40:1    40:1
40:6    40:17
drop [3] 37:15    66:14
67:3
dropped [3]    66:24
67:1    67:5
dry [1]    36:5
dryers [1]    35:24
drywall [1]    16:7
Due [1]    49:7
duly [3]    1:16    4:3
80:12
during [3]    5:8
14:24    31:7

-E-

E [6]    1:20    2:1
2:1    2:7    3:1
3:12
educational [1] 8:20
effect [1]    27:18
effort [1]    5:17
eight [2] 44:23    50:18
either [3]    13:4
39:2    42:22
Elvira [1]    7:17
employed [2]    8:3
81:6
employment [1]
8:14
ended [1]    27:25
entire [1]    45:1
estimate [2]    25:8
25:15    63:1
estimates [4]    24:23
65:2    65:3    65:6
ET [2]    1:5    80:4
EUO [1] 69:18
event [1]    29:10
events [2]    33:4
46:12

everyday [1]    5:13
exactly [7]    14:9
16:21    23:25    25:4
38:5    67:23    67:23
examination [18]
3:7    4:4    67:12
67:16    67:19    67:25
68:7    68:11    68:15
68:19    69:4    69:11
69:14    69:19    69:21
70:1    70:4    80:18
example [6]    5:15
19:13    52:9    55:9
56:7    72:4
except [2]    48:1
79:2
excused [1]    23:13
executed [1]    79:12
exemption [1]    23:9
exhibit [12]    3:13
3:15    3:17    3:19
20:20    20:21    21:14
31:15    31:21    50:16
71:16    72:3
exhibits [2]    4:6
82:12
Expiration [1] 81:16
82:19
explain [1]    56:16
expressed [1]    79:12
extent [6]    21:5
66:19    73:9    73:13
73:19    74:8

-F-

face [2] 76:1    76:2
fact [2]    39:25    55:8
facts [1] 68:1
fair [4]    22:4    22:12
31:16    51:24
fall [1]    59:4
family [1]    9:9
9:12
fan [3]    35:25    36:1
40:9
fans [3]    35:25    36:4
40:8
far [10]    9:1    18:22
21:4    22:10    27:21
30:14    41:2    52:6
56:18    57:15
fast [1]    6:12
faucet [2]    20:13
20:13
faucets [1]    35:4
58:17
feet [1]    13:3
fell [6]    59:2    59:10
59:11    59:13    59:14
76:12
fella [1] 32:16
felt [1]    44:17
figure [1]    73:25

figures [4]    25:1
65:7    65:8    65:10
file [5]    10:2    10:15
10:20    25:3    67:9
filed [22]    4:12
9:3    9:6    10:10
10:14    54:24    55:2
55:3    67:12    67:15
67:18    68:2    68:6
68:10    68:15    68:19
68:25    69:3    69:8
69:10    70:5    82:16
filing [1]    23:19
fill [1]    47:11
finally [1]    29:13
financially [1]    81:8
fine [4]    5:11    32:4
49:14    74:8
finish [1]    5:16
first [15] 4:3    4:17
4:19    32:25    33:8
43:3    46:25    49:25
53:4    75:6    75:9
75:11    76:1    76:7
76:8
five [1]    22:16
fix [5]    36:15    37:17
37:19    62:23    65:11
fixed [3] 37:16    51:7
58:10
floor [27]    3:20
17:6    17:6    17:8
17:9    31:17    33:11
36:6    36:8    36:9
36:13    36:24    38:22
39:6    41:6    41:7
41:8    41:10    43:24
57:20    59:17    59:19
59:21    60:2    60:6
60:7    71:16
floors [4]    45:4
60:11    60:15    60:24
following [4]    37:3
40:15    80:11    81:1
follows [2]    4:3
80:21
Force [2]    63:14
63:15
foregoing [2]    79:1
79:11
forever [1]    54:22
55:9
form [11]    17:17
19:15    21:10    22:13
24:10    33:23    36:14
51:13    52:3    54:8
74:4
found [8]    6:11
10:4    10:11    27:8
35:5    36:18    51:6
51:11
foundation [5] 45:21
45:25    61:20    61:23
Four [6] 3:19    4:6
7:8    31:15    71:16
72:3

frame [1]    53:24
Francisco [3]    4:8
7:17    7:25
FRANK [11]    1:2
1:10    1:14    3:6
4:2    79:1    79:4
79:9    80:2    80:6
80:12
friend [1]    30:2
full [1]    4:7
funny [1]    71:15

-G-

gadget [1]    32:23
general [2]    63:18
63:19
generally [1]    8:20
Gilbert [4]    2:4
53:10    53:11    53:25
given [4]    4:17
5:5    20:22    21:2
61:18    68:15    68:19
69:11    79:13    80:14
80:24
giving [3]    21:16
21:25    22:2
goal [2]    23:18
GOLDMAN [1]
2:8
gone [2]    23:3    24:4
good [4] 46:10
grade [1]    9:2
graduate [1]    8:24
green [1]    72:2
growth [2]    52:8
52:13
guess [14]    7:4
10:14    14:21    15:21
15:25    25:21    30:21
37:11    52:19    58:12
60:8    68:9    72:9
75:24
guy [4]    12:2    59:7
60:10    60:15

