H:/ljg/231001107/msj.mtn
01/28/04/DEP/CJS/lou

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

**United States District Court**
**Southern District of Texas**
**FILED**

JAN 2 9 2004

**Michael N. Milby**
**Clerk of Court**

| | | |
|---|---|---|
| FRANK CARRALES and SANDRA | § | |
| CARRALES | § | |
| | § | |
| VS. | § | CASE NUMBER B-03-144 |
| | § | JURY |
| ALLSTATE TEXAS LLOYD'S | § | |
| INSURANCE, TONY SILVA, and | § | |
| GARY SELIGMAN | § | |

## DEFENDANTS' OPPOSED MOTION FOR SUMMARY JUDGMENT AND NO EVIDENCE SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants, ALLSTATE TEXAS LLOYD'S COMPANY ("Allstate"), TONY SILVA, and

GARY SELIGMAN (collectively referred to as "Defendants"), file this Opposed Motion for

Summary Judgment as to all claims for mold loss made by Plaintiffs, and in support would show the

Court that Defendants are entitled to judgment as a matter of law based upon the following.

### A. FACTS

1.    This lawsuit arises out of various water leaks/mold claims asserted by Frank and

Sandra Carrales ("Plaintiffs") under a homeowners Form B insurance policy. In or around the year

1976, Plaintiffs purchased their home located at 8359 Business 83, Harlingen, Cameron County,

Texas.[1] On June 18, 2001, Defendant, Allstate, issued a homeowner's Form B insurance policy

covering Plaintiffs' residence.[2]

---

[1] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 5, lines 7-9.
[2] *See* Exhibit "B," certified copy of Plaintiffs' insurance policy.

2.    According to Plaintiff, Sandra Carrales, sometime during the year 2000 or 2001, Plaintiffs discovered mold in their home.[3]  When Plaintiffs initially discovered the mold in their home they attempted to clean it and painted over it instead of reporting the mold problem to Allstate.[4]  Nearly two years later, Plaintiffs finally notified Defendants of their mold condition. Specifically, on May 16, 2002, Plaintiffs made their first claim under their policy complaining of water leak and mold damage in their hall bathroom (Claim No. 8202979368).  Once Allstate began its investigation and inspection of Plaintiffs home, Plaintiffs requested that two additional claims be opened.  Plaintiffs opened a claim for a water leak and resulting mold damage under their kitchen sink (Claim No. 8203038999) and a claim for an air conditioning system overflow and resulting mold damage (Claim No. 8203040913).  All of the leaks made the basis of these three claims had occurred and the resulting mold damage had been in existence for two years before Plaintiffs notified Allstate.[5]  Then, on January 22, 2003, Plaintiffs filed suit alleging breach of the common law of good faith and fair dealing, misrepresentation, violations of Articles 21.21 and 21.55 of the Texas Insurance Code, violations of the Texas Deceptive Trade Practices Act, and in the alternative, breach of contract.[6]

3.    By this motion, Defendants will show that Plaintiffs have no evidence that they complied with the "notice of loss" provision of their policy.  Defendants will also show that Plaintiffs have no evidence in support of their claims for misrepresentation against their insurance agent Tony Silva, their insurance adjuster Gary Seligman, and Allstate.  Finally, Defendants will show this Court that Plaintiffs' mold loss claims asserted under their insurance policy fail as a

---

[3] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 17, lines 12-14.
[4] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 18, lines 8-11.
[5] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 17, lines 12-14; page 19, lines 22-25.
[6] *See* Exhibit "C," Plaintiffs' Original Petition.

matter of law because Plaintiffs failed to comply with the "notice of loss" provision of their policy, which is a condition precedent to coverage.

## B. FIRST GROUND FOR SUMMARY JUDGMENT

4.      Pursuant to Federal Rule of Civil Procedure 56 and *Celotex v. Catrett*, 477 U.S. 317 (1996), Defendants would show that Plaintiffs' claims must fail because there are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.

5.      Plaintiffs have the burden of proof on all issues and theories of recovery. An adequate time for discovery has passed and Plaintiffs have failed to meet their burden on all issues and theories of recovery. Accordingly, Plaintiffs have no evidence of compliance with all conditions precedent to coverage under their insurance policy with Defendant, Allstate. Specifically, Plaintiffs have no evidence of compliance with § 1 - Conditions, Subsection 3(a)(1) and/or (6). Defendants have put forth competent, undisputed evidence that Plaintiffs noticed mold growth in their home in 2000 or 2001,[7] yet failed to inform Defendants of their loss until at least May 16, 2002. Plaintiffs have no evidence that their delay in providing notice to Defendants was reasonable. Therefore, any and all claims for mold loss against Defendants arising under Plaintiffs' insurance policy fail as a matter of law.

## C. SECOND GROUND FOR SUMMARY JUDGMENT

6.      Pursuant to Federal Rule of Civil Procedure 56, Defendants, Allstate Texas Lloyds Insurance, Tony Silva, and Gary Seligman, will show that Plaintiffs' claims for mold loss asserted against Defendants under their policy of insurance fail because no genuine issues of material fact exist, and Defendants are entitled to judgment as a matter of law. Specifically, Defendants will show the Court the following:

---

[7] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 17, lines 12-14.

A.   No coverage exists under Plaintiffs' insurance policy for any and all claims for mold loss asserted against Defendants because Plaintiffs fail to comply with the "notice of loss" provision of their insurance policy as a matter of law.

B.   Plaintiffs' misrepresentation claims, allegations of Insurance Code violations, and DTPA claims against their insurance agent, Tony Silva, and insurance adjuster, Gary Seligman, fail as a matter of law because Plaintiffs have no evidence of these claims.

### D.  SUMMARY JUDGMENT EVIDENCE

7.   As part of this Motion, Defendants request the Court to take judicial notice of all documents on file, incorporated herein by reference.  Specifically, Defendants will rely on the following documents attached to this Motion:

A.   Excerpts from the oral deposition of Plaintiff, Sandra Carrales (Exhibit "A");

B.   Certified copy of Plaintiff's insurance policy (Exhibit "B"); and

C.   Plaintiff's Original Petition filed on January 22, 2003, in Cameron County, Texas.

### E.  ARGUMENTS AND AUTHORITIES

A.   **No coverage exists under Plaintiffs' insurance policy for any and all claims for mold loss asserted against Defendants as a matter of law because Plaintiffs have no evidence that they complied with the "notice of loss" provision of their insurance policy.**

8.   Plaintiffs' homeowners Form B insurance policy with Allstate Insurance Company, number 428907950941534, contains the following provisions under "Section 1 - Conditions, Subsection 3, Duties After of Loss:"

a.   Your duties after loss.  In case of a loss to a covered property caused by a peril insured against, you must:

   (1)   Give **prompt** written notice to us of the facts relating to the claim.
   ...
   (6)   Send to us if we request, your signed sworn proof of loss within 91 days of our request on a standard form supplied by us.  We must request a signed sworn proof of loss within 15 days after we receive your written notice, or we waive our right to require a proof of loss.  Such waiver will not waive our other rights under this policy.

(a)     This proof of loss shall state, to the best of your knowledge and belief:

    (i)     The time and cause of loss.

    (ii)    The interest of the **insured** and all others in the property involved including all liens on the property.

    (iii)   Other insurance which may cover the loss.

    (iv)    The actual cash value of each item of property and the amount of loss to each item.

(b)     If you elect to make a claim under the replacement cost coverage of this policy, this proof of loss shall also state, to the best of your knowledge and belief:

    (i)     The replacement cost of the described dwelling.

    (ii)    The replacement cost of any other building on which loss is claimed.

    (iii)   The full cost of repair or replacement of loss without deduction for depreciation.

9.     It is well established in Texas that notice provisions requiring notice of an occurrence be given "as soon as practicable" or "promptly" are a condition precedent, the breach of which **voids** policy coverage.[8]   Generally, courts have interpreted insurance policy notice provisions to require that notice be given within a reasonable time after the occurrence.[9]   Courts, in addressing this issue, have roughly held that notification of a loss more than one month after the occurrence is unreasonable, thus negating coverage under the insurance policy.[10]

---

[8] *See Rogers v. Aetna Casualty & Surety Co.*, 601 F.2d 840, 844 (5th Cir. 1979); *Hanover Ins. Co. of N.Y. v. Hagler*, 532 S.W.2d 136-137 (Tex.Civ.App.--Dallas 1975, writ ref'd n.r.e.); *Dairyland County Mut. Ins. Co. v. Roman*, 498 S.W.2d 154, 157 (Tex. 1973) (holding failure to perform notice condition in policy constitutes *absolute defense to liability* even though insurer had actual notice of accident and was not prejudiced by lack of formal written notice).
[9] *See Stonewall Ins. Co. v. Modern Exploration, Inc.*, 757 S.W.2d 432, 435 (Tex.App.--Dallas 1988, no writ); *see National Surety Corp. v. Diggs*, 272 S.W.2d 604, 607 (Tex.Civ.App.--Fort Worth 1954, writ ref'd n.r.e.); *State Farm County Mut. Ins. Co. v. Plunk*, 491 S.W.2d 728, 731 (Tex.App.--Dallas 1973, no writ).
[10] *See National Union Fire Ins. Co. v. Bourn*, 441 S.W.2d 592 (Tex.Civ.App.--Fort Worth 1969, writ ref'd n.r.e.) (**44 days unreasonable**); *Edwards v. Ranger Ins. Co.*, 456 S.W.2d 419 (Tex.Civ.App.--Fort Worth 1970, writ ref'd

10.    Furthermore, the Texas Supreme Court has held that failure to perform the notice condition in a policy is an absolute defense to coverage even though the insurer had actual notice of an accident and was not prejudiced by lack of formal written notice.[11]

11.    As stated above, Plaintiffs first noticed mold growth and/or damage in their home approximately in 2000 or 2001.[12]  At that time, Plaintiffs attempted to "paint" over the mold but the mold problem continued because Plaintiffs could still "see the spots."[13]

12.    Despite noticing mold growth in their home in 2000 or 2001, and consecutively thereafter, Plaintiffs did not make a claim or otherwise inform Defendants of any mold loss or damage to their home until May 16, 2002, at the earliest, when Plaintiffs first made a claim under their policy.  As mentioned above, Plaintiffs made three separate claims.  The first claim was for a leak in their hall bathroom (Claim No. 8202979368).  Then shortly thereafter Plaintiffs requested that two additional claims be opened for a kitchen sink leak (Claim No. 8203038999) and an air conditioning system overflow (Claim No. 8203040913).  It is important to note that Plaintiffs noticed all of these leaks and resulting damage made the basis of these three claims at the same time.[14]  However, despite the fact that Plaintiffs were aware of these leaks and resulting mold damage, Plaintiffs waited for nearly two years to notify Defendants.[15]  This delay of

---

n.r.e.) **(46 days unreasonable)**; *Klein v. Century Lloyds*, 154 Tex. 160, 275 S.W.2d 95 (Tex. 1955) **(32 days unreasonable)**; *National Surety Corp v. Diggs*, 272 S.W.2d 604 (Tex.Civ.App.--Fort Worth 1954, writ ref'd n.r.e.) **(104 days unreasonable)**; *Southern Surety Co. v. Aronson*, 5 S.W.2d 629 (Tex.Civ.App.--Galveston 1928, no writ) **(130 days unreasonable)**; *Overland Sales Co. v. American Indemnity Co.*, 256 S.W. 980 (Tex.Civ.App.--Galveston 1923, no writ) **(14 months unreasonable)**; *Texas Glass & Paint Co. v. Fidelity & Deposit Co.*, 244 S.W. 113 (Tex. Com. App., 1922) **(21 months unreasonable)**; *LeSage v. Utilities Ins. Co.*, 131 F.2d 536 (5th Cir. 1942) **(2 years unreasonable)**; *Assicurazioni Generale Spa v. Pipeline Valve Specialties Co.*, 935 F. Supp. 879, 888 (S.D. Tex. 1996) **(16 months unreasonable)**; *Allen v. Western Alliance Ins. Co.*, 162 Tex. 572, 349 S.W.2d 590, 594 (Tex. 1961) **(107 days unreasonable)**; *Employers Casualty Co. v. Mireles*, 520 S.W.2d 516, 521 (Tex.Civ.App.--San Antonio 1975, writ ref'd n.r.e.) **(6 months unreasonable)**.

[11] *See Dairyland*, 498 S.W.2d at 157; *Hirsch v. Texas Lawyers Ins. Exchange*, 808 S.W.2d 561 (Tex.App.--El Paso 1991, writ denied).

[12] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 17, lines 12-14.

[13] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 18, lines 5-7.

[14] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 17, lines 12-16.