-H-

H [1]    3:12
half [5]    13:9    43:23
44:4    44:7    71:22
halfway [2]    47:17
47:17
hallway [2]    60:12
60:24
hand [1] 79:13
handle [1]    11:3
handled [1]    18:12
handling [2]    54:21
75:21
happening [1]    54:23
hardwood [1]    60:5
60:7
Harlingen [8]    6:17

| | | | | |
|---|---|---|---|---|
| 6:18    8:2    12:11 | **HVAC** [4]    41:5 | **joining** [1]    16:25 | **leak** [49] 33:9    33:10 | 60:25    60:25    76:21 |
| 27:12  42:25  43:6 | 41:6    41:11    56:23 | **Juan** [1] 59:7 | 33:12    33:18    33:24 | **looking** [6]    21:12 |
| 45:13 | | **JUDICIAL** [2] 1:5 | 34:2    34:10    34:11 | 52:12  52:15  52:18 |
| **head** [1] 4:24 | **-I-** | 80:4 | 34:23  34:25  35:14 | 52:19  52:20 |
| **health** [9]    8:16 | **idea** [8]  12:5    12:9 | **July** [4]  1:11    1:17 | 36:25    37:3    37:8 | **looks** [2]    50:22 |
| 8:18  48:19  48:25 | 13:1    20:3    46:20 | 22:1    80:6 | 37:14  38:5    38:6 | 70:15 |
| 49:6  50:6    50:7 | 53:24  71:4    71:6 | | 38:14  38:20  38:24 | **loss** [1]  73:9 |
| 50:9  50:11 | **identified** [1] 46:14 | **-K-** | 39:1    39:4    39:13 | **losses** [2]    66:13 |
| **heard** [3]    52:24 | **identify** [1]    28:18 | | 39:17  40:13  40:16 | 66:22 |
| 57:7  57:15 | **identity** [1]    79:10 | **K-h-o-o-l** [1]    73:1 | 40:21  41:9    41:16 | **Luis** [2] 43:4    43:5 |
| **heaters** [1]    35:24 | **lgo** [1]  60:24 | **keep** [4] 34:19    43:17 | 43:22  44:1    44:13 | |
| **heights** [1]  53:17 | **important** [2]    4:23 | 59:24  61:10 | 44:22  50:18  51:7 | **-M-** |
| **help** [3]  18:23    20:19 | 5:2 | **kept** [2]  73:16    74:15 | 51:10  51:21  51:25 | **M** [1]    2:4 |
| 33:6 | **incident** [1]    44:3 | **Kevin** [10]    21:17 | 52:7    52:10  57:16 | **M.D** [1] 49:20 |
| **helped** [1]    76:11 | **includes** [1]    81:1 | 25:17  25:21  30:20 | 58:13  59:15  59:20 | **machine** [1]    1:19 |
| **hereby** [2]    79:1 | **indicate** [1]    72:9 | 30:22  30:25  54:7 | 59:23  60:3    60:11 | **mad** [2] 28:7    28:8 |
| 80:10 | **indicated** [2]    46:5 | 54:13  54:14  76:6 | 65:20  65:21 | **main** [1] 29:18 |
| **herein** [1]    82:15 | 46:9 | **kidding** [1]    53:13 | **leaked** [5]    36:23 | **maintenance** [10] |
| **hereto** [1]    1:23 | **indicates** [4]    33:8 | **kind** [3]  8:8    35:24 | 41:6  58:8    58:9 | 37:20    41:2    44:18 |
| **herself** [2]    28:18 | 43:21  44:20  45:1 | 39:13  41:16    49:4 | 59:17 | 46:23  61:8    61:11 |
| 31:12 | **Indicating** [1] 63:9 | 49:21 | **leaking** [1]    35:3 | 73:14  73:17  73:21 |
| **high** [5]  8:21    8:22 | **individual** [1]  72:22 | **kitchen** [20]    10:6 | 35:4    36:18 | 74:3 |
| 9:1    65:8    65:10 | **information** [2] 74:25 | 10:13  10:18  33:9 | **leaks** [9] 52:17    64:16 | **man** [3]  19:24    42:13 |
| **highlighter** [3] 71:14 | 80:24 | 33:18  33:24  34:8 | 71:11  74:14  74:15 | 60:19 |
| 71:24  72:5 | **inside** [4]    17:20 | 34:9  34:23    35:1 | 74:22  74:23  75:1 | **manner** [4]    31:10 |
| **himself** [3]    31:9 | 32:25  38:11  74:23 | 35:19  36:17  41:19 | 75:10 | 72:17  72:19  73:3 |
| 72:16  73:1 | **inspect** [3]    15:5 | 46:4    46:8    50:22 | **leave** [4] 17:15    17:24 | **Marie** [1]    7:10 |
| **hired** [1] 36:10 | 26:21  72:15 | 52:8    57:16  60:25 | 18:5    36:5 | **mark** [1] 71:16 |
| **hold** [3]  29:14    29:15 | **inspection** [6]    30:17 | 70:17 | **legal** [1] 9:9 | **marked** [7]    4:6 |
| 30:6 | 31:1    32:14  50:24 | **knew** [2]    36:12 | **less** [2]  37:23    37:25 | 20:20  21:14  31:14 |
| **hole** [1] 60:9 | 72:20  73:6 | 58:4    58:5 | **level** [2] 45:4    45:8 | 31:21  50:16  71:24 |
| **home** [43]    10:25 | **installed** [1]    20:7 | **knowledge** [7]  9:7 | **leveled** [4]    45:2 | **market** [1]    22:12 |
| 11:5  12:12  12:19 | **instance** [1]    1:15 | 21:1    21:22  22:8 | 45:3    45:22  61:22 | **married** [1]    7:3 |
| 12:24  13:10  15:6 | **instead** [1]    58:20 | 61:23  64:18  76:22 | **Leveling** [1]    45:10 | **MARTINEZ** [2] |
| 17:16  17:25  19:13 | **instructor** [3]    8:7 | **known** [6]    66:25 | **lie** [1]  56:5 | 1:20    1:20 |
| 19:20  21:9    22:12 | 8:8    8:10 | 57:9    57:13  79:9 | **life** [3]  6:3    57:9 | **material** [1]    30:10 |
| 22:19  22:23  23:1 | **instrument** [1]  79:11 | **Kohl** [4] 72:24    72:24 | 57:14 | **materials** [10]    17:15 |
| 23:5  24:9    24:14 | **insurance** [18]    8:18 | 72:25  73:2 | **line** [6]  2:5    33:9 | 17:19  17:23  17:25 |
| 24:24  26:22  30:25 | 10:22  11:3    11:5 | | 36:23  39:4    43:22 | 18:3    18:6    40:11 |
| 31:18  39:12  46:21 | 11:11  11:13  11:14 | **-L-** | 78:2 | 40:16  57:18  58:15 |
| 48:20  52:12  52:14 | 11:18  11:18  14:15 | **lady** [6]  7:13    27:17 | **linen** [4] 38:12    38:15 | **matters** [1]    11:3 |
| 61:3  61:8    61:13 | 18:18  37:12  64:20 | 28:8  28:24    29:2 | 38:18  58:18 | **may** [8]  9:22    14:9 |
| 61:15  62:23  65:3 | 66:2    66:5    66:7 | 29:4 | **LISA** [4]    1:18 | 16:7    21:15  23:10 |
| 66:9  70:8    72:20 | 66:24  67:1 | **lady's** [2]    14:2 | 80:9    81:15  82:19 | 23:12  25:20  30:9 |
| 73:10  73:14  73:19 | **insured** [4]    10:24 | 28:16 | **live** [6]  7:22    7:24 | **mean** [8]    50:7 |
| 73:20  74:24  76:18 | 11:13  11:15  37:10 | **last** [11] 9:17    19:13 | 8:1    24:17  24:18 | 50:20  52:4    55:10 |
| **homeowner** [3] 61:5 | **interested** [1]  81:9 | 19:20  20:5    20:9 | 43:5 | 56:8    60:13  62:4 |
| 66:8  73:21 | **interior** [2]    16:6 | 22:15  43:2    54:14 | **liveable** [1]    24:15 | 73:16 |
| **honorably** [1]  63:17 | 17:13 | 58:9    59:6    74:17 | **lived** [2] 6:2    6:19 | **meant** [1]    54:10 |
| **horrible** [1]    63:20 | **investigation** [12] | **laundry** [1]    46:5 | **living** [6]    24:21 | **media** [1]    52:24 |
| **hose** [1] 20:15 | 33:12  33:19  37:1 | 46:9 | 44:21  50:17  50:19 | **medication** [1] 49:5 |
| **hour** [1] 80:22 | 39:6  39:8    39:13 | **lavatory** [1]    26:15 | 72:5    72:6 | **Melissa** [1]    7:10 |
| **house** [34]    13:3 | 41:5  43:24  44:23 | 70:18 | **LLOYDS** [2]    1:5 | **mental** [3]    62:2 |
| 17:20  20:6    24:15 | 45:3  57:17  59:16 | **lawsuit** [24]    4:11 | 80:4 | 62:4    62:7 |
| 24:17  26:8    26:11 | **issue** [1] 48:17 | 10:2    10:10  23:19 | **located** [2]    12:10 | **met** [2]  4:10    76:1 |
| 31:4  37:20    41:2 | **issues** [5]    44:18 | 24:7  54:24    55:2 | 45:12 | **Mexico** [1]    6:1 |
| 41:3  45:2    45:3 | 50:6  50:9    50:11 | 55:8  62:19    64:25 | **locations** [1]    71:17 | **might** [4]    24:6 |
| 45:8  45:10  46:13 | 73:14 | 67:11  67:15  67:18 | **longer** [1]    43:14 | 26:8 |
| 46:22  46:25  47:15 | | 68:2    68:6    68:10 | **look** [12] 6:7    27:15 | **military** [6]    6:8 |
| 47:17  47:18  47:19 | **-J-** | 68:18  68:25  69:3 | 31:16  32:5    33:17 | 6:9    63:3    63:4 |
| 47:21  47:22  48:12 | | 69:7    75:9    75:15 | 45:25  52:1    52:17 | 63:7    63:11 |
| 49:3  52:2    54:16 | **Javier** [1]    7:17 | 75:22  77:3 | 65:8    65:10  74:13 | **mind** [1] 62:25 |
| 59:8  61:11  62:1 | **John** [1] 32:16 | **lawsuits** [2]    9:3 | 74:25 | |
| 64:1  65:12  73:17 | | 9:6 | **looked** [10]    34:3 | |
| **Housewife** [1]  9:16 | | **lawyer** [4]    4:15 | 41:20  50:23  51:1 | |
| | | 30:3  53:16  53:21 | 51:12  51:17  51:22 | |