[15] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 18, lines 22-25.

approximately two years in notifying Defendants of a "mold loss" at the insured premises is not reasonable or prompt as a matter of law.[16]

13.    Therefore, because Plaintiffs have failed to give prompt or reasonable "notice of loss" as required under their insurance policy as a condition precedent to coverage, any and all claims for mold loss against Defendants fail as a matter of law.[17]

**B.    Plaintiffs' misrepresentation claims, allegations of Insurance Code violations, and DTPA claims against Tony Silva (Plaintiffs' insurance agent), Gary Seligman (Plaintiffs' insurance adjuster), and Allstate fail as a matter of law because Plaintiffs have no evidence in support of these claims.**

14.    The following are the elements that a plaintiff must prove in order to establish a claim for misrepresentation:

    1.    The defendant made a representation to the plaintiff;
    2.    The representation was material;
    3.    The representation was false;
    4.    When the defendant made the representation it:
        (i)    Knew the representation was false, or
        (ii)    Made the representation recklessly, as a positive assertion, and without knowledge of its truth;
    5.    The defendant made the representation with the intent that the plaintiff act upon it;
    6.    The plaintiff relied upon the representation; and
    7.    The representation caused the plaintiff injury[18]

15.    Here, Plaintiffs have no evidence that Defendants Tony Silva (Plaintiffs' insurance agent), Gary Seligman (Plaintiffs' insurance adjuster), or Allstate made a material representation to Plaintiffs, that Plaintiffs relied upon, that Defendants knew was false or made without knowledge of

---

[16] *See Rogers v. Aetna Casualty & Surety Co.*, 601 F.2d 840, 844 (5th Cir. 1979); *Hanover Ins. Co. of N.Y. v. Hagler*, 532 S.W.2d 136-137 (Tex.Civ.App.--Dallas 1975, writ ref'd n.r.e.); *Dairyland County Mut. Ins. Co. v. Roman*, 498 S.W.2d 154, 157 (Tex. 1973) (holding failure to perform notice condition in policy constitutes *absolute defense to liability* even though insurer had actual notice of accident and was not prejudiced by lack of formal written notice).
[17] *See id.*
[18] *Insurance Co. of M. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998); *Johnson & Higgins, Inc. v. Kennaco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex.1998).

its truth, and intended that Plaintiffs act upon such representation. Therefore, since an adequate time for discovery has passed, Plaintiffs' misrepresentation claims must fail as a matter of law.[19]

16.    In further support, with respect to Tony Silva and Plaintiffs' allegations, the evidence is actually to the contrary. Plaintiff Sandra Carrales' stated in her oral deposition that Plaintiffs have **NO** complaints or criticisms about their agent Tony Silva.[20] Accordingly, Plaintiffs cannot maintain a cause of action for misrepresentation, Insurance Code violations, or DTPA claims against Defendant Tony Silva.

17.    Additionally, since an adequate time for discovery has passed and Plaintiffs have no evidence in support of their allegations of Insurance Code violations or DTPA claims against Gary Seligman and Allstate, these claims must also fail as a matter of law.[21]

18.    FOR THESE REASONS, Defendants, ALLSTATE TEXAS LLOYD'S COMPANY, TONY SILVA, and GARY SELIGMAN request this Court to:

- Set this Opposed Summary Judgment for hearing with notice to Plaintiffs;

- Grant Defendants, ALLSTATE TEXAS LLOYD'S COMPANY, TONY SILVA, and GARY SELIGMAN's, Opposed Motion for Summary Judgment, holding that all coverage and claims for mold loss under Plaintiffs' insurance policy are void as a matter of law;

- Order that Plaintiffs take nothing against Defendants, ALLSTATE TEXAS LLOYD'S COMPANY, TONY SILVA, and GARY SELIGMAN, for any and all claims for mold loss asserted under their insurance policy by this suit; and

- Award any other such relief that it is justly entitled.

---

[19] *See Morris*, 981 S.W.2d at 674; *Kennaco Energy, Inc.*, 962 S.W.2d at 524.
[20] *See* Exhibit "A," Oral Deposition of Plaintiff Sandra Carrales at page 27, lines 10-12.
[21] *See Morris*, 981 S.W.2d at 674; *Kennaco Energy, Inc.*, 962 S.W.2d at 524.

Respectfully submitted,

ADAMI, GOLDMAN & SHUFFIELD
Nowlin Building
9311 San Pedro, Suite 900
San Antonio, Texas  78216
Telephone:  (210) 344-0500
Telecopier:  (210) 344-7228

By:_____

      LARRY J. GOLDMAN
      Attorney in Charge
      State Bar No. 08093450
      Federal I.D. No. 341
      DOUGLAS E. PENNEBAKER
      State Bar No. 00788178
      Federal I.D. No. 23238

ATTORNEYS FOR DEFENDANTS,
ALLSTATE TEXAS LLOYD'S INSURANCE,
TONY SILVA, and GARY SELIGMAN

## CERTIFICATE OF CONFERENCE

Counsel for Defendants and counsel for Plaintiffs have not been able to come to an agreement regarding Defendants' Motion for Summary Judgment.

_____

LARRY J. GOLDMAN
DOUGLAS E. PENNEBAKER

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been forwarded to the following counsel of record in compliance with the Federal Rules of Civil Procedure on this 28th day of January, 2004:

Mr. Benigno (Trey) Martinez
MARTINEZ, BARRERA Y MARTINEZ, L.L.P.
1201 E. Van Buren
Brownsville, Texas 78520

Mr. Gilbert M. Piette
PEREZ & ASSOCIATES
436 Paredes Line Road
Brownsville, Texas 78523-3490

_____
LARRY J. GOLDMAN
DOUGLAS E. PENNEBAKER

# EXHIBIT "A"

Page 5

1  Q. Let me get some background information. What
2 is your date and place of birth?
3  A. Mercedes, Texas, 9-26-53, birthdate.
4  Q. Have you lived any where in your lifetime
5 other than the Valley or have you always lived here?
6  A. Always here.
7  Q. How long have you lived in the home made the
8 basis of this lawsuit?
9  A. Twenty-seven years.
10  Q. And were you married to Mr. Carrales when you
11 all bought the home?
12  A. Yes.
13  Q. When did you buy Allstate insurance?
14  A. Around '98, I believe.
15  Q. Who was your insurance company before that?
16  A. Republic. The agent was Cocozza.
17  Q. Could you spell that, please?
18  A. Cocozza?
19  Q. No?  Okay.
20      MR. PIETTE: I can spell it for you, if
21 you want.
22      MR. PENNEBAKER: Okay. That's fine.
23      MR. PIETTE: C-o-c-o-z-z-a.
24  Q. Cocozza. Is that agent still in business?
25  A. No, I believe not.

Page 6

1  Q. No, they're not business anymore?
2  A. No.
3  Q. How long were you insured with Republic on
4 this property?
5  A. Oh, I'd say 15 -- 15 years or more.
6  Q. And did Republic drop you --
7  A. Yes.
8  Q. -- or cancel your policy?
9  A. Uh-huh.
10  Q. Is that a "yes"?
11  A. Yes.
12  Q. Why did they cancel your policy?
13  A. Because we had a dog.
14  Q. So you agree with your husband?
15  A. Yes, sir.
16  Q. Was there a period of time after you were
17 canceled by Republic that you went without homeowner's
18 insurance?
19  A. Maybe two or three weeks.
20  Q. Is that all?
21  A. Yes, sir.
22  Q. And how did you go about selecting Allstate
23 Insurance?
24  A. We just got it.
25  Q. I mean, did you know an agent or was it

Page 7

1 recommended?
2  A. No.  No, we just -- there are so many in
3 Harlingen. We just picked one.
4  Q. And who is your agent now?
5  A. Tony Silva.
6  Q. Have you met with Tony Silva before?
7  A. I have talked to him, yes.
8  Q. Have you met face-to-face with him?
9  A. Yes.
10  Q. How long has he been your agent, since '98?
11  A. Yes, since '99, '98, something like that.
12  Q. When you first purchased insurance, did you go
13 to his office or did you call him on the phone?
14  A. We went to his office.
15  Q. Did you fill out an application or --
16  A. I don't remember.
17  Q. Did you ask for any particular type of
18 insurance or just homeowner's insurance?
19  A. Just a homeowner's, just a homeowner's policy.
20  Q. And were you told at that time by Mr. Silva or
21 anyone in his office what all the policy would cover
22 and what all the policy excluded?
23  A. I don't remember.
24  Q. Did you get a copy of the policy?
25  A. Yes, we did.

Page 8

1  Q. Have you ever read the policy?
2  A. Just skimmed through it.
3  Q. Are you aware that you have what is called an
4 HOB policy?  You may not be.
5  A. No, I don't know what that is.
6  Q. You're probably not aware that the HOB policy
7 that you have was approved by the Department of
8 Insurance?  No?
9  A. I don't know.
10  Q. Tell me what conversations that you have had
11 with your agent, Mr. Silva, or anyone in his office.
12  A. Well, we just asked him about getting a
13 policy, and he -- he just went over -- I believe he
14 just went over some -- the policy and that was it, but
15 nothing else.
16  Q. Do you have any criticisms of the policy that
17 he sold you?
18  A. No.
19  Q. Are you aware that Mr. Silva is not an
20 insurance adjuster?
21  A. No, I wasn't aware of that.
22  Q. Do you understand the difference between an
23 Allstate agent who sells the policy, for example, and
24 an Allstate adjuster --
25  A. Yeah.

Page 17

1   A. I don't know.  I don't remember.
2   Q. Has it been a long time ago?
3   A. No.  Two or three years I guess.  I really
4 can't tell you.
5   Q. What caused you to notice it?
6   A. The door, we had it -- well, in the restroom
7 the door was blue and all of a sudden it was black.  We
8 didn't know what it was, and we still don't know.  We
9 don't know if it's mold or not.
10   Q. What caused you to notice under the sink?
11   A. The smell.
12   Q. So did you notice what you believe is mold in
13 all these areas about two to three years ago?
14   A. More or less.
15   Q. All about the same time?
16   A. I think so, yeah.
17   Q. And what did you all do about it when you
18 noticed it for the first time?
19   A. I used bleach to clean the door and also under
20 the sink.
21   Q. And then what happened when you used bleach to
22 clean it?
23   A. It went away.
24   Q. It did go away?
25   A. Yeah.

Page 18

1   Q. So then what happened?
2   A. Well, then you still see spots everywhere but
3 that's it.
4   Q. Did it come back or did it stay?
5   A. I suppose it did because when I cleaned it the
6 first time it all went away and we painted the door,
7 but you can still see spots.  So I don't know.
8   Q. When did you paint over what you thought was
9 mold?
10   A. About two or three years ago at the same time
11 that we saw it and cleaned it.
12   Q. Did you make a claim?
13   A. No.
14   Q. Why didn't you make a claim at that time?
15   A. Because I didn't think we needed to make a
16 claim.
17   Q. When did you decide that you needed to make a
18 claim or did you ever decide that, was that --
19   A. No, I never was -- my husband's the one that
20 said, you know, well, we need to do something about
21 this, and I agreed with him.
22   Q. How long was it after you all first noticed
23 what you thought was mold on those three areas before
24 you contacted Allstate approximately?
25   A. About two years, two and a half years,

Page 19

1 something like that.
2   Q. Let me ask you what water leaks you can
3 remember having.  Do you remember having water leaks in
4 this house either from sinks or from air conditioners
5 or --
6   A. Yeah, from the air conditioner I remember.
7   Q. Tell me as best you can when you had the air
8 conditioning leak.
9   A. I don't remember, just --
10   Q. Do you remember having the air conditioning
11 leak?
12   A. Yeah.
13   Q. What do you remember about it?
14   A. That I had to go mop the floor because it was
15 always wet.  We tried getting it fixed, and when they
16 did it, it stopped so --
17   Q. How long did it go on before you got the air
18 conditioner fixed?
19   A. Maybe a week.
20   Q. And you had to mop every day?
21   A. Uh-huh.  Yeah.
22   Q. And then, finally, whose idea was it to get it
23 fixed?
24   A. Well, my husband because he's -- he's the one
25 that does that.

Page 20

1   Q. And do you remember who fixed it?
2   A. Huh-uh.
3   Q. Is that a "no"?
4   A. No, I don't.  I'm sorry.
5   Q. That's all right.  Do you remember whether any
6 building materials, flooring, two-by-fours, sheetrock,
7 paneling, things of that nature, got wet?
8   A. Yeah, the floor got -- got wet, and the -- a
9 pipe that comes out from the -- the condenser -- I
10 guess is what you call them -- it was -- you could see
11 the leak.  You could see the gooey stuff.
12   Q. When you had the air conditioning fixed, did
13 you also replace any of the building materials like the
14 floor?
15   A. Yeah.  Yeah, he had to.
16   Q. What all was replaced as you recall?
17   A. Some boards and they had to go down there and
18 put some pillars because -- to hold the boards up.
19   Q. Under the flooring?
20   A. Under the flooring, yeah.
21   Q. What else was replaced?
22   A. I don't remember anything else that I can --
23   Q. At the time that you had an air conditioning
24 leak, did you make a claim or --
25   A. No.