minutes [1]        80:22
mistakes [1]       32:10
mold [42]          10:12
  26:8     27:18    27:20
  27:21    29:5     30:9
  33:14    33:20    34:1
  34:5     34:20    36:16
  37:4     39:10    41:10
  41:18    41:23    41:25
  42:3     44:2     48:12
  48:20    49:1     52:1
  52:8     52:13    52:22
  53:1     56:18    56:20
  70:7     70:11    70:16
  70:20    70:21    71:4
  71:18    71:25    74:1
  75:14    76:17
MoldPro [9]        3:18
  31:22    32:1     32:13
  33:19    46:5     47:25
  64:3     72:15
MoldPro's [4]     46:14
  50:15    50:23    59:16
moldy-looking [1]
  10:6
money [2]          48:3
  48:9
month [2]          49:16
  50:3
months [12]        27:8
  29:11    45:2     54:1
  54:1     54:2     54:2
  63:16    64:9     75:17
  75:17    75:17
moonlights [1]     43:9
Moore [2]          81:16
  82:20
mortgage [1]       12:22
most [1] 75:21
move [2]           48:11
  48:14
moved [2]          46:25
  47:3
movement [1]       45:21
Ms [2]    7:3      31:12
must [2] 6:8       44:5
  44:5
musty [2]          46:3
  46:7

          -N-

N [2]     2:1      3:1
name [14]          4:7
  4:9     6:25     11:25
  14:2     19:24    20:2
  21:16    28:16    32:16
  42:13    43:3     72:23
  79:11
named [1]          25:3
names [3]          7:9
  19:11    19:19
nature [2]         4:25
  23:10
need [11]          5:9
  5:23    23:13    23:14