Page 25

1   A. That I know of.
2   Q. So none of these leaks were reported to
3 Allstate when they actually happened, is that right?
4   A. Oh, no, sir.
5   Q. Do you know when it was that your husband
6 contacted Allstate to make the claim?
7   A. I'm figuring it was like in the -- I'm saying
8 2000, but I'm not sure.
9   Q. Let me ask you this: Had it been a couple of
10 years since the leaks happened?
11  A. No, I don't think so.
12  Q. How long had it been since the leaks occurred
13 when your husband contacted Allstate?
14  A. I couldn't tell you. I don't remember.
15  Q. Do you have any idea when your husband
16 contacted Allstate to make the claim?
17  A. I don't remember.
18  Q. But I think I understood you to say that your
19 husband did not contact Allstate when any of these
20 events actually happened, correct?
21  A. Right. Because that's -- to my understanding,
22 that's what you do with your own home, you repair your
23 house, whatever happens to it.
24  Q. So what I'm trying to find out is how long was
25 it after these events happened was it before you all

Page 26

1 contacted Allstate?
2   A. I don't remember.
3   Q. And do you remember what it was specifically
4 that made you all contact Allstate?
5   A. A smell that we smelled, and we knew we had
6 some kind of water damage.
7   Q. Where have you seen water damage?
8   A. Pardon me?
9   Q. Where have you seen water damage in your home?
10  A. In the restroom, in the sink, and the air
11 conditioner.
12  Q. Is that all?
13  A. Yes, sir.
14  Q. The same places that you previously --
15  A. Yeah.
16  Q. -- told me you saw mold --
17  A. Yeah.
18  Q. -- is that right? Okay. So you never had any
19 conversations at all with an adjuster by the name of
20 Gary Seligman?
21  A. Huh-uh. No, sir.
22  Q. No conversations with Kevin Brown?
23  A. No, my husband's the one that had them.
24  Q. And no conversations with Cathy Bair?
25  A. I answered the phone once, and then I gave it

Page 27

1 to my husband but that was about it.
2   Q. Do you personally have any criticisms of any
3 of the people involved in the lawsuit?
4   A. No.
5   Q. Do you have criticisms of Allstate in terms of
6 the way the claim was handled?
7   A. Yes, sir. I think it's taken too long.
8   Q. Too long?
9   A. Yes, sir.
10  Q. Okay. Do you have any criticisms against the
11 agent, Mr. Silva?
12  A. No.
13  Q. Do you have any criticisms of Allstate other
14 than simply it's taken too long on the claim?
15  A. No, sir.
16  Q. Do you have an idea in your mind what Allstate
17 should pay on the claim?
18  A. No, sir.
19  Q. You are asking Allstate to pay some money on
20 the claim --
21  A. Yes.
22  Q. -- right?
23  A. Yes, sir.
24  Q. You're asking Allstate to pay money on the
25 claim that has been submitted, correct?

Page 28

1   A. Right.
2   Q. From your prospective, what is that money
3 going to be for?
4   A. Well, hopefully, to get -- get the areas done
5 where it supposedly has that water -- what they say is
6 mold. I don't know.
7   Q. So let me see if I can clarify that.
8   A. Okay.
9   Q. You're saying what Allstate should pay is for
10 what it is going to cost to repair the water damage and
11 the mold?
12  A. Right.
13  Q. Are you saying that Allstate should pay for
14 anything else besides the water damage and the mold?
15      MR. PIETTE: Objection, form.
16  Q. Let me rephrase that question. Are you saying
17 that Allstate should pay on the claim anything other
18 than for water damage and for mold repair?
19  A. Just what we're asking, I mean, you know, for
20 the mold -- not the mold but the water damage.
21  Q. Have you seen any estimates as to what it's
22 going to cost to make those repairs?
23  A. Just what MoldPro had but --
24  Q. You mean Quantum?
25  A. Yeah, Quantum.

EXHIBIT "B"



CAUSE NO. 2003-01-296-C

FILED 4:00 O'CLOCK P M
AURORA DE LA GARZA DIST. CLERK

JAN 2 2 2003

DISTRICT COURT OF CAMERON COUNTY TEXAS
DEPUTY

| | | |
|---|---|---|
| FRANK CARRALES AND SANDRA CARRALES | § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| VS. | § § | |
| | § § | CAMERON COUNTY, TEXAS |
| ALLSTATE TEXAS LLOYDS INSURANCE, TONY SILVA, and GARY SELIGMAN | § § § § | |
| Defendants. | § § | 197 JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, **FRANK CARRALES AND SANDRA CARRALES**, Plaintiffs herein, and file

this their Original Petition against the above-named Defendants, and for cause of action would

respectfully show the Court the following:

### I.

Pursuant to Rule 190, T.R.C.P., plaintiffs intend to conduct discovery under Level 3.

### II.

1.    Plaintiffs are residents of Cameron County, Texas.

2.    Defendant ALLSTATE TEXAS LLOYDS, is a Texas insurance corporation. Service

       of process upon ALLSTATE TEXAS LLOYDS may be accomplished by serving C.T.

       Corporation System at 350 N. St. Paul Street, Dallas, Texas 75201.

Claim # 8203040913

3.      Defendant, Tony Silva, is an individual duly authorized to do business on behalf of ALLSTATE TEXAS LLOYDS in Texas.  Service of process may be accomplished by serving him at , 1322 E. Harrison St., Harlingen, Texas.

4.      Defendant, GARY SELIGMAN, is duly authorized to do business in Texas.  Service of process upon may be accomplished by serving him at 1500 City West, Suite 800, Houston, Texas 77042.

### III.

Venue as to this petition is proper in Cameron County, in that all or part of Plaintiffs causes of action accrued in such county and the property that is the subject of this suit is located in such county. This Honorable Court has jurisdiction of the case, and the Plaintiffs hereby invoke the unlimited monetary jurisdiction of this Court by filing the suit with the District Clerk according to state law and local rule.

### IV.

Suit is brought pursuant to the law of good faith and fair dealing as well as under common law and Articles 21.21 and 21.55 of the Texas Insurance Code and the Texas Deceptive Trade Practices Act. In the alternative, this suit is brought for breach of contract and for recovery under a policy of insurance. Plaintiffs are consumers of the Defendant, in that they purchased insurance from said entities and/or service to be provided by them.  Each Defendant is an individual, corporation, association, partnership, or other legal entity engaged in the business of insurance.  Such Defendants constitute persons as that term is defined in Article 21.21, Section 2 of the Texas Insurance Code.

### V.

Defendant, ALLSTATE TEXAS LLOYDS, et al. , are Plaintiffs  homeowner s insurance company.  Plaintiffs own and/or reside in a dwelling at 8359 Business 83, Harlingen, Cameron County, Texas.  Defendants provided coverage to the Plaintiffs for such dwelling, personal property, and other

Claim#82080409 13

matters under insurance policies described above. During the policy term of said policy, Plaintiffs sustained covered losses in the form of water leaks and discharges, and damages resulting there from, including, but not limited to damage to the architectural finishes of the home. Plaintiffs promptly reported same to Defendants pursuant to the terms of the insurance policy.

## VI.

The Plaintiffs discovered water damage, and resulting damages therefrom to their home and property. As a result, Plaintiffs' home and property sustained damage to the areas of the home including, but not limited to, the cost of destruction and restoration of the home necessary to access, remediate, repair the leaks, and restore the house. These constituted covered damages under Plaintiffs homeowner s insurance policy with the Defendant.

## VII.

The Carrier Defendant and their agents visited and inspected Plaintiffs' property at 8359 Business 83, Harlingen, Cameron County, Texas, in connection with the Plaintiffs' claim of property damage. Carrier Defendant knew or should have known that Plaintiffs had already sustained significant damage to the property requiring significant repairs as a result of a loss and peril covered by the insurance policies. They were also made aware of the need to perform repairs to the different leaks, which would result in covered tearing out and restoration of portions of the property covered. The Carrier Defendant knew that a substantial covered loss was owed. Nonetheless, they denied, delayed, or failed to pay or properly investigate some or all of Plaintiffs' covered claims with no reasonable basis. They have failed to act promptly or to conduct a good faith investigation. This delay and/or denial is in bad faith and a violation of Articles 21.21 and 21.55 of the Texas Insurance Code. Therefore, Plaintiffs file this bad faith claim.

Claim # 8203040913

## VIII.

Despite the fact that all conditions precedent to Plaintiffs' recovery have been performed or have occurred, Defendants failed and refused to pay the Plaintiffs a just amount in accordance with their contractual obligations, agreements, and representations.

## IX.

Such denial, delay, refusal and/or failure to pay by the Carrier Defendant was in bad faith, and constitutes a breach of the covenant of good faith and fair dealing, which breach was a proximate cause of damages to the Plaintiffs more specifically set forth herein below. There was no reasonable basis for denying, delaying, or failing to pay or investigate Plaintiffs' claim for damage, and the Carrier Defendant and its agents named herein knew or should have known that there was no such reasonable basis to deny, delay, and fail to pay such claims.

The conduct of the Defendants was irresponsible, unconscionable, and they took advantage of the Plaintiffs' position to a grossly unfair degree. Furthermore, the conduct of the Defendants amount to one or more of the following:

(1)     not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become reasonably clear in violation of Art. 21.21, Section 4(10)(a)(ii);

(2)     refusing to pay claims without conducting a reasonable investigation based upon all available information in violation of 21.21, Section (4)(10)(a)(viii);

(3)     failing to handle or process the Plaintiffs' claims in good faith, in violation of common law as expressly stated by the Texas Supreme Court in *Vail v. Texas Farm Bureau*, 754 S.W.2d 129 at 135 (Tex. 1988).

Claim# 820804O913

(4)     committing a course of conduct that is unconscionable;

(5)     omitting any information or making any false implication or impression that was either misleading of deceptive or have the capacity to be misleading or deceptive in violation of 21.21, Section 4(11);

(6)     refusing to pay a claim without a reasonable basis in violation of common law;

(7)     delaying payment of a claim without a reasonable basis in violation of common law;

(8)     denying and/or delaying payment of a claim without determining whether there is any reasonable basis to do so in violation of common law;

(9)     representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(10)     representing that goods or services are of a particular standard , quality, grade, or that goods are of a particular style or model, if they are of another;

(11)     representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(12)     failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

(13)     violations of Art. 21.21 Tex. Ins. Code, including, but not limited to, Section 4, Subsections (11) and (10(a)(i), in that they misrepresented the terms of the policy; or

(14)     other violations of law.

Claim# 8203040913

**X.**

The conduct of Carrier Defendant and the conduct alleged against the other Defendants constitute violations of Article 21.21, et seq. of the Texas Insurance Code. Such violations include, but are not limited to, violations of the rules and regulations lawfully adopted by the State Board of Insurance under Article 21.21 of the Texas Insurance Code, including unfair methods of competition and/or unfair or deceptive acts or practices in the business of insurance. In addition, the actions of the Defendant violate Article 21.21, Section 4 of the Texas Insurance Code. They also violate the Texas Insurance Code, specifically Section 16, in that they constitute practices defined by Section 17.46 of the TEXAS BUSINESS AND COMMERCE CODE, as amended, as unlawful deceptive trade practices. As to the Defendants, such conduct also constitutes bad faith claims handling. All statutory causes of action, including those arising under Art. 21.55 of the Insurance Code are here asserted against all Defendants.

**XI.**

As a result of all such conduct, Plaintiffs have been damaged in an amount in excess of the minimum jurisdictional limits of this Court. In addition, the conduct of the Carrier Defendant was committed knowingly, and under circumstances constituting willful and wanton and reckless disregard of the rights of the Plaintiffs, and others similarly situated. Such conduct of the Defendants was negligent. The conduct of one or more Defendants constituted misrepresentation of fact. The conduct of the Defendants proximately caused the injuries and damages to the Plaintiffs for which they herein sue. Plaintiffs seek all damages as allowed by law from the Defendants.

**XII.**

Carrier Defendant has by its conduct breached their contract of insurance with the Plaintiffs. Such breach proximately caused damages to the Plaintiffs. In addition, Plaintiffs are entitled to recover attorney s fees in connection with their contractual causes of action. Defendants have made actionable fraudulent misrepresentations to Plaintiffs.

Claim#820304 0913

## XIII.

All of the conditions precedent to bringing this suit under the policy and to the Defendant s liability to the Plaintiffs under the policy for the claims alleged have been performed or have occurred. More than sixty days prior to the filing of this suit, written demand for payment and notice of complaint pursuant to the Texas Deceptive Trade Practices Act and/or Texas Insurance Code, Article 21.21, et seq., were sent to each of the Defendant, or compliance with said notice is excused. All notices and proofs of loss were timely and properly given in such manner as to fully comply with the terms and conditions of the relevant insurance policies and applicable law. In the alternative, Plaintiffs allege that as to any such terms, conditions, notices, or requirements, the Defendant waived them, the Defendant are stopped from asserting them, and/or the plaintiffs substantially complied with them. Plaintiffs make the same allegations of waiver or stopped as to every defense or exclusion pleaded by the Defendant and as to each claim for breach of contract or statutory violation as to each Defendant.

## IX.

Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs herein request a jury trial and along with the filing of the Original Petition, tendered to the Clerk of the Court the statutory jury fee.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon trial of this matter, the Court grant:

1. Judgment against the Defendant, and each of them;
2. Actual damages;
3. Attorney s fees;
4. Costs of suit;
5. Statutory penalties;
6. Prejudgment and post judgment interest as allowed by law;
7. Any additional damages and punitive damages under the facts set forth in this or any amended pleading; and,
8. Such other and further relief to which Plaintiffs may show themselves entitled.

C Klim# 890304 0913

Respectfully submitted,

MARTINEZ , BARRERA Y MARTINEZ, L.L.P.