24:1     27:21    48:23
  61:13    61:14    61:23
  73:25
needed [9]         6:11
  15:19    18:1     27:14
  29:4     47:2     47:6
  49:9     59:8
needs [1]          61:20
  73:24
neither [1]        81:5
never [7]          24:4
  29:7     48:17    48:18
  55:13    68:12    69:23
new [2]   65:22    76:14
next [6]  36:22    39:3
  41:4     43:21    44:20
  45:1
nickname [1]       20:1
nobody [1]         45:23
None [1]           39:24
nor [1]   81:6
normal [1]         73:14
north [3]          36:24
  37:2     40:15
NOTARY [1]        79:15
noted [1]          79:2
notes [1]          65:24
  74:15
nothing [2]        54:4
  75:4
notice [6]         33:20
  34:1     34:5     51:20
  66:12    66:21
noticed [7]        33:16
  41:18    41:23    46:3
  46:7     50:17    51:8
noticing [1]       52:7
now [9]   24:21    40:3
  46:10    46:17    47:21
  49:6     54:25    67:22
  72:2
number [32]        6:6
  6:12     20:20    20:21
  21:15    26:25    27:2
  27:6     29:17    29:19
  29:21    30:5     31:15
  31:21    36:24    37:5
  39:14    40:14    43:22
  44:6     45:13    46:4
  46:8     50:16    50:21
  51:9     51:14    51:15
  51:16    51:17    52:9
  58:14
numbered [1]       1:17
numbers [2]        6:10
  6:13

          -O-

oath [18] 5:4      67:13
  67:16    67:20    67:25
  68:1     68:8     68:11
  68:16    68:20    69:4
  69:11    69:14    69:19
  69:22    70:1     70:5
  79:10

object [1]         66:18
Objection [11]     17:17
  19:15    21:10    22:13
  24:10    33:23    36:14
  51:13    52:3     54:8
  74:4
obligation [3]     66:8
  66:11    66:21
observe [1]        36:16
observed [6]       33:14
  37:4     39:9     41:10
  42:2     44:2
occasions [1]      55:13
occur [1]          33:24
occurred [2]       21:8
  33:9     33:12    36:25
  39:5     43:23    44:22
  81:12
Ocosa [1]          12:3
odor [2] 46:4      46:8
off [8]   15:25    20:15
  36:3     53:23    59:10
  59:12    59:13    59:14
office [1]          12:10
  13:24    26:2     28:20
  29:18    65:24    79:13
officer [2]        80:13
  80:25    82:4
officer's [1]      82:10
offices [1]        1:20
old [2]   12:12    61:13
Once [1] 30:6
one [39]  3:13     4:6
  5:18     5:18     7:10
  7:10     7:11     7:11
  7:13     7:25     9:4
  9:20     13:9     14:17
  19:21    20:20    21:15
  34:15    36:22    38:8
  41:4     42:23    42:23
  43:23    44:14    46:25
  60:20    65:15    65:17
  65:21    69:14    72:5
  72:7     72:8     74:17
  74:18    75:24    76:7
  76:8
ones [3]  46:13    72:11
  72:12
onto [2]  41:6     59:17
open [1] 34:8
operated [1]       49:16
operation [2]      49:9
  49:19
opinion [1]        22:11
  61:5
opposed [2]        4:24
  63:19
oral [3]  1:9      1:14
  80:14
ordinary [1]       61:8
  74:2
original [4]       25:23
  82:3     82:8     82:11
otherwise [1]      81:9

outcome [1]        81:9
outlined [1]       64:3
outside [9]        17:12
  20:14    32:24    32:25
  41:7     42:23    59:18
  65:22    74:20
overcrowding [2]
  63:22    63:24
overflow [1]       47:6
own [2]   37:18    37:19
owned [2]          12:17
  67:4

          -P-

P [2]     2:1      2:1
p.m [1]  1:18
page [3]  3:3      78:2
  82:6
paid [10] 12:19    15:21
  15:25    16:3     18:8
  43:20    48:3     48:9
  74:16    75:1
paint [1] 16:17
paneling [1]       16:7
  16:11
paper [1]          52:25
paragraph [8]      33:3
  33:8     33:9     41:4
  43:21    44:8     44:20
  45:1
PAREDES [1]       2:5
part [11] 17:6     17:15
  17:19    37:20    48:2
  50:15    56:6     58:5
  58:14    60:7     61:7
particular [1]     53:25
parties [3]        81:1
  81:6     82:15
party [1] 80:20
pass [1] 29:8
past [6]  15:16    18:19
  19:4     20:23    74:10
  74:14
pay [11]  15:13    15:15
  15:16    15:17    16:6
  43:19    61:6     61:7
  61:16    62:18    73:11
Pedro [3]          2:8
  81:17    82:21
Pena [3] 32:17    32:19
  72:15
Pennebaker [13]
  2:7     3:7      4:5
  4:9     23:14    53:15
  53:21    54:10    66:18
  72:13    77:6     80:22
  81:4
people [5]         11:18
  32:11    32:13    46:1
  54:18
PEREZ [1]         2:4
perhaps [1]        18:19
perimeter [1]      45:5