By: _____

Benigno (Trey) Martinez
State Bar No. 00797011
1201 E. Van Buren
Brownsville, Texas 78520
Telephone:     (956) 546-7159
Facsimile:     (956) 544-0602

_____

Gilbert M. Piette
State Bar No. 24007845
**PEREZ & ASSOCIATES**
436 Paredes Line Road
Brownsville, Texas 78523-3490
Telephone:     (956) 504-5403
Facsimile:     (956) 504-5991

*ATTORNEYS FOR PLAINTIFFS*

Claim# 820304 0913

Citation _or Personal Service — GENERAL          Lit. Seq. # 5.004.01

No. 2003-01-000295-C

**COPY**

T H E   S T A T E   O F   T E X A S

NOTICE TO DEFENDANT: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: TONY SILVA
1322 E. HARRISON ST.
HARLINGEN, TEXAS

the          DEFENDANT          , GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFFS' ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 197th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas. Said          PETITION          was filed on JANUARY 22, 2003 . A copy of same accompanies this citation.

The file number of said suit being No. 2003-01-000295-C.

The style of the case is:

FRANK CARRALES AND SANDRA CARRALES
VS.
ALLSTATE TEXAS LLOYDS INSURANCE, TONY SILVA, GARY

Said petition was filed in said court by          HON. BENIGNO (TREY)
(Attorney for          PLAINTIFF          ), whose address is
1201 E. VAN BUREN STREET BROWNSVILLE TX  78520

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 23rd day of JANUARY , A.D. 2003.

AURORA DE LA GARZA          , DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521
By: _____          , Deputy

Claim# 8203040913

EXHIBIT "C"



National Support Center
**Allstate Insurance Company**
1819 Electric Road S.W.
Roanoke, VA 24018-1618
Bus: (540) 989-2200

Claim#___820 2979368___

To Whom It May Concern:

I, Linda Sisson, employee of Allstate Insurance Company, Roanoke, Virginia, do certify

that the enclosed is a copy of Policy Number___216 885 073___,

in the name of___Frank & Sandra Carrales___,

showing the coverages that were on the policy at the time of loss of___12-1-01___.

_Linda Sisson_
Claim Support

State of Virginia, County of Roanoke

On this___13th___ day of___February___, 2003, before me

personally appeared Linda Sisson to me known to be the person who executed the

foregoing instrument and acknowledged that she executed the same as a free act and

deed.

_____
Notary Public

My Commission Expires:___5-3/03___

*Tony G Silva*
*1322 E Harrison*
*Harlingen TX 78550*

**Your Quick Insurance Check**

✓ Verify the information listed in the Declarations Page.

✓ Please call if you have any questions.

✓ File this package safely away.

✓ Watch the mail for your bill; it will arrive soon.

Frank & Sandra Carrales
8359 Bus 83
Harlingen TX 78550

**Thank you for choosing Allstate Texas Lloyd's for your insurance protection. It's time to renew your policy.**

This policy renewal offer contains your Declarations Page — which lists your coverages, limits, premiums, and any discounts you're receiving—and other documents relating to your insurance policy. Your bill will arrive soon in a separate mailing. In the meantime, reading the enclosed documents carefully will help you understand your coverage and may prompt questions that you might like to contact me about.

The enclosed Declarations Page may reflect a change in your premium from your last renewal. If so, this may be due to a general rate change that takes effect with this policy renewal, or it could be the result of new policy features we are introducing. I'd like to tell you about two of the new features that we're introducing—and that may save you money.

**Renovated Home Discount**: For policies effective as of March 26, 2001, we are offering the Renovated Home Discount. You may be eligible for this discount if your home has been renovated within the last 10 years. For purposes of this discount, "renovated" means that your home's roof, plumbing, electrical, and/or heating/cooling system were replaced by a licensed contractor within the last 10 years.

**Home Buyer Discount**: If you plan to purchase a brand new house in the future, we may be able to offer you a lower rate with this discount. If you acquire any additional property, please contact me for information on appropriate discounts.

*(over)*

PROP *010004201050353044130501*



Information as of
May 3, 2001

RP132

I'd also like to remind you of two significant discounts we continue to offer.

**Claim Free Discount:** You could earn a discount on most of your major coverages if, during the most recent three-year period, you have not filed certain types of claims specified by the terms of the discount.

**Supporting Auto Discount:** You may be eligible for a 25% discount if you have a qualifying auto policy with Allstate.

If you'd like more details on these discounts, please call me for an explanation of the other terms and conditions that may apply.

Thanks again—you're a valued customer.  If you have any questions about the information enclosed in this mailing or about any aspect of your insurance coverage, please call me at (956) 421-3980.

Sincerely,

*Tony G. Silva*

Tony G Silva
Your Allstate Agent

**Allstate Texas Lloyd's**
A Lloyd's Company
8701 N. Freeport Pkwy. Irving, TX 75063-1908

## RENEWAL

# Texas Homeowners Policy - Form B Declarations Page

### *Summary*        *Allstate Classic*

| | | |
|---|---|---|
| **NAMED INSURED / MAILING ADDRESS**<br>Frank & Sandra Carrales<br>8359 Bus 83<br>Harlingen TX 78550 | **YOUR ALLSTATE AGENT IS:**<br>Tony G Silva<br>1322 E Harrison<br>Harlingen TX 78550 | **CONTACT YOUR AGENT AT:**<br>(956) 421-3980 |
| **POLICY NUMBER**<br>2 16 885073 06/18 | **POLICY PERIOD**<br>Effective date:   June 18, 2001<br>Expiration date: June 18, 2002<br>at 12:01 A.M. standard time<br>at the location of the Residence Premises/Dwelling | **PREMIUM PERIOD**<br>June 18, 2001to June 18, 2002<br>at 12:01 A.M. standard time |

| | |
|---|---|
| **Residence Premises / Dwelling** | 8359 Bus 83,<br>Harlingen, TX 78550 |
| **Addition** | |
| **Lot Block**<br>See Above | |

| | |
|---|---|
| **AGENCY AT**  Harlingen,TX | **AGENT** Tony G Silva |

## Total Premium for the Premium Period   *(Your bill will be mailed separately)*

| | |
|---|---|
| Premium for Property Insured | $725.00 |
| **TOTAL POLICY PREMIUM** | **$725.00** |



# Allstate Texas Lloyd's
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**    Your Agent:  **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**    **Allstate Classic**

---

| COVERAGES | | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|---|
| (Other Coverages, Limits and Exclusions apply - Refer to your Policy) | | | |
| **SECTION I** | **PROPERTY** | | |
| Coverage A. | Dwelling | $92,000 | |
| | Other Structures | $9,200 | |
| Coverage B. | Personal Property | $55,200 | |
| | Personal Property Off Premises | $5,520 | |
| **SECTION II** | **LIABILITY** | | |
| Coverage C. | Personal Liability (Each Occurrence) | $100,000 | |
| Coverage D. | Medical Payments to Others (Each Person) | $1,000 | |
| Loss of Use Coverage | | $18,400 | |

| **BASIC PREMIUM** | **$712.00** |
|---|---|
| Increased Liability Limits Premium | $7.00 |

---

| OTHER COVERAGES AND ENDORSEMENTS | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|
| HO-105 (7-8-92) Residence Glass Coverage | | $6.00 |

---

| DEDUCTIBLES (SECTION I ONLY) | AMOUNT OF DEDUCTIBLE | DEDUCTIBLE ADJUSTMENT PREMIUM |
|---|---|---|
| Deductible Clause 1 - Windstorm, Hurricane, Hail or Wind Driven Rain | $920.00 1.0% | $0.00 |
| Deductible Clause 2 - All Other Perils | $920.00 1.0% | $0.00 |

| **TOTAL POLICY PREMIUM** | **$725.00** |
|---|---|

(Continued on Next Page)

# Allstate Texas Lloyd's
A Lloyd's Company

---

| | | |
|---|---|---|
| Policy Number: **2 16 885073 06/18** | Your Agent: | **Tony G Silva  (956) 421-3980** |
| For Premium Period Effective: **June 18, 2001** | | **Allstate Classic** |

## DISCOUNTS    Your premium reflects the following discounts on applicable coverage(s):

| | |
|---|---|
| Renovated House | Claim Free |
| Supporting Auto | 55 and Over |
| Home Security Device | |

## RATING INFORMATION
Key Rate: N/A    Construction: Brick Veneer
Hydrant- Under 500 feet    PPC: 10

# Allstate Texas Lloyd's
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**    Your Agent:    **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**      **Allstate Classic**

---

## Subject to the following Forms and Endorsements

Your Homeowners policy consists of this Declarations Page and the documents listed below. Please keep these together.
- Texas Homeowners Policy - Form B (1-1-96)
- HO-101 (10-2-93) Replacement of Personal Property
- HO-105 (7-8-92) Residence Glass Coverage
- HO-320 (7-8-92) General Change Endorsement

## Important Payment and Coverage Information

Coverage A - Dwelling Protection includes an approximate increase    of $1,000       due to the property insurance adjustment provision using the Boeckh Publications building cost index.  Coverage B - Personal Property Protection adjusted accordingly.

Please note: This is not a request for payment.  Your bill will be mailed separately.

If, however, you would like to make a payment by credit card (Visa/MasterCard/Discover) or Check-By-Phone, please call 1-800-357-5092.

---

IN WITNESS WHEREOF, **Allstate** has caused this policy to be signed by two of its officers at Irving, Texas, and if required by state law, this policy shall not be binding unless countersigned on the Declarations Page by an authorized agent of **Allstate**.

Secretary                                    President

---

# Allstate Texas Lloyd's
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**    Your Agent: **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**    **Allstate Classic**

---

# IMPORTANT NOTICE

To obtain information or make a complaint:

You may call Allstate's toll-free telephone number for information or to make a complaint at

### 1-800-949-2287

You may also write to Allstate at

8701 N. Freeport Pkwy
Irving, TX 75063-1908

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

### 1-800-252-3439

You may write the Texas Department of Insurance

P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

## PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

## ATTACH THIS NOTICE TO YOUR POLICY:
This notice is for information only and does not become a part or condition of the attached document.

# AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de Allstate para informacion o para someter una queja al

### 1-800-949-2287

Usted tambien puede escribir a Allstate

8701 N. Freeport Pkwy
Irving, TX 75063-1908

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

### 1-800-252-3439

Puede escribir al Departamento de Seguros de Texas

P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

## DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZA:
Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

PROP *01000420105035304413050⁴*

X6565

**Allstate Texas Lloyd's**
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**    Your Agent:    **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**    **Allstate Classic**

# Important Notice

## *How We Use and Protect Your Personal Information*

Allstate shares your concerns about privacy. We understand that you want to know how we treat the personal information that we obtain from you or other sources in the course of providing you with products and services. As an Allstate customer, you may be wondering . . .

- What do we do with the personal information we have about you?
- What kind of personal information do we have, and where did we get it?
- How do we protect that information?
- How can you find out what information we have about you?

We hope this notice will help answer those questions. We want you to know — whether you're doing business with us through your local agent, our Customer Information Center, or allstate.com — that we respect the privacy of our customers.

**What do we do with the personal information we have collected about you?**

Allstate does not disclose any of your personal information, or your medical information, to companies or organizations not affiliated with us that would use the information we have provided them to contact you about their own products and services.

Your agent or broker may use your personal information in his or her files for marketing purposes or to help you with your overall insurance program. We may also use your personal information to communicate with you about products, features, and options you have expressed an interest in or that we believe may be of interest to you. In addition, we may, as permitted by law and without your prior permission, provide personal information about you contained in our records or files to persons or organizations such as:

- persons who perform a business function for us,
- your agent or broker,
- insurance support organizations,
- other insurance companies in order to perform their role in an insurance transaction involving you,
- independent claim adjusters,
- businesses with whom we have a marketing agreement,
- businesses that conduct actuarial or research studies,
- regulatory or law — enforcement authorities,
- our affiliated companies,
- persons requesting information pursuant to subpoena or court order, and
- repair shops and recommended vendors.

**Page 1**

# Allstate Texas Lloyd's
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**      Your Agent:   **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**        **Allstate Classic**

### What kind of personal information do we have, and where did we get it?

Much of the personal information that we have about you comes directly from you. You disclosed much of this information to us on your application or request for insurance or other products we offer. We may contact you by telephone or mail for additional information. We also keep information about the types of products and services you purchase from us, as well as account balances and payment history.

Depending on the nature of the transaction you are completing with us, you may be required to provide Allstate, our affiliates, agencies, or other entities working on Allstate's behalf with information. That information may include, for example, your name, address, birthdate, phone number, health information, E — mail address, the types and numbers of the policies you hold, mother's maiden name, Social Security number, credit card information, driver's license number, accident/violation history, information about vehicle operators, mortgages, lien/lease holders, or vehicle information. We may also collect information from our website such as your activity while using our site and information from online collecting devices known as "cookies" (for more information, see our online Privacy Statement at allstate.com).

We may also collect personal information from outside sources, including consumer reporting agencies and health care providers. This information includes loss information reports, motor vehicle reports, credit reports, and medical information.

### How do we protect your personal information?

When we share personal information with companies working on Allstate's behalf, we protect that personal information where required by law with a confidentiality agreement that obligates those companies to conform to our standards and keep confidential any information about you that we give them. Within Allstate, your personal information is available to those individuals who may need to see it to fulfill and service the needs of Allstate customers. In addition, we communicate regarding the need to protect your information to those individuals who have access to it, and we've established physical, electronic, and procedural safeguards to protect your information.