period [1]         49:23
person [2]         25:16
  26:12    54:15    65:21
  79:11
personally [1]     79:9
perspective [2]    24:1
  73:24
phone [1]          27:25
photograph [6]     50:16
  50:21    51:5     51:14
  51:15    51:15
photographs [2]
  50:14    64:1
pictures [6]       64:6
  64:8     64:11    64:14
  70:21    72:8
piece [1] 58:18
pier [1]  13:10
Piette [18]        2:4
  17:17    19:15    21:10
  22:13    24:10    33:23
  36:14    51:13    52:3
  53:10    53:17    54:8
  55:19    74:4     77:9
  80:23    81:3
pine [1]  60:8
pipe [1]  42:10
pipes [6]          34:4
  35:8     35:9     57:19
  70:24    71:19
place [3]          5:24
  5:25    47:9
places [1]         52:12
Plaintiff [2]      2:3
  81:3
plan [3]  3:20     31:17
  71:16
plugged [1]        41:5
plumber [4]        19:21
  35:12    38:2     38:7
plumbers [1]       19:14
  38:8     44:14
plumbing [13]      20:6
  20:10    20:12    20:17
  20:18    34:17    35:14
  74:9     74:14    74:22
plywood [4]        40:5
  58:18    58:19    58:20
PMB [2] 81:17    82:20
point [2] 28:3     31:6
policies [1]       69:16
policy [11]        11:22
  11:23    12:1     56:18
  66:3     66:5     66:20
  69:15    69:19    73:10
  74:1
poorly [1]         55:11
positive [1]       18:25
Premont [1]        8:23
preparing [1]      82:11
PRESENT [1]       1:6
pretty [2]         6:12
  45:17    57:14

previous - separated                    CondenseIt!™                    Frank Carrales
July 31, 2003

previous [1]          18:14
previously [1]       21:2
price [1] 12:24
priest [4]            53:12
  53:16   53:19   53:22
problem [7]           14:5
  51:3   51:6   51:6
  51:8   52:21  56:20
problems [8]          14:7
  20:10  21:8   32:10
  48:19  48:25  49:6
  73:19
Procedure [1]        1:22
proceeding [1] 81:7
process [2]           5:22
  31:7
produced [1]         1:15
professional [3]
  31:10  72:16  73:2
professionally [1]
  31:12
prompt [2]           66:12
  66:21
prompted [1]         52:11
promptly [1]         66:12
proof [1]            65:11
protect [1]          66:9
protested [1]        23:4
prove [2]            27:17
  29:5
proved [1]           79:10
provide [3]          66:12
  66:21  67:25
provided [1]         64:11
  67:19
provisions [1]       1:22
PUBLIC [1]           79:15
pup [1]  63:24
purchase [1]         12:24
purposes [4]          5:6
  22:19  67:25  79:2
pursuant [3]         1:21
  80:24  81:10
put [17] 13:14   15:24
  15:24  16:1   16:18
  17:6   29:2   35:24
  36:1   36:3   40:18
  60:4   60:8   60:8
  65:13  65:22  76:14
putting [1]          15:21

          -Q-

qualified [1]        49:3
Quantum [19]         25:3
  25:4   25:5   25:6
  25:7   25:10  25:11
  25:12  25:13  25:14
  25:18  25:20  60:10
  60:16  60:19  61:19
  65:3   65:5   72:22
questions [13]        4:5
  4:3   5:21   9:22
  9:25   21:7   21:22

          22:7   32:21  32:22
          74:7   77:7   77:9

          ─────────────
                 -R-

R [1]    2:1
radiation [4]        49:23
  49:25  50:1   50:4
rain [7]  14:24  15:2
  16:12  17:14  17:21
  47:1   47:5
rain-type [1]        14:25
Raymond [1]          7:17
read [4]  32:7   52:25
  66:5   79:1
real [1]  70:22
really [3]            9:18
  13:4   76:21
reason [6]            5:3
  5:10   11:1   33:2
  67:5   78:2
reasons [1]          82:6
receipts [6]         34:18
  34:19  39:23  43:15
  43:17  74:10
receive [1]          8:13
received [2]         47:25
  66:2
receiving [1]        49:14
recently [1]         74:17
receptionist [2] 28:23
  29:1
Recess [2]           23:16
  72:14
recommend [1]  25:10
recommended [1]
  34:15
record [4]           1:23
  53:23  80:14  81:2
records [2]          10:24
  65:23
referenced [2]       72:5
  75:8
regular [1]          60:8
related [3]           44:3
  73:14  81:6
rely [2]  5:4    21:7
remediation [1] 24:25
remember [48]  11:2
  12:25  13:2   14:11
  14:13  15:8   15:20
  18:14  18:22  20:11
  21:4   21:11  21:15
  21:25  22:2   26:17
  26:17  27:22  28:16
  29:15  30:15  30:16
  32:2   32:12  32:13
  32:15  34:14  39:21
  40:19  41:13  46:11
  46:13  46:16  49:12
  53:2   57:22  58:1
  59:6   59:21  59:25
  60:1   60:20  61:1
  71:21  72:10  72:11
  72:12  72:23

remembered [1]
  22:10
remove [6]           34:22
  34:24  35:16  35:16
  35:22  40.10
repair [17]          20:10
  24:8   24:13  24:24
  34:11  34:18  35:12
  35:13  38:8   39:1
  39:19  42:8   43:7
  43:15  62:22  65:2
  74:14
repaired [18]        33:13
  36:4   37:22  38:1
  39:21  42:10  44:13
  59:9   61:13  61:14
  61:21  61:24  65:15
  65:16  65:19  65:21
  66:16  75:2
repairs [9]          15:17
  20:12  47:24  48:4
  60:21  61:2   61:6
  61:7   74:9
repeat [3]           19:16
  19:18  23:2   46:6
replace [14]         16:3
  16:6   16:10  16:14
  16:16  17:5   17:10
  17:13  17:23  18:2
  39:25  42:25  57:17
  60:23
replaced [36]        16:21
  16:22  18:1   18:7
  19:2   19:4   19:6
  37:3   39:7   40:15
  40:16  40:19  41:8
  41:14  42:23  44:1
  44:10  57:20  58:2
  58:4   58:5   58:6
  58:15  58:16  58:19
  58:21  58:22  58:23
  58:24  59:1   59:20
  59:22  60:3   60:7
  64:17  76:9
replacing [1]        74:20
report [30]          3:18
  26:10  29:7   31:22
  31:23  32:1   32:2
  32:5   32:7   32:10
  37:13  40:21  41:1
  44:17  46:5   46:9
  46:15  47:25  50:15
  59:16  59:19  60:22
  61:18  64:3   66:12
  66:15  75:13
reported [16]        1:19
  25:23  26:1   26:5
  26:16  26:20  33:4
  33:8   37:3   38:22
  39:4   39:9   41:9
  43:22  44:2   44:21
Reporter [2]         4:20
  80:10
Reporter's [2]       3:10
  80:5
Reporters [1]        81:16
  82:20