Finally, should your relationship with Allstate end, your personal information will remain protected in accordance with our privacy practices as outlined in this Important Notice.

### How can you find out what information we have about you?

You may request to either see, or obtain from us by mail, the personal information about you in our records. If you believe the personal information we have about you in our records is incomplete or inaccurate, you may request that we make any necessary corrections, additions or deletions to the disputed personal information. We may make arrangements with an insurance support organization or a consumer reporting agency to copy and disclose personal information to you on our behalf. You may also request a more complete description of the persons to whom we disclose personal information about you, or the circumstances which might warrant such disclosures.

**Page 2**

PROP *0100042010503530441305057*



# Allstate Texas Lloyd's
A Lloyd's Company

---

Policy Number: **2 16 885073 06/18**    Your Agent:    **Tony G Silva  (956) 421-3980**
For Premium Period Effective: **June 18, 2001**    **Allstate Classic**

You may send any of the requests listed above in writing to:

Allstate Insurance Company
Customer Privacy Inquiries
P.O. Box 11904
Roanoke, VA 24022

### If you are an Internet user. . .

To better serve you, allstate.com provides information about Allstate, our products, and the agencies and brokers that represent us. You may also perform certain transactions on the website. When accessing allstate.com, please be sure to read the Privacy Statement that appears there.

In addition to the information contained in this Important Notice, the allstate.com Privacy Statement provides important information relating to your use of the website, including, for example, information regarding: 1) our use of "cookies," and 2) our collection of information such as IP address (the number assigned to your computer when you use the Internet), browser and platform types, domain names, access times, referral data, and your activity while using our site. The website notice also contains important information you should consider regarding the degree of security of information transmitted over the Internet.

We hope you have found this Important Notice helpful. If you have any questions or would like more information, please don't hesitate to contact your Allstate agent, call the Allstate Customer Information Center at 1-800-Allstate, or visit allstate.com.

X66702

This notice is being provided on behalf of the following companies:

ALLSTATE COUNTY MUTUAL INSURANCE COMPANY
ALLSTATE FLORIDIAN INDEMNITY COMPANY
ALLSTATE FLORIDIAN INSURANCE COMPANY
ALLSTATE INDEMNITY COMPANY
ALLSTATE INSURANCE COMPANY
ALLSTATE INVESTMENT MANAGEMENT COMPANY {AIMCO}
ALLSTATE NEW JERSEY INSURANCE COMPANY
ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY
ALLSTATE TEXAS LLOYD'S
ALLSTATE TEXAS LLOYD'S, INC.
FORESTVIEW MORTGAGE INSURANCE COMPANY
GENERAL UNDERWRITERS AGENCY, INC.
ROADWAY PROTECTION AUTO CLUB, INC.

Page 3

 **ENDORSEMENT NO. H0-320    GENERAL CHANGE ENDORSEMENT**
**Effective**
**July 8, 1992**

**This endorsement may not be used for any change involving additional or return premium.**

Effective Date:_____

This policy is amended as follows:

# Allstate
# Texas Homeowners Policy
# Form B

Policy:

Effective:

Issued to:

By your Allstate agent:



Prescribed by the Texas Department of Insurance
Homeowners Form B—Effective July 8, 1992
(Revised January 1, 1996)



AU2131-1

# QUICK REFERENCE
# TEXAS HOMEOWNERS POLICY — FORM B

Insuring Agreement ................................................ 2
Definitions .............................................................. 2

## SECTION I — PROPERTY COVERAGE

Coverage A
    Dwelling ......................................................... 3
    Other Structures ........................................... 3
Coverage B
    Personal Property ......................................... 3
    Personal Property Off Premises ................... 3
Special Limits of Liability ...................................... 4
Property Not Covered ............................................ 4
Extensions of Coverage
    Debris Removal ............................................. 5
    Loss of Use ................................................... 5
    Reasonable Repairs ..................................... 5
    Trees, Shrubs, Plants and Lawns ................. 5
    Property Removed ......................................... 5
    Consequential Loss ...................................... 5
    Automatic Removal ........................................ 6
Perils Insured Against
    Coverage A (Dwelling) .................................. 6
    Coverage B (Personal Property) ................... 6

Exclusions .............................................................. 7

Deductibles ............................................................ 9

Section I — Conditions
    Insurable Interest and Limit of Liability ......... 9
    Residential Community Property Clause ....... 9
    Duties After Loss
        Your Duties After Loss ....................... 9
        Our Duties After Loss ..................... 10
    Loss Settlement .......................................... 11
    Loss to a Pair or Set ................................... 12
    Salvage Rights ............................................ 12
    Appraisal ..................................................... 12
    Loss Payment ............................................. 12
    Catastrophe Claims .................................... 12
    Other Insurance .......................................... 13
    Suit Against Us ............................................ 13
    Abandonment of Property ............................ 13
    Vacancy — Suspension of Coverage ...... 13
    Mortgage Clause ......................................... 13
    No Benefit to Bailee .................................... 14

## SECTION II — LIABILITY COVERAGE

Coverage C (Personal Liability) .......................... 14
Coverage D (Medical Payments to Others) ......... 14

Exclusions
    Coverage C and D Exclusions ..................... 15
    Coverage C Exclusions ............................... 17
    Coverage D Exclusions ............................... 17

Additional Coverages
    Claim Expenses .......................................... 18
    Imperative Medical Expenses to Others ....... 18
    Damage to Property of Others ..................... 18
Section II — Conditions
    Limit of Liability .......................................... 18
    Severability of Insurance ............................. 19
    Duties After Loss ........................................ 19
    Duties of an Injured Person ......................... 19
    Payment of Claim under Coverage D ........... 19
    Suit Against Us ............................................ 19
    Bankruptcy of the Insured ........................... 19
    Other Insurance .......................................... 20
    Notice of Settlement of Liability Claim .......... 20

## POLICY CONDITIONS
## APPLYING TO SECTIONS I AND II

Policy Period ........................................................ 20
Concealment or Fraud .......................................... 20
Liberalization Clause ............................................ 20
Waiver or Change of Policy Provisions ................. 20
Cancellation .......................................................... 20
Refusal to Renew .................................................. 21
Assignment ........................................................... 21
Subrogation .......................................................... 21
Death .................................................................... 22

---

**YOUR DUTIES AFTER A LOSS**

Section I:

1. Protect the property from further damage.
2. Give prompt written notice to the company.
3. Call the police if a law has been broken.
4. Make a list of all damaged personal property, including costs.
5. If requested, obtain proof of loss form from your agent or the company and submit within 91 days of the request.

Section II:

1. Do not make any voluntary payment except for first aid to others at the time of the accident.
2. Give written notice to agent or company, including details about the accident and any witnesses.
3. Send copies of legal notices you receive to the company.
4. Help the company get the necessary information to make settlement.

FOR A COMPLETE LIST OF YOUR DUTIES SEE PAGES 9 AND 19 OF YOUR POLICY.

---

# HOMEOWNERS FORM B

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown on the declarations page and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1.  "Bodily injury" means bodily harm, sickness or disease. This includes required care, loss of services and death that results.

2.  "Business" includes trade, profession or occupation.

3.  "Business day," when used in this policy means a day other than a Saturday, Sunday or holiday recognized by the state of Texas.

4.  "Insured" means you and residents of your household who are:

    a.  your relatives; or

    b.  other persons under the age of 21 and in the care of any person named above.

    Under Section II Liability, "insured" also means:

    c.  any person or organization legally responsible for animals or watercraft to which this policy applies. You or a person included in 4.a. or 4.b. above must own the animal or watercraft. A person or organization using or having custody of these animals or watercraft without consent of the owner is not an insured.

    d.  With respect to any vehicle to which this policy applies:

        (1) any employee of an insured while engaged in the employment of the insured; or

        (2) any other person using the vehicle on an insured location with your consent.

5.  "Insured location" means:

    a.  the residence premises.

    b.  the part of other premises, other structures and grounds you use as a residence and:

        (1) which is shown on the declaration page; or

        (2) which you acquire during the policy period for your use as a residence.

    c.  any premises you use in connection with a premises in 5.a. or 5.b. above.

    d.  any part of a premises:

        (1) not owned by an insured; and

        (2) where an insured is temporarily residing.

    e.  vacant land, other than farm land, owned by or rented to an insured.

HO-B                                                                          Page 2

PROP *E10004200061257014681B0E*



f.   land owned by or rented to an <u>insured</u> on which a one or two family dwelling is being built as a residence for an <u>insured</u>.

g.   individual or family cemetery plots or burial vaults of an <u>insured</u>.

h.   any part of a premises occasionally rented to an <u>insured</u> for other than <u>business</u> use.

6.   "<u>Occurrence</u>" means an accident, including exposure to conditions, which result in <u>bodily injury</u> or <u>property damage</u> during the policy period.

7.   "<u>Property damage</u>" means injury to, destruction of, or loss of use of property.

8.   "<u>Residence employee</u>" means an employee of an <u>insured</u> who performs duties related to the ownership, maintenance or use of the <u>residence premises</u>, including maintenance or use of a motor vehicle. This includes employees who perform similar duties elsewhere for an <u>insured</u>. This does not include employees while performing duties related to the <u>business</u> of an <u>insured</u>.

9.   "<u>Residence premises</u>" means the <u>residence premises</u> shown on the declarations page. This includes the one or two family dwelling, including other structures, and grounds where an <u>insured</u> resides or intends to reside within 60 days after the effective date of the policy.

## SECTION I — PROPERTY COVERAGE

**COVERAGE A (DWELLING)**

We cover:

1.   the dwelling on the <u>residence premises</u> shown on the declarations page including structures attached to the dwelling.

2.   other structures on the <u>residence premises</u> set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line or similar connection.

The total limit of liability for other structures is the limit of liability shown on the declaration page or 10% of the Coverage A (Dwelling) limit of liability, whichever is greater. This is additional insurance and does not reduce the Coverage A (Dwelling) limit of liability.

We do not cover other structures:

a.   used for business purposes; or

b.   wholly rented to any person, unless used solely as a private garage.

3.   wall to wall carpeting attached to a building on the <u>residence premises</u>.

**COVERAGE B (PERSONAL PROPERTY)**

We cover:

1.   a.   personal property owned, worn or used by an <u>insured</u> while on the <u>residence premises</u>. This includes window or wall air conditioning units.

b.   at your request, property of others while the property is on the part of the <u>residence premises</u> occupied by an <u>insured</u>.

2.   a.   personal property owned, worn or used by an <u>insured</u> anywhere in the world.

b.   at your request, personal property of a <u>residence employee</u> when:

(1)   the property is away from the residence premises of the <u>residence employee</u> and in the control of the <u>residence employee</u>; and

HO-B

(2) while the <u>residence employee</u> is performing work for you.

Our total limit of liability under 2.a. and 2.b. above is 10% of the Coverage B (Personal Property) limit of liability or $1000, whichever is greater. This is additional insurance and does not reduce the Coverage B (Personal Property) limit of liability.

**SPECIAL LIMITS OF LIABILITY.** These limits do not increase the Coverage B (Personal Property) limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. Money/Bank Cards. $100 on money or numismatic property or loss by theft or unauthorized use of bank fund transfer cards registered to an <u>insured</u>.

2. Bullion/Valuable Papers. $500 on gold or silver bullion, manuscripts, notes, securities, stamps, philatelic property, accounts, bills, deeds, evidences of debt, letters of credit, passports, documents, transportation or other tickets.

3. Jewelry/Watches/Furs. $500 for loss by theft of gems, watches, jewelry or furs.

4. <u>Business</u> Personal Property. $2,500 on <u>business</u> property.

   We do not cover any <u>business</u> property:

   a. that consists of samples or articles for sale or delivery; or

   b. if the property is away from the <u>residence premises</u>.

**PROPERTY NOT COVERED.** We do not cover:

1. articles separately described and specifically insured by this or other insurance.

2. animals or birds.

3. motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment.

   However, we do cover such vehicles which are not subject to motor vehicle registration and are:

   a. devices and equipment for assisting the handicapped.

   b. power mowers.

   c. golf carts.

   d. vehicles or machines used for recreational purposes while located on the <u>residence premises</u>.

   e. farm equipment not designed for use principally on public roads.

4. trailers, semi-trailers or mobile homes.

   However, we do cover:

   a. trailers and semi-trailers that are designed for use principally off public roads.

   b. boat trailers while on the <u>residence premises</u>.

5. aircraft meaning any device used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

6. watercraft, including outboard motors and furnishings or equipment.

   We do cover watercraft, including outboard motors and furnishings or equipment, while located on land on the <u>residence premises</u>.

7. property of roomers and tenants.

HO-B

PROP *61000420006125701468 1907*



8.  property usually rented to others off the
    <u>residence premises</u>.

The periods of time for loss of use are not limited
by expiration of this policy.



3.  REASONABLE REPAIRS. If a Peril Insured

1.  DEBRIS REMOVAL. We will pay your expense
    for the removal from the <u>residence premises</u> of:

    a.  debris of covered property if a Peril Insured
        Against causes the loss.

    b.  a tree that has damaged covered property if
        a Peril Insured Against causes the tree to
        fall.