reports [1]          37:15
representation [1]
  31:17
representatives [1]
  20:23
Republic [11]         11:9
  11:10  11:22  12:1
  18:19  18:21  18:24
  67:2   67:3   67:5
  67:9
requested [2]        67:12
  68:20
requirements [1]
  81:10
reserve [1]          77:9
resolved [4]         23:24
  24:2   24:6   73:12
response [1]         27:23
responses [1]        4:23
responsibility [2]
  73:15  73:22
responsive [1]  66:19
rest [2]  41:21  72:9
restaurant [3]       29:22
  29:23  29:24
Restoration [4] 25:20
  65:3   65:5   72:23
result [8]            4:11
  8:14   15:1   16:8
  44:22  48:20  60:3
  62:3
retired [3]           8:4
  8:5    43:10
retirement [1]       8:13
return [2]           55:23
  80:18
returned [4]         55:13
  82:3   82:5   82:8
review [2]           20:24
  23:1
reviewed [1]     20:25
REYNOLDS [4]
  1:18   80:9   81:15
  82:19
right [32]            4:21
  5:20   7:14   16:2
  16:25  17:3   17:21
  22:4   26:3   28:5
  29:3   29:12  35:3
  37:6   38:19  39:11
  39:14  42:4   42:6
  44:6   46:17  47:20
  48:9   48:24  50:2
  53:13  62:16  62:17
  66:16  71:19  74:5
  74:20
Rio [1]  5:25
ROAD [1]             2:5
role [1]  28:22
roof [11] 18:24  18:24
  19:2   19:4   19:7
  44:22  50:18  64:16
  64:16  71:11  76:9
roofers [1]          19:13

room [10]            16:24
  17:3   44:21  46:5
  46:9   50:17  50:19
  59:10  72:5   72:6
rooms [1]            70:19
Rosales [3]          42:14
  42:20  65:21
Rosales's [2]        43:3
  65:19
rot [4]   56:25  57:3
  57:5   57:7
rotted [1]           56:24
rotten [1]           57:11
rotting [1]          56:21
Rottweiler [1]       67:4
routine [1]          74:2
rude [1]  5:14
Rule [3] 81:11       82:1
  82:14
Rules [1]            1:22
running [1]          70:24

          ─────────────
                 -S-

S [2]     2:1    3:12
San [8]   2:8    2:9
  4:15   45:14  81:17
  81:18  82:21  82:21
Sandra [4]            1:3
  2:11   7:1    80:2
Sarcoma [1]          49:22
satisfied [1]        38:11
saw [7]   10:5   10:12
  18:7   25:2   34:2
  38:21  52:15
says [6]  39:3   40:14
  41:4   45:4   59:16
  59:19
scared [2]           70:1
  70:2
school [3]           8:21
  8:22   9:1
seal [1]  79:13
second [2]           22:5
  22:8
secretary [3]        13:25
  14:4   28:19
security [4]          6:6
  6:10   6:12   6:13
see [13]  4:20   18:23
  20:18  23:20  35:9
  36:7   36:10  36:12
  52:12  52:17  62:11
  62:12  62:14
seeing [1]           71:17
sell [1]  11:18
send [6]  26:21  28:9
  28:10  30:17  30:19
  30:20
sent [10] 24:25  25:1
  25:14  25:19  25:19
  25:21  29:14  30:22
  76:4   76:6
separated [1]        40:2

Frank Canales · · Case 1:03-cv-00144 Document 9 · Filed in TXSD on 09/11/2003 · Page 79 of 80 · Condenselt! · septic - visible

July 31, 2003

40:3 40:6 40:6
**septic** [4] 46:17
46:19 47:15 47:19
**serious** [1] 53:14
**served** [1] 82:15
**service** [1] 42:19
**several** [2] 55:12
64:9
**sewing** [1] 17:3
**shaking** [1] 4:24
**shaped** [1] 71:15
**sheetrock** [9] 16:11
16:18 17:14 34:22
35:16 35:18 40:10
58:17 58:20
**sheetrocked** [1] 16:20
**Shepherd** [4] 11:14
11:21 12:1 12:2
**Shield** [1] 8:19
**shingles** [5] 15:19
16:4 19:7 19:8
76:14
**shorthand** [1] 1:19
80:9
**shortly** [2] 44:1
50:2
**show** [11] 10:24
20:19 27:24 31:14
31:20 50:21 51:14
64:2 64:14 70:21
72:3
**showed** [1] 15:12
**shower** [11] 36:23
36:25 37:8 37:14
38:12 38:16 38:17
38:20 39:16 40:13
58:13
**shown** [2] 51:8
82:15
**SHUFFIELD** [1]
2:8
**sides** [1] 58:6
**signature** [5] 3:9
78:1 79:1 80:18
82:6
**Silva** [7] 13:17 13:18
13:19 13:21 64:20
64:22 64:25
**Silva's** [1] 13:24
**similar** [1] 67:24
**simply** [2] 61:13
73:20
**sink** [32] 10:6 10:13
10:17 10:18 26:9
30:10 33:9 33:11
33:18 33:24 34:8
34:9 34:23 35:1
35:19 36:17 39:4
39:14 40:22 41:19
43:23 44:10 50:22
51:1 51:2 51:5
51:16 52:8 52:9
52:16 57:16 70:17
**sinks** [2] 56:24
70:13