    This does not increase the limit of liability that
    applies to the damaged property.

2.  LOSS OF USE. If a loss caused by a Peril Insured
    Against under Section I makes the <u>residence
    premises</u> wholly or partially untenantable, we
    cover:

    a.  additional living expense, meaning any
        necessary and reasonable increase in living
        expense you incur so that your household
        can maintain its normal standard of living.

    b.  fair rental value, meaning the fair rental
        value of that part of the residence premises
        usually rented to other by you, less any
        expenses that do not continue.

    The total limit of liability for all loss of use is 20%
    of the Coverage A (Dwelling) limit of liability. This
    is additional insurance and does not reduce the
    Coverage A (Dwelling) limit of liability. The
    deductible clause does not apply to loss of use
    coverage.

    Payment will be for the reasonable time required
    to repair or replace the damaged property. If you
    permanently relocate, payment will be for the
    reasonable time required for your household to
    become settled.

Against causes the loss, we will pay the
reasonable cost you incur for necessary repairs
made solely to protect covered property from
further damage. This coverage does not increase
the limit of liability that applies to the property
being repaired.

4.  TREES, SHRUBS, PLANTS AND LAWNS. We
    cover trees, shrubs, plants and lawns, on the
    <u>residence premises</u>, only for loss caused by the
    following Perils Insured Against: Fire or
    Lightning, Explosion, Aircraft, Vehicles not
    owned or operated by a resident of the
    <u>residence premises</u>. Vandalism and Malicious
    Mischief, Riot and Civil Commotion and Theft or
    attempted theft.

    The maximum limit of liability for this coverage is
    5% of the Coverage A (Dwelling) limit of liability.
    We will not pay more than $250 for any one tree,
    shrub or plant, including the cost of removal. We
    do not cover property grown for <u>business</u>
    purposes.

    This is not additional insurance and does not
    increase the Coverage A (Dwelling) limit of
    liability. The deductible clause does not apply to
    trees, shrubs, plants and lawns.

5.  PROPERTY REMOVED. We pay for expense and
    damage incurred in the removal of covered
    property from an <u>insured location</u> endangered
    by a Peril Insured Against. This coverage exists
    on a pro rata basis for 30 days at each location to
    which such property is removed for
    preservation. This is not additional insurance and
    does not increase the Coverage B (Personal
    Property) limit of liability.

6.  CONSEQUENTIAL LOSS. We insure:

    a.  property contained in a building on the
        <u>residence premises</u> against loss due to

change in temperature as a direct result of physical damage to the dwelling, or any equipment contained in the dwelling, caused by a Peril Insured Against. The deductible clause does not apply to this coverage.

b.  property contained in a building on the <u>residence premises</u> against a loss due to change in temperature as a direct result of physical damage to any power, heating or cooling equipment (including connections and supply pipes) not contained in or on the dwelling, caused by a Peril Insured Against.

The total limit of liability for the coverage described in 6.b. above is $500. This is not additional insurance and does not increase the Coverage B (Personal Property) limit of liability.

7.  AUTOMATIC REMOVAL. If you move from the <u>residence premises</u> shown on the declarations page to another location within the United States, to be occupied as your principal residence, we cover:

a.  the personal property under Coverage B (Personal Property) at each location in the proportion that the value at each location bears to the total value of all the personal property covered under Coverage B (Personal Property).

b.  property in transit up to 10% of the Coverage B (Personal Property) limit of liability or $1,000, whichever is greater.

We provide coverage for only 30 days from the date the removal begins.

---

## SECTION I — PERILS INSURED AGAINST

### COVERAGE A (DWELLING)

We insure against all risks of physical loss to the property described in Section I Property Coverage, Coverage A (Dwelling) unless the loss is excluded in Section I Exclusions.

### COVERAGE B (PERSONAL PROPERTY)

We insure against physical loss to the property described in Section I Property Coverage, Coverage B (Personal Property) caused by a peril listed below, unless the loss is excluded in Section I Exclusions.

1.  Fire and Lightning.

2.  Sudden and Accidental Damage from Smoke.

3.  Windstorm, Hurricane and Hail.

4.  Explosion.

5.  Aircraft and Vehicles.

6.  Vandalism and Malicious Mischief.

7.  Riot and Civil Commotion.

8.  Collapse of Building or any part of the building.

9.  Accidental Discharge, Leakage or Overflow of Water or Steam from within a plumbing, heating or air conditioning system or household appliance.

A loss resulting from this peril includes the cost of tearing out and replacing any part of the building necessary to repair or replace the system or appliance. But this does not include loss to the system or appliance from which the water or steam escaped.

Exclusions 1.a. through 1.h. under Section I Exclusions do not apply to loss caused by this peril.

HO-B    Page 6

PROP *6100042900612570146819D8*


10. **Falling Objects.**

This peril does not include loss to property contained in a building unless the roof or outside wall of the building is first damaged by the falling object.

11. Freezing of household appliances.

12. Theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

---

## SECTION I — EXCLUSIONS

1. The following exclusions apply to loss to property described under Coverage A (Dwelling) or Coverage B (Personal Property), but they do not apply to an ensuring loss caused by fire, smoke or explosion.

   a. We do not cover loss to electrical devices or wiring caused by electricity other than lightning.

   b. We do not cover loss caused by smog or by smoke from industrial or agricultural operations.

   c. We do not cover loss caused by windstorm, hurricane or hail to:

      (1) cloth awnings, greenhouses and their contents, buildings or structures located wholly or partially over water and their contents.

      (2) radio and television towers, outside satellite dishes, masts and antennas, including lead-in wiring, windchargers and windmills.

      (3) personal property contained in a building unless direct force of wind or hail makes an opening in a roof or wall and rain, snow, sand or dust enters through this opening and causes the damage.

   d. We do not cover loss of the following property by theft, including attempted theft and loss of property from a known place

when it is likely that the property has been stolen.

   (1) personal property while away from the <u>residence premises</u> at any other residence owned by, rented to or occupied by an <u>insured</u>, except while an <u>insured</u> is temporarily living there.

   (2) building materials and supplies not on the <u>residence premises</u>.

   e. We do not cover loss to machinery, appliances and mechanical devices caused by mechanical breakdown.

   f. We do not cover loss caused by:

      (1) wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself.

      (2) rust, rot, mold or other fungi.

      (3) dampness of atmosphere, extremes of temperature.

      (4) contamination.

      (5) rats, mice, termites, moths or other insects.

      We do cover ensuing loss caused by collapse of building or any part of the building, water damage or breakage of glass which is part of the building if the loss would otherwise be covered under this policy.

HO-B

Page 7

g.  We do not cover loss caused by animals or
    birds owned or kept by an <u>insured</u> or
    occupant of the <u>residence premises</u>.

—  We do cover ensuing loss caused by
    collapse of building or any part of the
    building, water damage or breakage of glass
    which is part of the building if the loss
    would otherwise be covered under this
    policy.

h.  We do not cover loss under Coverage A
    (Dwelling) caused by settling, cracking,
    bulging, shrinkage, or expansion of
    foundations, walls, floors, ceilings, roof
    structures, walks, drives, curbs, fences,
    retaining walls or swimming pools.

    We do cover ensuing loss caused by
    collapse of building or any part of the
    building, water damage or breakage of glass
    which is part of the building if the loss
    would otherwise be covered under this
    policy.

i.  We do not cover loss caused by or resulting
    from flood, surface water, waves, tidal water
    or tidal waves, overflow of streams or other
    bodies of water or spray from any of these
    whether or not driven by wind.

    We do cover an ensuing loss by theft or
    attempted theft or any act or attempted act
    of stealing.

j.  We do not cover loss caused by or resulting
    from freezing while the building is
    unoccupied unless you have used
    reasonable care to:

    (1)  maintain heat in the building; or

    (2)  shut off the water supply and drain
         plumbing, heating and air conditioning
         systems of water.

k.  We do not cover loss caused by
    earthquake, landslide or earth movement.

2.  **GOVERNMENTAL ACTION.**

    We do not cover loss caused by the destruction
    of property by order of governmental authority.

    But we do cover loss caused by acts of
    destruction ordered by governmental authority
    taken at the time of a fire to prevent its spread, if
    the fire would be covered under this policy.

3.  **BUILDING LAWS.**

    We do not cover loss caused by or resulting
    from the enforcement of any ordinance or law
    regulating the construction, repair or demolition
    of a building or structure.

4.  **WAR DAMAGE.**

    We do not cover loss resulting directly or
    indirectly from war. This includes undeclared
    war, civil war, insurrection, rebellion, revolution,
    warlike act by military personnel, destruction or
    seizure or use for military purpose, and any
    consequence of these. Discharge of a nuclear
    weapon will be deemed a warlike act even if
    accidental.

5.  **NUCLEAR DAMAGE.**

    We do not cover loss resulting directly or
    indirectly from nuclear reaction, radiation or
    radioactive contamination, all whether controlled
    or uncontrolled or however caused. We cover
    direct loss by fire resulting from nuclear reaction,
    radiation or radioactive contamination.

**HO-B**                                                     **Page 8**

PROP "61000420006125701468190S"



## SECTION I — DEDUCTIBLES

**DEDUCTIBLE CLAUSE 1 — WINDSTORM, HURRICANE, HAIL OR WIND DRIVEN RAIN —** The amount shown on the declarations page for Deductible Clause 1 will be deducted from the combined amount of each loss under Coverage A (Dwelling) and Coverage B (Personal Property) that results from windstorm, hurricane, hail or wind driven rain.

**DEDUCTIBLE CLAUSE 2 — ALL OTHER PERILS —** The amount shown on the declarations page for Deductible Clause 2 will be deducted from the combined amount of each loss under Coverage A (Dwelling) and Coverage B (Personal Property), unless the loss results from windstorm, hurricane, hail or wind driven rain.

If a single event causes loss by windstorm, hurricane, hail or wind driven rain and loss by lightning, only the larger deductible will apply.

## SECTION I — CONDITIONS

1.  Insurable Interest and Limit of Liability. Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

    a.  to the insured for more than the amount of the insured's interest at the time of loss: or

    b.  for more than the applicable limit of liability.

    Each time there is a loss to any building insured under Coverage A (Dwelling), the amount of insurance applicable to that building for loss by fire will be reduced by the amount of the loss. As repairs are made, the amount of insurance will be reinstated up to the limit of liability shown on the declarations page.

    Article 6.13. Policy A Liquidated Demand. A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy. The provisions of this article shall not apply to personal property.

2.  Residential Community Property Clause. This policy, subject to all other terms and conditions, when covering residential community property, as defined by state law, shall remain in full force

    and effect as to the interest of each spouse covered, irrespective of divorce or change of ownership between the spouses unless excluded by endorsement attached to this policy, until the expiration of the policy or until cancelled in accordance with the terms and conditions of this policy.

3.  Duties After Loss.

    a.  Your Duties After Loss. In case of a loss to covered property caused by a peril insured against, you must:

        (1) give prompt written notice to us of the facts relating to the claim.

        (2) notify the police in case of loss by theft.

        (3) (a)  protect the property from further damage.

            (b)  make reasonable and necessary repairs to protect the property.

            (c)  keep an accurate record of repair expenses.

HO-B                                                                                          Page 9

(4) furnish a complete inventory of damaged personal property showing the quantity, description and amount of loss. Attach all bills, receipts and related documents which you have that justify the figures in the inventory.

(5) as often as we reasonably require:

(a) provide us access to the damaged property.

(b) provide us with pertinent records and documents we request and permit us to make copies.

(c) submit to examination under oath and sign and swear to it.

(6) send to us if we request, your signed sworn proof of loss within 91 days of our request on a standard form supplied by us. We must request a signed sworn proof of loss within 15 days after we receive your written notice, or we waive our right to require a proof of loss. Such waiver will not waive our other rights under this policy.

(a) This proof of loss shall state, to the best of your knowledge and belief:

(i) the time and cause of loss;

(ii) the interest of the <u>insured</u> and all others in the property involved including all liens on the property.

(iii) other insurance which may cover the loss.

(iv) the actual cash value of each item of property and the amount of loss to each item.

(b) If you elect to make claim under the Replacement Cost Coverage of this policy, this proof of loss shall also state, to the best of your knowledge and belief:

(i) the replacement cost of the described dwelling.

(ii) the replacement cost of any other building on which loss is claimed.

(iii) the full cost of repair or replacement of loss without deduction for depreciation.

b. **Our Duties After Loss.**

(1) Within 15 days after we receive your written notice of claim, we must:

(a) acknowledge receipt of the claim.

If our acknowledgment of the claim is not in writing, we will keep a record of the date, method and content of our acknowledgement.

(b) begin any investigation of the claim.

(c) specify the information you must provide in accordance with "Your Duties After Loss" (item 3.a. above).

We may request more information, if during the investigation of the claim such additional information is necessary.

(2) After we receive the information we request, we must notify you in writing whether the claim will be paid or has been denied or whether more information is needed:

HO-B                                                                                                    Page 10

PROP *G1000420006125701468191G*



(a) within 15 business days; or

(b) within 30 days if we have reason to believe the loss resulted from arson.

(3) If we do not approve payment of your claim or require more time for processing your claim, we must:

(a) give the reasons for denying your claim; or

(b) give the reasons we require more time to process your claim. But, we must either approve or deny your claim within 45 days after requesting more time.