**sit** [1] 73:8
**sitting** [1] 4:21
**situation** [1] 34:6
**situations** [1] 56:13
**six** [11] 33:12 33:19
33:25 34:11 35:1
35:2 49:12 50:3
57:17 58:11 63:16
**small** [1] 44:19
**smelled** [1] 53:3
**sneezes** [1] 49:5
**social** [4] 6:6
6:10 6:12 6:13
**someone** [1] 27:3
28:4
**sometimes** [1] 49:5
**sopped** [2] 36:2
36:3
**sorry** [6] 7:16 11:16
13:2 40:4 51:4
63:23
**sounds** [1] 52:5
**speak** [2] 15:10
28:13
**specifically** [1] 74:13
**spell** [1] 12:5
**spoke** [2] 27:6
29:1
**spots** [1] 70:22
**sprinkler** [1] 20:14
**square** [1] 13:3
**stain** [2] 44:21 50:17
**stains** [4] 70:19
71:6 71:9 72:4
**stand** [1] 33:6
**start** [2] 5:16 52:12
**started** [2] 52:7
52:19 63:7
**state** [6] 1:19 4:7
8:6 79:6 79:16
80:10
**statement** [8] 3:14
3:16 21:14 21:16
21:25 22:2 22:5
22:8
**statements** [4] 20:22
20:24 21:2 21:6
**States** [1] 6:2
**stating** [1] 68:1
**STE** [1] 2:8
**still** [6] 11:15 12:8
40:3 40:6 43:13
64:22
**stop** [1] 60:9
**stuff** [9] 10:6 10:16
26:9 36:2 41:22
42:1 49:4 70:12
75:10
**sub-floor** [8] 33:11
41:7 41:8 41:11
59:18 59:19 59:21
60:2
**submit** [2] 69:4

69:21
**submitted** [3] 67:15
68:7 80:16
**submitting** [1] 69:13
**subscribed** [1] 79:11
**suffered** [1] 62:2
**suit** [5] 48:5 68:14
69:10 70:5 76:3
**Suite** [2] 81:17 82:21
**suppose** [2] 51:22
70:6
**supposed** [2] 56:10
64:14
**surgery** [2] 50:2
50:3
**suspect** [14] 33:14
37:4 39:10 41:10
42:3 44:2 48:12
48:20 49:1 52:1
52:8 52:13 52:22
71:25
**suspicion** [1] 52:10
**sworn** [3] 1:16
4:3 80:13
**system** [4] 10:5
10:8 10:12 65:14

### -T-

**T** [1] 3:12
**takes** [1] 49:5
**taking** [1] 4:16
**Tamaulipas** [1] 5:25
**tank** [2] 46:17 46:19
**Tax** [1] 23:1
**taxes** [1] 22:20
**Technical** [1] 8:6
**telling** [1] 59:7
**tend** [1] 5:13
**tents** [1] 63:25
**terms** [1] 21:8
54:20 74:22
**test** [2] 32:25 39:12
**testified** [1] 4:3
**testimony** [2] 80:14
80:25
**Texas** [15] 1:4
1:5 1:19 1:21
1:21 2:5 2:9
6:18 8:6 79:6
80:3 80:4 80:10
81:18 82:21
**thank** [6] 6:15
28:1 31:20 72:13
77:6 77:8
**thankfully** [1] 50:7
**Thanks** [1] 62:13
**thereabouts** [1] 12:14
**thereafter** [1] 50:5
**therefor** [1] 82:7
**therein** [1] 79:12
**thought** [23] 26:8
28:9 30:9 37:19

41:3 41:25 42:2
47:4 47:11 52:16
53:6 56:21 56:24
63:6 65:19 66:15
70:21 70:23 71:6
71:8 71:9 71:22
72:1
**thousand** [1] 37:23
**three** [6] 3:17 4:6
13:7 14:21 31:21
37:1
**through** [9] 24:4
29:2 31:4 32:7
33:6 33:7 57:20
60:24 79:10
**tile** [3] 37:2 40:15
40:18
**tiles** [6] 58:25 59:1
59:2 59:4 59:10
59:13
**times** [1] 55:23
**today** [15] 4:16
4:22 5:4 5:9
5:17 6:23 9:22
26:4 31:23 49:6
50:6 70:8 73:8
73:19 77:7
**together** [1] 42:16
**Tony** [6] 13:18 13:19
13:20 13:24 64:20
64:22
**too** [1] 37:15
**took** [2] 15:23 60:5
**touch** [1] 43:11
**towels** [1] 40:8
**town** [1] 8:1
**transcript** [3] 80:13
80:16 82:12
**TRCP** [2] 81:11
82:1
**treat** [3] 55:10 55:11
56:1
**treatment** [2] 49:15
50:1
**treatments** [1] 49:24
**trial** [2] 5:6 77:10
**tried** [1] 61:10
**true** [3] 21:1 79:2
80:14
**truthful** [1] 56:10
**try** [1] 5:3
**trying** [1] 59:11
**tub** [1] 36:25
**turned** [1] 36:3
**twice** [1] 45:3
**two** [12] 3:15 4:6
7:25 20:21 39:5
39:8 39:12 45:2
54:18 60:11 60:15
74:6
**two-by-fours** [4]
16:22 16:23 17:5
60:5
**type** [1] 23:21