4. **Loss Settlement.** Covered property losses are settled as follows:

a. Our limit of liability and payment for covered losses to personal property, wall to wall carpeting, cloth awnings and fences will not exceed the smallest of the following:

(1) the actual cash value at the time of loss determined with proper deduction for depreciation.

(2) the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or

(3) the specified limit of liability of the policy.

b. Our limit of liability for covered losses to dwelling and other structure(s) under Coverage A (Dwelling), except wall to wall carpeting, cloth awnings and fences, will be at replacement cost settlement subject to the following:

(1) If, at the time of loss, the Coverage A (Dwelling) limit of liability is 80% or more of the full replacement cost of the dwelling, we will pay the repair or replacement cost of the damaged building structure(s), without deduction for depreciation.

(2) If, at the time of loss, the Coverage A (Dwelling) limit of liability is less than 80% of the full replacement cost of the dwelling, we will pay only a proportionate share of the full replacement cost of the damaged building structure(s). Our share is equal to:

$$\frac{\text{Replacement Cost of the Loss}}{\text{80\% of Replacement Cost of the Dwelling}} \times \underline{\text{Coverage A (Dwelling) Limit of Liability}}$$

(3) If, at the time of loss, the actual cash value of the damaged building structure(s) is greater than the replacement cost determined under (1) or (2) above, we will pay the actual cash value up to the applicable limit of liability.

In determining the amount of insurance required to equal 80% of the full replacement cost of the dwelling, do not include the value of excavations, underground pipes, and wiring and foundations which are below the surface of the ground.

We will pay only the actual cash value of the damaged building structure(s) until repair or replacement is completed. Repair or replacement must be completed within 365 days after loss unless you request in writing that this time limit be extended for an additional 180 days. Upon completion of repairs or replacement, we will pay the additional amount claimed under

replacement cost coverage, but our payment will not exceed the smallest of the following:

(1) the limit of liability under this policy applicable to the damaged or destroyed building structure(s);

(2) the cost to repair or replace that part of the building structure(s) damaged, with material of like kind and quality and for the same use and occupancy on the same premises; or

(3) the amount actually and necessarily spent to repair or replace the damaged building structure(s).

5. **Loss to a Pair or Set.** In case of loss to an item which is part of a pair or set, the measure of loss shall be a reasonable and fair proportion of the total value of the pair or set. The importance of the item will be considered in assessing the loss. Such loss will not be considered a total loss of the pair or set.

6. **Salvage Rights.** If we notify you that we will pay your claim or part of your claim, the notice must also state whether we will or will not take all or any part of the damaged property. We must bear the expense of our salvage rights.

7. **Appraisal.** If you and we fail to agree on the actual cash value, amount of loss, or cost of repair or replacement, either can make a written demand for appraisal. Each will then select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a district court of a judicial district where the loss occurred. The two appraisers will then set the amount of loss, stating separately the actual cash value and loss to each item. If you or we

request that they do so, the appraisers will also set:

a. the full replacement cost of the dwelling.

b. the full replacement cost of any other building upon which loss is claimed.

c. the full cost of repair or replacement of loss to such building, without deduction for depreciation.

If the appraisers fail to agree, they will submit their differences to the umpire. An itemized decision agreed to by any two of these three and filed with us will set the amount of the loss. Such award shall be binding on you and us.

Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally.

8. **Loss Payment.**

a. If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you.

b. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

9. **Catastrophe Claims.**

If a claim results from a weather related catastrophe or a major natural disaster, each claim handling deadline shown under the Duties After Loss and Loss Payment provisions is extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

a. is declared a disaster under the Texas Disaster Act of 1975; or

HO-B

PROP *61000042000612257014681911*

b. is determined to be a catastrophe by the State Board of Insurance.

10. **Other Insurance — Section I.** Other insurance is permitted on property covered by this policy, but other insurance covering the dwelling is not permitted. If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

11. **Suit Against Us.** No suit or action can be brought unless the policy provisions have been complied with. Action brought against us must be started within two years and one day after the cause of action accrues.

12. **Abandonment or Property.** There can be no abandonment of property to us.

13. **Vacancy.** If the insured moves from the dwelling and a substantial part of the personal property is removed from that dwelling, the dwelling will be considered vacant. Coverage that applies under Coverage A (Dwelling) will be suspended effective 60 days after the dwelling becomes vacant. The coverage will remain suspended during such vacancy.

14. **Mortgage Clause (without contribution).**

a. The word "mortgagee" includes trustee.

b. We will pay for any covered loss of or damage to buildings or structures to the mortgagee shown on the declarations page as interests appear.

c. The mortgagee has the right to receive loss payment even if the mortgagee has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgagee has

the right to receive loss payment if the mortgagee:

(1) at our request, pays any premiums due under this policy, if you have failed to do so.

(2) submits a signed, sworn statement of loss within 91 days after receiving notice from us of your failure to do so.

(3) has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgagee.

All of the terms of this policy will then apply directly to the mortgagee. Failure of the mortgagee to comply with d.(1), d.(2) or d.(3) above shall void this policy as to the interest of the mortgagee.

e. If we pay the mortgagee for any loss or damage and deny payment to you because of your acts or because you failed to comply with the terms of this policy:

(1) the mortgagee's rights under the mortgage will be transferred to us to the extent of the amount we pay.

(2) the mortgagee's right to recover the full amount of the mortgagee's claim will not be impaired.

At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If this policy is cancelled, we will give the mortgagee specifically named on the declarations page written notice of cancellation.

HO-B

If we cancel the policy, we will give the mortgagee the same number of days notice of cancellation we give to you.

If you cancel the policy, we will give the mortgagee notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

We will not give notice of cancellation to any successor or assignee of the mortgagee named in this policy.

g.   If the property described under Coverage A (Dwelling) is foreclosed upon under the deed of trust, the mortgagee may cancel this policy of insurance and will be entitled to any unearned premiums from this policy.

The mortgagee must credit any unearned premium against any deficiency owed by the borrower and return any unearned premium not so credited to the borrower. The unearned premium will be figured using the customary pro rata procedures.

h.   If we elect not to renew the policy, the mortgagee specifically named on the declarations page will be given 30 days written notice of the non-renewal.

15.   **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage for the benefit of a person or organization holding, storing or moving property for a fee.

## SECTION II — LIABILITY COVERAGE

**COVERAGE C (Personal Liability)**

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:

1.   pay up to our limit of liability for the damages for which the insured is legally liable. Damages include pre-judgment interest awarded against the insured; and

2.   provide a defense at our expense by counsel of our choice even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.

**COVERAGE D (Medical Payments to Others)**

We will pay the necessary medical expenses incurred or medically determined within three years from the date of an accident causing bodily injury. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital,

professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household. This coverage does apply to residence employees. As to others, this coverage applies only:

1.   to a person on the insured location with the permission of an insured.

2.   to a person off the insured location, if the bodily injury:

a.   arises out of a condition on the insured location or the ways immediately adjoining.

b.   is caused by the activities of an insured.

c.   is caused by a residence employee in the course of the residence employee's employment by an insured.

d.   is caused by an animal owned by or in the care of an insured.

HO-B

PROP *E1000420006125701468 1912*

## SECTION II — EXCLUSIONS

1. Coverage C (Personal Liability) and Coverage D (Medical Payments to Others) do not apply to:

   a. bodily injury or property damage which is caused intentionally by or at the direction of the insured;

   b. bodily injury or property damage arising out of or in connection with a business engaged in by an insured. But this exclusion does not apply to activities which are ordinarily incidental to non-business pursuits.

   c. bodily injury or property damage arising out of the rental or holding for rental of any part of any premises by an insured. This exclusion does not apply to the rental or holding for rental of an insured location:

      (1) on an occasional basis if used only as a residence.

      (2) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders.

      (3) in part, as an office, school or studio.

      (4) if the rental is for not more than three car spaces or stalls in garages or stables.

   d. bodily injury or property damage arising out of the rendering of or failure to render professional services.

   e. bodily injury or property damage arising out of a premises:

      (1) owned by an insured;

      (2) rented to an insured; or

      (3) rented to others by an insured;

      that is not an insured location.

   This exclusion does not apply to bodily injury to a residence employee arising out of and in the course of the residence employee's employment by an insured.

   f. bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

      (1) motor or engine propelled vehicles or machines designed for movement on land, including attached machinery or equipment;

      (2) trailers, semi-trailers or mobile homes;

      which are owned or operated by or rented or loaned to an insured.

   However, this exclusion does not apply to:

      (1) motor vehicles which are not subject to motor vehicle registration and are:

         (a) used for assisting the handicapped.

         (b) used to service an insured location.

         (c) golf carts while on the residence premises or used for golfing purposes.

         (d) designed and used for recreational purposes, and are:

            (i) not owned by an insured; or

    (ii)  owned by an <u>insured</u> while on the <u>residence premises</u>.

  (e)  in dead storage on the <u>residence premises</u>.

  (f)  used exclusively on the <u>residence premises</u>.

(2)  trailers or semi-trailers while not being towed by or carried on a motor vehicle.

This exclusion does not apply to <u>bodily injury</u> to a <u>residence employee</u> arising out of and in the course of the <u>residence employee's</u> employment by an <u>insured</u>.

g.  <u>bodily injury</u> or <u>property damage</u> arising out of the ownership, maintenance, operation, use, loading or unloading of watercraft:

  (1)  with inboard or inboard-outdrive motor power of more than 50 horsepower owned by or rented to an <u>insured</u>.

  (2)  powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an <u>insured</u>. But, outboard motors of more than 25 total horsepower are covered for the policy period if:

    (a)  you acquire them prior to the policy period and:

      (i)  you declare them at policy inception; or

      (ii)  your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors.

    (b)  you acquire them during the policy period.

(3)  that is a sailing vessel, with or without auxiliary power, which is 26 feet or more in length owned by or rented to an <u>insured</u>.

This exclusion does not apply while the watercraft is on the <u>residence premises</u>.

This exclusion does not apply to <u>bodily injury</u> to a <u>residence employee</u> arising out of and in the course of the <u>residence employee's</u> employment by an <u>insured</u>.

h.  <u>bodily injury</u> or <u>property damage</u> arising out of the ownership, maintenance, operation, use, loading or unloading of aircraft.

Aircraft means any device used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

This exclusion does not apply to <u>bodily injury</u> to a <u>residence employee</u> arising out of and in the course of the <u>residence employee's</u> employment by an <u>insured</u>.

i.  <u>bodily injury</u> or <u>property damage</u> arising out of:

  (1)  the entrustment by an <u>insured</u> to any person; or

  (2)  the negligent supervision by an <u>insured</u> of any person;

with regard to the ownership, maintenance or use of any motor vehicle, watercraft or aircraft which is excluded in paragraph f., g. or h. above.

This exclusion does not apply to <u>bodily injury</u> to a <u>residence employee</u> arising out of and in the course of the <u>residence employee's</u> employment by an <u>insured</u>.

HO-B

PROP "61000420006125701468191 3"



j.   bodily injury or property damage caused directly or indirectly by war. This includes undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for military purpose, and any consequence of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

k.   bodily injury or property damage arising out of the transmission of sickness or disease by an insured through sexual contact.

l.   bodily injury to any person eligible to receive any benefits voluntarily provided or required to be provided by an insured under any workers' compensation law or occupational disease law.

2.   Coverage C (Personal Liability) does not apply to:

a.   liability under any contract or agreement.

However, this exclusion does not apply to written contracts:

(1)   that directly relate to the ownership, maintenance or use of an insured location; or

(2)   where the liability of others is assumed by an insured;

unless excluded elsewhere in this policy.

b.   property damage to property owned by an insured.

c.   property damage to property rented to, occupied or used by or in the care of an insured.

This exclusion does not apply to property damage caused by fire, smoke or explosion.

d.   bodily injury or property damage for which an insured under this policy is also an insured under a nuclear energy liability policy or would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by American Nuclear Insurers, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada.

e.   bodily injury to you or an insured within the meaning of part a. or part b. of insured as defined.

3.   Coverage D (Medical Payments to Others) does not apply to:

a.   bodily injury to a residence employee if the bodily injury:

(1)   occurs off the insured location; and

(2)   does not arise out of or in the course of the residence employee's employment by an insured.

b.   bodily injury to any person, other than a residence employee of an insured, regularly residing on any part of the insured location.

## SECTION II — ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

    a. expenses we incur and costs taxed against an <u>insured</u> in any suit we defend.

    b. premiums on bonds required in a suit we defend but not for bond amounts more than the limit of liability for Coverage C (Personal Liability). We need not apply for or furnish any bond.

    c. reasonable expenses incurred by an <u>insured</u> at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit.

    d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **Imperative Medical Expense to Others.** We pay expenses incurred by an <u>insured</u> for immediate medical and surgical relief to others if imperative at the time of the accident.

3. **Damage to Property of Others.** We pay replacement cost up to $500 per <u>occurrence</u> for

<u>property damage</u> to property of others caused by an <u>insured</u>.