**typed** [1] 20:21

### -U-

**U.S** [1] 6:4
**ultimately** [1] 67:18
**under** [51] 5:4
10:6 10:13 10:16
26:9 30:10 33:3
33:9 33:18 35:18
36:7 36:11 39:13
40:21 41:18 47:15
47:17 51:1 51:5
51:16 52:8 52:9
56:17 56:23 61:25
66:7 66:20 67:12
67:16 67:20 67:25
68:1 68:7 68:11
68:16 68:20 69:4
69:11 69:14 69:19
69:21 70:1 70:5
70:13 70:17 70:18
71:20 71:21 79:10
79:13 82:1
**underneath** [6] 34:23
35:1 41:23 42:5
50:22 51:17
**understand** [12] 4:12
5:2 5:16 11:16
17:18 19:17 62:11
66:6 68:17 68:23
69:16 74:6
**understood** [1] 32:8
**unit** [5] 42:5 42:23
42:25 65:22 74:20
**United** [1] 6:2
**unless** [1] 21:11
**untruthful** [2] 56:8
56:14
**up** [13] 15:22 16:1
17:11 17:12 20:21
33:6 36:2 36:3
42:24 47:11 60:22
61:11 73:16
**upkeep** [3] 61:8
73:15 73:21
**upset** [2] 62:4
62:8
**used** [4] 11:9 43:12
53:12 80:20
**using** [1] 6:12

### -V-

**Valley** [1] 7:24
**value** [2] 22:12
22:25 23:4
**Van** [1] 1:21
**various** [3] 21:8
31:6 33:4
**verbal** [1] 4:23
**Veronica** [2] 7:16
7:17
**visible** [10] 33:14
36:16 37:4 39:9
41:10 44:2 70:7
70:9 70:16 71:18

vivid - [sic]
July 31, 2003                    CondenseIt!™                    Frank Carrales

| vivid [1] | 60:20 |
| Volume [1] | 1:12 |
| VS [2] 1:4 | 80:3 |

**-W-**

| walk [1] 31:4 |
| wall [20] 15:24 | 15:24 |
| 16:1 | 16:17 | 16:23 |
| 17:13 | 33:11 | 33:14 |
| 36:16 | 36:24 | 36:24 |
| 37:2 | 37:2 | 39:6 |
| 40:15 | 40:15 | 43:24 |
| 59:1 | 59:3 | 59:4 |
| walls [2] | 16:15 |
| 16:16 |
| warped [1] | 60:17 |
| was/was [1] | 82:3 |
| water [59] | 10:4 |
| 10:7 | 10:11 | 10:16 |
| 15:1 | 15:3 | 20:7 |
| 26:7 | 26:10 | 30:8 |
| 30:11 | 31:6 | 33:4 |
| 33:9 | 35:6 | 36:3 |
| 36:18 | 36:23 | 38:7 |
| 38:11 | 38:14 | 38:15 |
| 38:18 | 38:21 | 39:4 |
| 39:13 | 41:6 | 41:21 |
| 43:22 | 44:21 | 46:12 |
| 47:8 | 47:10 | 47:13 |
| 48:1 | 51:23 | 52:1 |
| 52:15 | 52:15 | 52:20 |
| 56:20 | 56:20 | 56:22 |
| 56:25 | 57:3 | 57:5 |
| 57:12 | 59:17 | 60:14 |
| 62:23 | 64:2 | 71:6 |
| 71:9 | 73:25 | 74:19 |
| 74:23 | 75:14 | 76:17 |
| 76:23 |
| welding [2] | 8:9 |
| 8:10 |
| west [3] 36:24 | 37:2 |
| 40:15 |
| wet [21] 16:7 | 16:11 |
| 17:14 | 17:16 | 17:20 |
| 17:24 | 17:24 | 18:3 |
| 18:5 | 18:7 | 35:7 |
| 35:16 | 35:16 | 35:20 |
| 36:6 | 36:9 | 36:10 |
| 36:13 | 38:13 | 38:20 |
| 38:22 |
| wet-like [2] | 46:3 |
| 46:8 |
| wife [14] 4:12 | 6:22 |
| 9:6 | 9:15 | 11:3 |
| 14:8 | 17:3 | 25:24 |
| 34:9 | 37:12 | 48:22 |
| 64:5 | 74:15 | 75:23 |
| wife's [1] | 4:16 |
| wind [1] 14:23 |
| windstorm [5] | 14:25 |
| 15:2 | 16:11 | 17:14 |
| 17:20 |
| within [1] | 43:1 |
| witness [8] | 1:15 |
| 23:13 | 55:20 | 77:8 |
| 80:12 | 80:15 | 80:17 |

| 80:18 |
| Wonderful [1] | 49:18 |
| wood [10] | 17:8 |
| 41:7 | 56:21 | 56:24 |
| 57:1 | 57:3 | 57:6 |
| 57:8 | 59:18 | 60:17 |
| wooden [1] | 17:9 |
| words [1] | 23:23 |
| worked [3] | 8:6 |
| 9:17 | 42:16 |
| workers [2] | 19:12 |
| 19:19 |
| works [1] | 43:9 |
| worn [1] 61:14 |
| worried [1] | 56:19 |
| worry [2] | 62:15 |
| 62:19 |
| worth [1] | 22:14 |
| writing [1] | 4:21 |

**-X-**

| X [2] 3:1 | 3:12 |

**-Y-**

| Y [1] 1:20 |
| yard [2] 47:14 | 47:16 |
| year [9] 14:20 | 20:8 |
| 26:18 | 41:5 | 43:2 |
| 49:24 | 50:1 | 59:16 |
| 64:9 |
| years [33] | 6:21 |
| 7:4 | 8:12 | 8:14 |
| 9:17 | 10:23 | 12:17 |
| 12:18 | 13:15 | 14:21 |
| 19:5 | 19:7 | 19:13 |
| 19:20 | 19:21 | 22:16 |
| 33:12 | 33:19 | 33:25 |
| 34:12 | 35:1 | 35:2 |
| 37:1 | 39:5 | 39:8 |
| 39:12 | 43:23 | 44:23 |
| 49:12 | 50:3 | 50:18 |
| 57:17 | 58:11 |
| yellow [2] | 71:14 |
| 71:24 |
| yet [3] 68:15 | 68:19 |
| 69:11 |
| yourself [1] | 20:12 |

**-[-**

| [sic] [2] 12:7 | 55:12 |