We do not pay for <u>property damage</u>:

    a. caused intentionally by an <u>insured</u> who is 13 years of age or older.

    b. to property owned by an <u>insured</u>.

    c. to property owned by or rented to a tenant of an <u>insured</u> or a resident in your household.

    d. arising out of:

        (1) a <u>business</u> engaged in by an <u>insured</u>.

        (2) any act or omission in connection with a premises owned, rented or controlled by an <u>insured</u>, other than the <u>insured</u> <u>location</u>.

        (3) the ownership, maintenance, use, loading or unloading of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

This exclusion does not apply to any motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an <u>insured</u>.

## SECTION II — CONDITIONS

1. **Limit of Liability.** The limit of liability for Coverage C (Personal Liability) shown on the declarations page is our total liability under Coverage C (Personal Liability) for all damages resulting from any one <u>occurrence</u>. This limit is

the same regardless of the number of <u>insureds</u>, claims made or persons injured.

The limit of liability for Coverage D (Medical Payments to Others) shown on the declarations page is our total liability under Coverage D

HO-B

Page 18

PROP *6100042000612570146819147*



(Medical Payments to Others) for all medical expense payable for <u>bodily injury</u> to one person as the result of one accident. The total limit of our liability for all expenses payable to two or more persons injured in one accident is $25,000.

2. **Severability of Insurance.** This insurance applies separately to each <u>insured</u>. This condition will not increase our limit of liability for any one <u>occurrence</u>.

3. **Duties After Loss.** In case of an accident or <u>occurrence</u>, the <u>insured</u> will perform the following duties that apply or will help us by seeing that these duties are preformed:

   a. Give written notice to us or our agent as soon as is practical, which sets forth:

      (1) the identity of the policy and <u>insured</u>.

      (2) reasonably available information on the time, place and circumstances of the accident or <u>occurrence</u>.

      (3) names and addresses of any claimants and witnesses.

   b. Promptly forward to us every notice, demand, summons or other process relating to the accident or <u>occurrence</u>.

   c. At our request, help us:

      (1) to make settlement.

      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an <u>insured</u>.

      (3) with the conduct of suits, including attending hearings and trials.

      (4) to secure evidence and obtain the attendance of witnesses.

   d. The <u>insured</u> will not, except at the <u>insured's</u> own cost, voluntarily make payment, assume obligation or incur expense other than for immediate medical and surgical relief to others at the time of the <u>bodily injury</u>.

4. **Duties of an Injured Person — Coverage D (Medical Payments to Others).**

   The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical.

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor or our choice when and as often as we reasonably require.

5. **Payment of Claim — Coverage D (Medical Payments to Others).** Payment under this coverage is not an admission of liability by an <u>insured</u> or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

   No one will have the right to join us as a party to any action against an <u>insured</u>. Also, no action with respect to Coverage C (Personal Liability) can be brought against us until the obligation of the <u>insured</u> has been determined by final judgment or agreement.

   Under Coverage D (Medical Payment to Others), no action can be brought until 30 days after the required proofs of claim have been filed with us.

7. **Bankruptcy of the Insured.** Bankruptcy or insolvency of the <u>insured</u> or of the <u>insured's</u> estate will not relieve us of our obligations under this policy.

HO-B

Page 19

8. Other Insurance — Section II. If the insured has other insurance under Coverage C (Personal Liability), we will not be liable for a greater proportion of a loss than the limit of liability shown on the declarations page bears to the total limit of all valid and collectible insurance against such loss.

However, with respect to loss arising out of the ownership, maintenance, operation, use, loading or unloading of:

a. any motor vehicle or recreational vehicle at the residence premises; or

b. watercraft,

this policy will not apply to the extent that any valid and collectible insurance is available to the insured.

9. Notice of Settlement of Liability Claim.

a. We will notify the insured in writing of any initial offer to compromise or settle a claim against the insured under the liability section of this policy. We will give the insured notice within 10 days after the date the offer is made.

b. We will notify the insured in writing of any settlement of a claim against the insured under the liability section of this policy. We will give the insured notice within 30 days after the date of the settlement.

---

## SECTION I AND II — CONDITIONS

1. Policy Period. This policy applies only to loss in Section I or bodily injury or property damage in Section II which occurs during the policy period stated on the declarations page.

2. Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance, made false statements or committed fraud relating to this insurance, whether before or after a loss.

3. Liberalization Clause. If the State Board of Insurance adopts a revision which would broaden or extend the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened or extended coverage will immediately apply to this policy.

4. Waiver or Change of Policy Provisions. Changes in this policy may be made and perils added only by attaching a written endorsement

properly executed by our authorized agent. No provision of this policy may be waived unless the terms of this policy allow the provision to be waived. Our request for an appraisal or examination will not waive any of our rights.

5. Cancellation.

a. You may cancel this policy at any time by notifying us of the date cancellation is to take effect. We will send you any refund due when the policy is returned to us.

b. We may cancel this policy for the reasons stated in this condition by mailing you notice in writing of the date cancellation takes effect.

(1) If this policy has been in effect for less than 90 days and is not a renewal policy, we may cancel this policy for any reason.

The effective date of cancellation cannot be before:

HO-B

PROP "6100042000612570146B1915"



(a) the 10th day after we mail notice if we cancel for non-payment of premium.

(b) the 30th day after we mail notice if we cancel for any other reason.

(2) If this policy has been in effect 90 days or more, we may not cancel this policy unless:

(a) you do not pay the premium or any portion of the premium when due.

(b) the State Board of Insurance determines that continuation of the policy would violate the Texas Insurance Code or any other laws governing the business of insurance in this state.

(c) you submit a fraudulent claim.

(d) there is an increase in hazard covered by this policy that is within your control and that would produce an increase in the premium/rate of this policy.

The effective date of cancellation cannot be before the 10th day after we mail the notice. Our notice of cancellation must state the reason for cancellation.

c. If we cancel, our notice to you will state that if the refund is not included with the notice, it will be returned on demand.

d. We may not cancel this policy solely because you are an elected official.

6. Refusal to Renew.

a. We may not refuse to renew this policy because of claims for losses resulting from natural causes.

b. We may not refuse to renew this policy solely because you are an elected official.

c. We may refuse to renew this policy if you have filed three or more claims under the policy in any three year period that do not result from natural causes.

If you have filed two claims in a period of less than three years, we may notify you in writing, that if you file a third claim during the three year period, we may refuse to renew this policy by providing you proper notice of our refusal to renew as provided in d. below. If we do not notify you after the second claim, we may not refuse to renew this policy because of losses.

A claim does not include a claim that is filed but is not paid or payable under the policy.

d. If we refuse to renew this policy, we must deliver to you, or mail to you at your mailing address shown on the declarations page and any mortgagee named in the declarations page, written notice of our refusal to renew not later than the 30th day before the date on which this policy expires. Proof of mailing will be sufficient proof of notice. If we fail to give you proper notice of our decision not to renew, you may require us to renew the policy.

7. Assignment. Assignment of this policy will not be valid unless we give our written consent.

8. Subrogation. An insured may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an <u>insured</u> must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9.  Death. If the named insured dies, we insure:

a.  the named insured's spouse, if a resident of the same household at the time of death.

b.  the legal representative of the deceased. However, if this legal representative was not an <u>insured</u> at the time of death of the named insured, this policy will apply to such legal representative only with respect to the premises of the original named insured.

c.  any person who is an <u>insured</u> at the time of such death, while a resident of said premises.

HO-B

PROP *E10004200061257014681916*

Policy Number:                              Your Agent:
For Premium Period Effective:

# RESIDENCE GLASS COVERAGE

## ENDORSEMENT NO. HO-105
### Effective July 8, 1992

The terms and conditions of this endorsement apply only to the property described in this endorsement.
None of the terms, conditions and limits of liability stated in the policy apply to this endorsement except the
Waiver or Change of Policy Provisions, Cancellation, Assignment, Subrogation and Definitions.

This insurance applies to: (check the box(es) that applies)

☐  Unscheduled Glass;

☐  Scheduled Glass described in the schedule below;

   while in or on the dwelling or other structures on the <u>residence premises</u>.

1.  **Residence Glass Coverage.** We will pay for damages to residence glass caused by breakage of or by
    chemicals applied to such glass if:

    a.  described in the schedule below.

    b.  permanently attached to the dwelling or other structures on the <u>residence premises</u>, including
        storm windows and doors not permanently attached.

    We will also pay for making temporary repairs, resulting damage to encasing frames, and removing or
    replacing obstructions because of a covered loss to glass.

2.  **Exclusions.** We will not pay for loss or damage caused by:

    a.  fire.

    b.  war. This includes undeclared war, civil war, insurrection, rebellion or revolution or any
        consequence of these.

    c.  nuclear reaction, nuclear radiation or radioactive contamination or any consequence of these.

Prescribed by the State Board of Insurance                                      Page 1
Endorsement No. HO-105 — Residence Glass Coverage — Effective July 8, 1992



---

Policy Number:                    Your Agent:
For Premium Period Effective: .

3.  Loss Settlement.

   a.  Unscheduled Residence Glass. We will not pay more than:

      (1)  $100 for all damage in any one occurrence for each of the following objects:

         (a)  multiple plate insulating unit;
         (b)  radiant heating panels;
         (c)  conservatory or greenhouse glass;
         (d)  chandeliers or light fixtures;
         (e)  jalousies, louvers or shutters;
         (f)  venetian type doors or windows;
         (g)  stained or leaded glass; or
         (h)  glass bricks, shingles or other structural glass.

      (2)  $100 for any one pane or plate of glass comprising any other object not listed in 3.a.(1) above.

   b.  Scheduled Residence Glass. We will not pay more than the smallest of the following:

      (1)  actual cash value of the property at the time of the loss;

      (2)  the cost to repair the damaged property with like kind and quality or replace the glass with safety glazing material when required by ordinance or law; or

      (3)  the limit of liability stated in the schedule below.

   c.  Pair or Set. If loss to an article which is part of a pair or set occurs, we will measure that loss at a reasonable and fair proportion of the total value of the pair or set giving consideration to the importance of the article.

     We will not pay a total loss to the pair or set when the loss is to an article that is part of a pair or set.

   d.  We may pay for the loss in money or may repair or replace the property. Any property we pay for or replace will become our property.

Prescribed by the State Board of Insurance                    Page 2
Endorsement No. HO-105 — Residence Glass Coverage — Effective July 8, 1992

Policy Number.                         Your Agent:
For Premium Period Effective:

## SCHEDULED RESIDENCE GLASS

| Number in Plates | Length in Inches | Width in Inches | Description of Glass, Lettering and Ornamentation; Position in Building. The glass in plain flat glass with all edges set in frames, unless otherwise stated herein. | Specific Limit (if any) | Premium |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Total Scheduled Glass Premium $

4.  **Your Duties After Loss.** In case of loss to covered property, you must:

    a.  give prompt written notice to us.

    b.  file a proof of loss at our request, on forms that we provide. If we request a proof of loss, we must request it not later than the 15th day after we receive your written notice. We may require this filing of proof of loss to be under oath.

5.  **Action Against Us.** There can be no action against us unless you have complied with all the terms of this policy.

6.  **Other Insurance.** If a loss covered under this endorsement is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this endorsement bears to the total amount of valid and collectible insurance covering the loss.

Prescribed by the State Board of Insurance                                      Page 3
Endorsement No. HO-105 — Residence Glass Coverage — Effective July 8, 1992



Policy Number:                          Your Agent:
For Premium Period Effective:

# REPLACEMENT OF
# PERSONAL PROPERTY

## ENDORSEMENT NO. HO-101
### Effective October 2, 1993

SECTION I PROPERTY COVERAGE

For an included additional premium, our limit of liability and payment for covered loss to:

1.  personal property; and

2.  wall-to-wall carpeting and cloth awning (Forms HO-B & HO-C only);

is extended to include Replacement Cost. Replacement Cost means there will not be a deduction for depreciation. Payment will not exceed the smallest of the following:

    a.  the Coverage B (Personal Property) limit of liability;

    b.  the replacement cost at the time of loss;

    c.  for property that is repairable, the cost of repair with material of like kind and quality with no deduction for depreciation; or,

    d.  the interest of the <u>insured</u>.

We do not pay replacement cost for:

    a.  property which cannot be replaced.

    b.  property not maintained in good or workable condition.

    c.  property that is either obsolete or useless to the <u>insured</u> at the time of loss.

    d.  watercraft including outboard motors for any replacement cost in excess of $2,500.

        We will pay replacement cost of watercraft including outboard motors up to a limit of $2,500.

Prescribed by the State Board of Insurance                                    Page 1
Endorsement No. HO-101 — Replacement of Personal Property — Effective October 2, 1993



Policy Number:                          Your Agent:
For Premium Period Effective:

   e.   Property that is not repaired or replaced.

Loss Settlement:

   a.   We will pay you:

       1.   the replacement cost of your damaged property up to $1,500; and

       2.   the actual cash value of your remaining damaged property within 5 business days after we notify you that we will pay the claim.

       If you repair or replace the damaged property, you may make claim for reimbursement on a replacement cost basis for the replacement cost of your property exceeding $1,500. You must repair, restore or replace the property within 365 days after the loss. Reimbursement will be made within 5 business days after we receive proof that the property has been repaired, restored or replaced.

   b.   In lieu of (a.) above, we may offer and you may accept or reject our offer to provide a replacement item of like kind and quality for your damaged property.